# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION

| | | |
|---|---|---|
| **TEX CHRISTOPHER, in his capacity as a community leader, TRACY SHANNON, Mass Resistance Houston Division, PASTOR CALVIN MILLER, founder of 1 Team 1 Fight Ministries, LT MARK CHRISTOPHER SEVIER, De Facto Attorney Generals and Special Forces Of Liberty,**<br><br>**V.**<br><br><br>**RHEA LAWSON, Ph.D., Executive Director Of The Houston Public Library, SYLVESTER TURNER, in his official capacity as Mayor of Houston** *Defendants* | | United States Courts<br>Southern District of Texas<br>**FILED**<br><br>OCT 25 2018<br><br>David J. Bradley, Clerk of Court<br><br>**Case No: 4:18-cv-03943**<br><br><br>**Before Honorable Chief Judge Rothenthal** |

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFF TEX CHRISTOPHER'S MOTION FOR RECONSIDERATION ON THE MOTION FOR A TEMPORARY RESTRAINING ORDER JOINED BY PLAINTIFF SEVIER</u>

### ORAL ARGUMENT REQUESTED

https://www.chron.com/news/houston-texas/houston/article/Judge-rejects-conservative-Christian-group-s-13334135.php

Marriageretorationact.com

Understanding the Marriage And Constitution Restoration Act
https://youtu.be/VhFM-Hg7298
What is the Lemon Test?
https://youtu.be/_hYslZWsjxA
Religion of Secular Humanism
https://youtu.be/TeSM7cbXSEI

**Banks, Gabrielle** <Gabrielle.Banks@chron.com>

Wed, Oct 24, 2018 at 5:07 PM
**Subject:** Drag Queen Story Hour Lawsuit

To: Special Forces Of Liberty <ghostwarsmusic@gmail.com>

I'd welcome a comment on the denial of the injunction today by Judge Rosenthal. Could you tell me how many city libraries you have sued? Is this the first? Also I'm assuming this is Chris Sevier, of laptop fame, yes? Can you remind me where you live and how old you are?

## TABLE OF CONTENTS

I. INTRODUCTION
.......................................................................................................1

II. "IF THIS, THEN THAT" APPLYING LIBERAL LOGIC
.......................................................................................................5

Fundamental Right For Polygamists And Machinists Too Or It Is A Sham
.......................................................................................................8

Individual Right For Polygamists And Machinists Too Or It Is A Sham
.......................................................................................................8

Existing Right For Polygamists And Machinists Too Or It Is A Sham
.......................................................................................................9

Intimate Choice For Polygamists And Machinists Too Or It Is A Sham
.......................................................................................................9

Sexual Orientation Is A Protected Class For All Individuals Or It Is A Sham
.......................................................................................................10

Irrelevant Emotion Appeals To Impose Gay Marriage Is Undone By *Holloman*
.......................................................................................................11

III. GAY MARRIAGE AND DRAG QUEEN STORYTIME VIOLATES THE *LEMON* TEST
.......................................................................................................12

A.  PRONG ONE: LEGALLY IMPOSED GAY MARRIAGE AND DRAG QUEEN STORY TIME ARE A NON-SECULAR SHAM IN EVERY RESPECT
.................................................................................................................13

(1) THE MISUSE OF SUBSTANTIVE DUE PROCESS TO IMPOSE GAY MARRIAGE ON ALL 50 STATES IS A NON-SECULAR SHAM FOR THE PURPOSES OF THE ESTABLISHMENT CLAUSE
.................................................................................................................17

(2)  THE MISUSE OF THE EQUAL PROTECTION CLAUSE IS A SHAM
.................................................................................................................20

B.  PRONG TWO: GAY MARRIAGE HAS THE EFFECT OF ESTABLISHING SECULAR HUMANISM
.................................................................................................................23

C.  PRONG THREE:  GAY MARRIAGE AND DRAG QUEEN STORY HOUR PROMOTES EXCESSIVE ENTANGLEMENT
.................................................................................................................25

The Unbalanced Distribution Of The Constellation of Benefits Exclusively To Self-Identified Homosexuals Discriminates Against "Religion And Religion" And Entangles Government with The Religion of Secular Humanism In Violation Of Prong III Of *Lemon*
.................................................................................................................28

IV.  MAN-WOMAN MARRIAGE IS SECULAR AND THEREFORE NOT CHALLENGED UNDER THE ESTABLISHMENT CLAUSE
.................................................................................................................29

VI.  CONCLUSION
.................................................................................................................32

**TABLE OF CASES**
*ACLU v. Rabun Cnty. Chamber of Commerce, Inc.,*
698 F.2d 1098 (11th Cir. 1983)
.................................................................................................................14

*Agostini v. Felton,*
521 U.S. 203 (1997)
.................................................................................................................13

*Americans United for Separation of Church &. State v. Prison Fellowship Ministries,.*
432 F. Supp. 2d 862 (S.D. Iowa 2006)
.................................................................................................................9

*Am. Atheists, Inc. v. City of Starke,*
2007 U.S. Dist. LEXIS 19512 (M.D. Fla. 2007)
.................................................................................................................20

*Baehr* v. *Lewin*, 74 Haw.
852 P. 2d 44 (1993)
.................................................................................................................34

*Baker v. Nelson,*
409 U.S. 810 (1972)

........................................................................................4

*Blazer v. Black,*
196 F.2d 139 (10th Cir. 1952)
........................................................................................1

*Brenner v. Scott,*
2014 WL 1652418 (2014)
........................................................................................4

*Bowers v. Hardwick,*
478 U. S. 186 (1986)
........................................................................................12, 16

*Bookcase, Inc. v. Broderick,*
18 N.Y.2d 71, 271 N.Y.S.2d 947, 218 N.E.2d 668, (1966)
........................................................................................19

*Brown* v. *Buhman,*
947 F. Supp. 2d 1170 (Utah 2013)
........................................................................................6

*Church of the Holy Trinity v. United States,*
143 U.S.457 (1892)
........................................................................................27

*Church of Scientology v. City of Clearwater,*
2 F.3d 1514 (11th Cir. 1993)
........................................................................................20

*City of Boerne v. Flores,*
521 U.S. 507 (1997)
........................................................................................24

*Clark v. Associates Commercial Corp.,*
149 F.R.D. 629 (D. Kan.1993)
........................................................................................1

*Center for Inquiry, Inc. v. Marion Circuit Court Clerk,.*
758 F.3d 869 (7th Cir. 2014)
........................................................................................15

*Cervelli v. Aloha Bed & Breakfast,*
No. 11–1–3103–12 ECN (Haw. Cir. Ct. Dec. 19, 2011)
........................................................................................25

*Cleveland Bd. of Ed.* v. *LaFleur,*
414 U.S. 632 (1974)
........................................................................................3, 8

*Cnty. of Allegheny v. ACLU,*
492 U.S. 573 (1989)
........................................................................................13

*District Attorney's Office for Third Judicial Dist.* v. *Osborne,*
557 U.S. 52 (2009)
........................................................................................18

*Dred Scott v. Sandford,*
60 U.S. 393 (1857)

............................................................................................18

*Duffy v. State Personnel Board,*
232 Cal. App. 3d. 1 (Cal. App. 1991)
............................................................................................12

*Edwards v. Aguillard,*
482 U.S. 578 (1987)
............................................................................12, 13, 14, 27

*Elane Photography, LLC v. Willock,*
2013 N.M. Lexis 284 (N.M. 2013)
............................................................................................25

*Flast v. Cohen,*
392 U.S. 83 (1968)
..............................................................................................2

*Gadling-Cole v. West Chester University,*
868 F.Supp.2d 390 (E.D. PA. 2012)
............................................................................................25

*Ginsberg v. New York,*
390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968)
............................................................................................19

*Glassroth v. Moore,*
335 F.3d 1282 (11th Cir. 2003)
............................................................................................26

*Goodridge v. Department of Public Health,*
440 Mass. 309, 798 N. E. 2d 941 (2003)
............................................................................................11

*Hein v. Freedom from Religion Foundation,*
551 U.S. 587 (2007)
..............................................................................................2

*Holloman v. Harland,*
370 F.3 1252 (11th Cir. 2004)
............................................................................4, 10, 11, 12

*Indiana Civil Liberties Union v. O'Bannon,*
259 F.3d 766 (7th Cir. 2001)
............................................................................................23

*In re Young,*
141 F.3d 854 (8th Cir 1998)
............................................................................................25

*Kitchen v. Herbert,*
755 F. 3d 1193 (CA 10 2014)
..............................................................................................4

*Lader v . Dahlberg,*
2 F.R.D. 49 (S.D.N.Y.1941)
..............................................................................................1

*Lann v. Hill,*
436 F. Supp. 463 (W.D. Okla. 1977)

..................................................................................1

*Larkin v. Grendel's Den,*
459 U.S. 116 (1982)

..................................................................................23

*Lawrence v. Texas,*
539 U.S. 558 (2003)

.........................................................................3, 16, 19, 22

*Lee v. Weissman,*
505 U.S. 577, 627, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)

...................................................................................13, 27, 29

*Lemon v. Kurtzman,*
403 U.S. 602 (1971)

..................................................................................13

*Loving* v. *Virginia,*
388 U.S. 1 (1967)

.........................................................................8, 9, 11, 22, 23

*Maynard* v. *Hill,*
125 U.S. 190 (1888)

..................................................................................28, 34

*McDonald v. Santa Fe Trail Transp. Co.,*
427 U.S. 273, 96 S. Ct. 2574, 49 L. Ed. 2d 493 (1976)

..................................................................................21

*McCreary Cnty, Ky. v. ACLU of Ky.,*
545 U.S. 844 (2005)

...................................................................................14, 29

*Meyer* v. *Nebraska,*
262 U.S. 390 (1923)

..................................................................................8

*Mishkin v. State of New York,*
383 U.S. 502, 86 S. Ct. 958, 16 L. Ed. 2d 56 (1966)

..................................................................................19

*Miller v. California,*
413 U.S. 15 (1973)

..................................................................................16

*Miller v. Davis,*
123 F. Supp. 3d 924 (E.D. Ky. 2015)

..................................................................................25

*M. L. B.* v. *S. L. J.,*
519 U.S. 102 (1996)

..................................................................................8, 14

*Moore* v. *East Cleveland,*
431 U.S. 494 (1977)

..................................................................................18

*Moore v. Judicial Inquiry Commission of the State of Alabama,*
200 F. Supp. 3d 1328 (M.D.Ala. 2016)

.................................................................................................................25

*Northwest Austin Municipal Util. Dist. No. One v. Holder,*
557 U.S. 193 (2009)
.................................................................................................................12

*New York Trust Co. v. Eisner,*
256 U.S. 345 (1921)
.................................................................................................................12

*Obergefellv.Hodges,*
135 S.Ct. 2584 (2015)
.......1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 13, 14, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31

*Patterson v. Indiana Newspapers*, Inc.,
589 F.3d 357 (C.A.7 (Ind.) 2009)
.................................................................................................................25

*Paris Adult Theatre I v. Slaton,*
413 US 49, at 63 (1973)
.................................................................................................................20

*Planned Parenthood of Southeastern Pa. v. Casey,*
505 U.S. 833 (1992)
.................................................................................................................15

*Poe v. Ullman,*
367 U.S. 497 (1961)
.................................................................................................................20

*Reno* v. *Flores,*
507 U.S. 292 (1993)
.................................................................................................................17

*Real Alternatives, Inc. v. Burwell,*
150 F. Supp. 3d 419 (M.D. Pa. 2015)
.................................................................................................................15

*Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.,*
2017 WL 3324690 (3d Cir. Aug. 4, 2017)
.................................................................................................................15

*Roe v. Wade,*
410 U.S. 113 (1973)
.................................................................................................................10, 18

*School Dist. v. Ball,*
473 U.S. 373 (1985)
.................................................................................................................23

*Skinner* v. *Oklahoma ex rel. Williamson,*
316 U.S. 535 (1942)
.................................................................................................................8

*Sevier v. Brown,*
17-cv-5046 (N.D. Cal. 2017)
.................................................................................................................26

*Sevier v. Lowenthal*
17-cv-570 (D.C. Cir 2017)

......................................................................................26

*State v. Holm*,
137 P.3d 726 (Utah 2006)
......................................................................................31

*Snyder* v. *Massachusetts*,
291 U.S. 97 (1934)
......................................................................................17

*Torcaso v. Watkins*,
367 U.S. 488 (1961)
......................................................................2, 11, 14, 20, 24

*Turner* v. *Safley*,
482 U.S. 78 (1987)
......................................................................................8

*Troxel* v. *Granville*,
530 U.S. 57 (2000)
......................................................................................18

*Trunk v. City of San Diego*,
629 F.3d 1099 (9th Cir. 2011)
......................................................................................20

*United States v. Richardson*,
418 U.S. 166 (1974)
......................................................................................2

*United States* v. *Salerno*,
481 U.S. 739 (1987)
......................................................................................18

Wallace v. Jaffree,
472 U.S. 38 (1985)
......................................................................................23

*Washington Ethical Society v. District of Columbia*,
101 U.S. App. D.C. 371, 249 F.2d 127 (1957)
......................................................................................14

*Washington* v. *Glucksberg*,
521 U.S. 702(1997)
......................................................................................17

*Westchester Day School v. Village of Mamaroneck*,
504 F.3d 338 (2d Cir. 2007)
......................................................................................26

*Zablocki v. Redhail*,
434 U.S. 374 (1978)
......................................................................................8

**Other Rules And Statutes**
Fed. R. Civ. P 8(e)(2)
......................................................................................1

See Bennett, Polyamory: The Next Sexual Revolution? Newsweek, July 28, 2009 (estimating
500,000 polyamorous families in the United States)

................................................................................6

  Li, Married Lesbian "Throuple" Expecting First Child, N. Y. Post, Apr. 23, 2014
................................................................................6

Otter, Three May Not Be a Crowd: The Case for a Constitutional Right to Plural Marriage, 64
Emory L. J. 1977 (2015)
................................................................................6

Encyclopaedia of the Social Sciences, 293; J. Archer, Faiths Men Live By 120—138, 254—313
(2d ed. revised by Purinton 1958)
................................................................................14

Stokes & Pfeffer, supra, n. 3, at 560. Welsh v. U.S, 1970398 U.S. 333 (U.S. Cal. June 15)
................................................................................14

Judicial Improvements Act of 2002
................................................................................23

Art. I, § 2, cl. 5
................................................................................23

18 U.S.C. § 2381
................................................................................23

# I.    INTRODUCTION

NOW COMES, Plaintiff Tex Christopher, joined by Plaintiff Chris Sevier Esq., a former Judge

Advocate General, pursuant to FRCP 59, 54, and 60 seeking reconsideration of their motion for

temporary restraining order, asking that this Court have the common sense and integrity to do

what the Western District of Louisiana did and shut down the Drag Queen Storytime during the

"duration of the litigation." The Court has no basis for not issuing the restraining order because

the Court has no basis for denying the restraining order - see DE 24 and DE 25.  Judicial game

playing and judicial laziness is not going to be tolerated in this case.  Judge Rosenthal's

substanceless and immoral decision combined with Gabriella Bank's intentional false reporting

on this case for the Houston Chronicle - alone - demonstrates that the Library's decision to

sponsor and promote Drag Queen Storytime for children is as much of a non-secular sham as the

State's policies that respect gay marriage. Good job Judge Rosenthal, your intentional abuse of

discretion have reporters false reporting on a very real case that parallels an action in another

state within the 5th Circuit where the Court is taking the opposite approach.  After nearly three

decades on the bench, the Plaintiffs would expect Judge Rosenthal to have learned by now that

"who is making the argument" is not as important as "what is being argued." The Plaintiffs have

filed a cause of action where they are seeking to protect children, defend the integrity of the civil

rights movement lead by Pastor Martin Luther King Jr, and to restore the rule of law that has

been substantially violated by dishonest judicial activists. It is not just that the Plaintiffs have a

zero tolerance policy towards any judicial activism in this action, it is that the members of the

Senate Judiciary committee who Plaintiff Sevier reports back to direct do. The Plaintiffs are not

sure what it is about Houston, but there is a spirit of the air here where many Judicial actors feel that they can act above the rule of law with impunity.

In the face of watertight motions for temporary restraining orders - after the Plaintiffs working very hard to dot every "i" and cross every "t" in seeking injunctive relief - Judge Lee H. Rosenthal managed to totally and completely abuse her discretion by denying the motions with a single sentence: " There is no basis to support the requested relief." Next time, the Court should just write "There is no basis to support the requested relief because I am intentionally abusing my discretion in the hopes of creating an internal circuit split so that this case can make its way to United States Supreme Court where a 5 to 4 conservative majority awaits." That way the Court will not be exposing Gabriella Banks and the Houston Chronicle to civil liability in the Court of competent jurisdiction.

On October 22, 2018, the well known self-identifed homosexual Mayor announced to Channel 11 news that the case was "frivolous because the case was frivolous." Judge Lee Rosenthal's per se dishonest feeling that "there was no basis to support the request" was the same kind of circular reasoning that the well known homosexual mayor managed to float in step with his entitlement syndrome and contempt for his duties under Article VI of the United States Constitution. After nearly three decades on the bench, Plaintiff Sevier and Plaintiff Christopher expect Judge Lee Rosenthal to know the objective difference between right and wrong, real and fake, and secular and non-secular. Apparently she does not. With President Trump in office, this kind of flagrant judicial tyranny is not something that is going to be tolerated by the United States any more.

Whether any of us like it or not, this case presents itself as a serious emergency. There are no disputed facts, and the validity of the Court is as equally on trial as the pathetic Mayor. The Plaintiffs are taxpayers who have been persecuted by the LGBTQ church relentlessly. The Defendants are enforcing policies that respect LGBTQ orthodoxy and are excessively entangling the government with the religion of Secular Humanism. The Plaintiffs have a logical nexus as taxpayers to stop the government from enforcing any policy that respects LGBTQ orthodoxy. The Defendants have a duty under Article VI to uphold the United States Constitution by not enforcing policies that violate the Establishment Clause. Under the Free Exercise Clause of the First Amendment of the United States Constitution, the Plaintiffs content than anyone has the right to self-identify as anything they would like, they can have wedding ceremonies, and they can live as married people do. The Plaintiffs have no objection to Drag Queen Story Hour being hosted at a private facility, as long as the government does not endorse the event.

Despite the Mayor's verifiable irrational worldview, the First Amendment Establishment Clause is the kryptonite to the government's endorsement of identity policies. Identity politics are not matters of politics. Identity politics is a matter of religion. While the Free Exercise Clause allows all individuals to assume any identity narrative they want, the Establishment Clause requires that the State and Federal government get out of the parody marriage business and to completely and totally disentangle itself from the LGBTQ religion. In filing this case, the Plaintiffs have been subjected to a series of threats. This is a case where the Plaintiffs are asking an Article III Court to interpret the Constitution as it was written and to stop attempting to rewrite the Constitution to placate the unexamined assumption of the superiority of our cultural moment.

On the one hand, like *Obergefellv.Hodges,* 135 S.Ct. 2584 (2015), "this case [indirectly] concerns only what States may do under the Constitution" in determining (1) how the Constitution permits the States to legally define marriage and (2) which types of marriages the States can legally recognize. On the other hand, this case goes far beyond that causing all policies that respect LGBTQ ideology to be instantly invalidated. If the Court is too chicken to do so, the legislatures will by the introduction and passing of the Marriage And Constitution Restoration Act.

Self-identified polygamists have the right to file a lawsuit to seek "marriage equality" if this Court is going to continue to impose the dishonest charade that the LGBTQ ideology is not religious in nature. Accordingly, this is a de facto "if not this, then that" lawsuit that goes far beyond the Library's moronic and unconstitutional decision to sponsor, authority, promote, and endorse the Drag Queen Storytime. If the Establishment Clause does not ultimately cause the State to be enjoined from legally recognizing and respecting non-secular parody marriages and from enforcing pro-gay policies, then self-identified polygamists warrant the same right to host polygamy story time and to legally marry based on their obscene identity narrative under the Equal Protection and Due Process Clause of the Fourteenth Amendment. Either way, the current legal definition of marriage and the State's decision to only legally respect one form of non-secular parody marriage is wildly unconstitutional from every angle. The bottom line is that government actors should be ashamed of themselves and purged from office through any lawful means necessary for entangling the government with LGBTQ identity politics in total violation of the Establishment Clause of the First Amendment of the United States Constitution. The very idea that Judge Rosenthal feels that she is entitled to make serious rulings without a single

explanation is the kind of imperialism that is grounds for impeachment. This is especially true when the Court is being asked to make a decision to bother to interpret the Constitution. If any government actor by now cannot see that homosexual and transgender orthodoxy is immoral or that it erodes community standards of decency, they are objectively unfit to serve in office for a lack of character fitness based on an objective standard.

Under their Establishment Clause claims, the Plaintiffs brought a cause of action in which they have standing under *Flast v. Cohen*, 392 U.S. 83 (1968) where they contend that legally recognized gay marriage, transgender policies, and sexual orientation discrimination statutes are (1) "not secular shams" that (2) have the effect of creating indefensible legal weapons against non-observers of the religion of Secular Humanism and that (3) have the effect of excessively entangling the government with the religion Secular Humanism. That is, the government's enforcement of pro-gay policies, to include Drag Queen Story Hour, fail every prong of the *Lemon* and Coercion tests and, therefore, violate the Establishment Clause.[1] The testimony of

---

[1] For purposes of standing, the Plaintiffs have standing under their Establishment Clause claims as taxpayers under *Flast v. Cohen*, 392 U.S. 83 (1968) despite the plausibility of their self-asserted sex-based identity narrative. The general rules regarding standing to challenge governmental actions are designed to ensure that courts are addressing actual cases that can be resolved by the judicial system. However, in some circumstances, individuals may seek to challenge governmental actions for which neither those individuals nor any other individuals could meet standing requirements. Indeed, the Supreme Court has noted that in some instances "it can be argued that if [someone with a generalized grievance] is not permitted to litigate this issue, no one can do so." *United States v. Richardson,* 418 U.S. 166 (1974) Generally, the Court has noted, "lack of standing within the narrow confines of Art. III jurisdiction does not impair the right to assert [one's] views in the political forum or at the polls." However, the ability of individuals to affect change through political and democratic means does not eliminate all cases where a large group of individuals would be affected by the challenged governmental action. In particular, the Court has specifically allowed taxpayer standing for claims arising under the Establishment Clause. Under the *Flast* exception to the general prohibition on taxpayer standing, taxpayers may raise challenges of actions exceeding specific constitutional limitations (such as the Establishment Clause) taken by Congress under Article I's Taxing and Spending Clause which is applicable to the states under the Fourteenth Amendment. *Flast v. Cohen,* 392 U.S. 83 (1968). These exceptions, the Court has explained, result because the Establishment Clause is a constitutional limit on the government's ability to act. According to the Court, the framers of the Constitution feared abuse of governmental power that might result in favoring "one religion over another." *Flast,* 392 U.S. at 103-04. It is difficult to imagine circumstances in which potential abuses of the Establishment Clause could be enforced without this exception.

ex-gays, persecute christians, medical experts, and licensed ministers conclusively shows that there is no real proof of a gay gene, that sexual orientation is not predicated on immutability, and that sexual orientation is a dogma, doctrine, and mythology that is inseparably linked to the religion of Secular Humanism, and here is the kicker, the United States Supreme Court has already recognized that Secular Humanism is a religion for the purposes of the First Amendment Establishment Clause in *Torcaso v. Watkins*, 367 U.S. 488 (1961) and reaffirmed in *Edwards v. Aguillard*, 482 U.S. 578 (1987). See also *Washington Ethical Society v . District of Columbia,* 101 U.S. App. D.C. 371, 249 F.2d 127 (1957); 2 Encyclopaedia of the Social Sciences, 293; J. Archer, Faiths Men Live By 120—138, 254—313 (2d ed. revised by Purinton 1958); Stokes & Pfeffer, supra, n. 3, at 560. *Welsh v . U.S*, 1970398 U.S. 333 (U.S. Cal. June 15). Now that the Justice Kennedy has stepped down, the entire effort by self-identified homosexuals to hijack the government to endorse their religion is going to implode, even if Judge Rosenthal thinks it is smart to abuse her discretion in this case.  The legislatures can see through the kind of Judicial tyranny that she has managed to memorialize in the record with a straight face, while at the same time failing to appreciate the implication that the Western District of Louisiana enjoined the Library there from having the exact event that the Plaintiffs are complaining of. The Plaintiffs remind Judge Lee Rosenthal that Louisiana and Texas are both part of the United States and that the United States is a Constitutional Republic and not a country that is government by dishonest judicial fiat. President Obama is no longer in office after all.

 The First Amendment Establishment Clause balanced with the Free Exercise Clause informs the State and Federal government how to respond to marriage requests of all kinds that do not involve a man and a woman and how to react to self-asserted sex-based identity narratives

that are questionably real, moral, and have a tendency to erode community standards of decency. Judge Lee Rosethal has zero basis to support a position that suggests otherwise. LGBTQ speech is not really protect free speech any more than calls by Islamists for immediate acts of violence against infidels is either. LGBTQ speech is harmful unprotect obscene speech that is inappropriate to expose minors to and it is completely subversive to human flourishing - see the suicide rates of LGBTQ teens.[2] While there has been no landrush in the wake of *Obergefell* on gay marriage, there has been a landrush by Secular Humanists to persecute Christians. Judge Lee Rosenthal has "no basis to support" a position to the contrary. There has been a landrush for self-identified homosexuals and their sympathizers to infiltrate public schools and public libraries with the sole purpose of using government asserts to proliferate credibility and to facilitate the indoctrinating minors to a religious worldview on sex, faith, marriage, and morality that was basically illegal until recently and that remains illegal in many modern well developed nations for good cause shown. Judge Lee Rosenthal's feeling that it is ok to just allow that unconstitutional misconduct to persist with impunity is per se grounds for impeachment by Senate oversight. Judge Lee Rosenthal has "no basis" to suggest otherwise.

Second, if *Obergefell* is good law and not just a thuggish act to gangerize the judiciary through fraud - which it is - then self-identified polygamists, zoophiles, objectophiles warrant the same "existing," "fundamental," and "individual" right to marry based on their "personal choice"

---

[2] "Obscenity is not within the area of protected speech or press." *Court v. State*, 51 Wis. 2d 683, 188 N.W.2d 475 (1971) vacated, 413 U.S. 911, 93 S. Ct. 3032, 37 L. Ed. 2d 1023 (1973) and abrogated by *State v. Petrone*, 161 Wis. 2d 530, 468 N.W.2d 676 (1991);; *State v. Weidner*, 2000 WI 52, 235 Wis. 2d 306, 611 N.W.2d 684;; *Ebert v. Maryland State Bd. of Censors*, 19 Md. App. 300, 313 A.2d 536 (1973). Obscenity is not protected expression and may be suppressed without a showing of the circumstances which lie behind the phrase "clear and present danger" in its application to protected speech. *Roth v. United States*, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498. *United States v. Gendron*, S24:08CR244RWS(FRB), 2009 WL 5909127 (E.D. Mo. Sept. 16, 2009) report and recommendation adopted, S2 4:08CR 244 RWS, 2010 WL 682315 (E.D. Mo. Feb. 23, 2010);; *Chapin v. Town of Southampton*, 457 F. Supp. 1170 (E.D.N.Y. 1978);; *Sovereign News Co. v. Falke*, 448 F. Supp. 306 (N.D. Ohio 1977);; *City of Portland v. Jacobsky*, 496 A.2d 646 (Me. 1985)

and "personal autonomy" in step with their self-asserted sex-based identity narrative to the same

extent that self-identified homosexuals are afforded by the Secular Humanists Justices who were

in the majority in *Obergefell*.[3] Judge Rosenthal has "no basis" to suggest otherwise. If precedent

applies under *Obergefell* to all individuals who seek to enter into a parody marriage based on

their sexual orientation, then self-identified polygamists and objectophiles are certainly entitled

to enter into a different kind of parody marriage in accordance with their self-asserted sex-based

identity narrative just as self-identified homosexuals are. Id. If self-identified transvestites are

authorized to hijack the children's library to put on Drag Queen Storytime, the self-identified

polygamists to put on Polygamists story time. To avoid any confusion, here is the holding in

*Obergefell*:

"These considerations lead to the conclusion that the right to marry is a fundamental right
inherent in the liberty of the person, and under the Due Process and Equal Protection Clauses of
the Fourteenth Amendment couples of the same-sex may not be deprived of that right and that
liberty. The Court now holds that [self-identified homosexuals] may exercise the fundamental
right to [legally] marry. No longer may this liberty be denied to them. *Baker* v. *Nelson* must be
and now is overruled, and the State laws challenged by Petitioners in these cases are now held
invalid to the extent they exclude [self-identified homosexuals] from civil marriage on the same
terms and conditions as opposite- sex couples [in a secular marriage]." *Obergefell* at 22-23.

If precedent controls, then "the conclusion" that this Court must reach is that "the right to marry

is a fundamental right inherent in the liberty of the person, and under the Due Process and Equal

Protection Clauses of the Fourteenth Amendment [self-identified objectophiles, zoophiles, and

polygamists] may not be deprived of that right and that liberty." Id. An polygamist is a "person"

with the same "liberty," "dignity," "autonomy" interests as self-identified homosexuals, if

---

[3] *Obergefell*, 192 L. Ed. 2d 609 1-28. *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978) (fundamental right); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 63940 (1974) (personal choice); *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (existing right/individual right); *Lawrence v. Texas*, 539 U.S. 558 (2003) (intimate choice)

*Obergefell* is good law. Id. But it is not good law and neither is Judge Rosenthal's flagrantly

abusive order that lacks a single sentence justifying her elist order. If the Library can host the

Drag Queen Storytime, it follows that self-identified polygamists cannot "be deprived of" the

right to legally marry in step with their self-asserted sex-based identity narrative as a matter of

"liberty" and partner with the Library to put on their obscene display in the children's divisio of

the Library. Id. Judge Rosenthal has "no basis to say otherwise." If Judge Rosenthal was a

serious jurists she would have to acknowledge that any attempts for the state to limit marriage to

two consenting adults is a state law policy that is preempted by the Substantive Due Process and

Equal Protection Clauses of the Fourteenth Amendment. But "Houston, we have a problem!"

While the Secular Humanist on the bench in *Obergefell* can perhaps collude and scheme with

other Secular Humanist litigants and atheists on the lower courts to overturn *Baker v. Nelson*,

409 U.S. 810 (1972) through a series of emotionally charged dishonest imperialistic power plays

in the hopes that no one would notice of blow the whistle, the Secular Humanists on the Supreme

Court cannot overturn the Establishment Clause nor sneak around it by camouflaging unproven

truth claims stemming from the religion Secular Humanism as if they were actually "secular"

and non-religious, when they are not. Judge Rosenthal's dishonest decision to suggest that there

was no basis to grant the relief demand of the Plaintiffs is clearly an immoral attempt to pervert

justice and endanger children as the result of a deliberate refusal to think logically.

    The series of irrelevant and emotionally exploitative appeals floated by the LGBTQ

lobby and ratified by the Majority in *Obergefell* to justify the imposition government's

entanglement with the LGBTQ church and the imposition of the most popular form parody

marriage on all 50 states is invalidated by the Establishment Clause under the analysis in

*Holloman v. Harland*, 370 F.3 1252 (11th Cir. 2004).[4] Jude Lee Rosenthal's dishonest order on

October 24, 2018 is the very kind of emotional arrogance that is invalidated by clear

Establishment Clause jurisprudence. Because all self-asserted sex-based identity narratives that

are questionably moral, legal, and real have nothing to do with the Equal Protection and Due

Process Clauses, the Article III courts that entertained the action lacked subject matter

jurisdiction in *Obergefell* and *Windsor*, which means that Stare Decisis does not apply nor does it

save *Obergefell* and *Windsor* from being overruled by implications presented by this watertight

case.[5] But this Court should not feel like it is under pressure, countless State and Federal

legislatures are mobilizing in force to ensure that all 50 states immediately get out of the parody

marriage business and disentangle itself with the LGBTQ church, which is anything but tolerant

and rife with intellectual darkness. The one thing that Drag Queen Story Hour that are set up by

the children's librarians prove is that the government's endorsement of gay marriage has been a

total disaster. Judge Lee Rosenthal has no basis to pretend otherwise and her invalid order that is

without any substance - alone - shows that gay marriage is an indefensible sham. The Supreme

Court already found that "questions which merely lurk in the record, neither brought to attention

of the court nor ruled upon, are not to be considered as having been so decided as to constitute

---

[4] In *Holloman*, a public school teacher defended a daily moment of silent prayer by arguing that she intended to teach students compassion, pursuant to a character education plan mandated by the State. Id. at 1285. The court concluded that this emotional explanation did not constitute a valid secular purpose because the teacher's most basic intent unquestionably was to offer her students an opportunity to pray. "While [the teacher] may also have had a higher-order ultimate goal of promoting compassion, we look not only to the ultimate goal or objective of the behavior, but also to the more immediate, tangible, or lower-order consequences a government actor intends to bring about." Id. The unmistakable message of the Supreme Court's teaching in *Holloman* is that the state cannot employ a religious means to serve an otherwise legitimate secular interests." Id. at 1286. The *Holloman* court further concluded that "a person attempting to further an ostensibly secular purpose through avowedly religious means is considered to have a Constitutionally impermissible purpose." Id., citing *Jagar v. Douglas County School*, 862 F.2d 824, 830 (11th Cir. 1989). ("An intrinsically religious practice cannot meet the secular purpose prong of the *Lemon* test.")
[5] *Obergefell* at 1-28

precedents." *Cooper Industries, Inc. v. Aviall Services, Inc.* 543 U.S. 157 (2004). The fact of the matter is that Establishment Clause claims were "lurking" in the record but undecided in *Obergefell*. The Court, here, is being asked to (1) act like a grown up, (2) stop putting form over substance, (3) act with integrity, (4) stop playing politics, and (5) turn back re-interpret the Constitution correctly now that the correct Constitutional narrative that has exclusive jurisdiction over the parody marriages is before it. Stare Decisis is at its weakest when the courts are being asked to interpret the Constitution.[6] The whole problem with *Obergefell* was that it was poisoned at the root: the wrong Constitutional narrative was being litigated at all times. This was insurmountably proven by Judge Hinkle in reaction to Plaintiff Sevier's motion to intervene in *Brenner v. Scott,* 2014 WL 1652418 (2014), when Judge Hinkle implicitly found that parody marriages were "removed from reality," which is another way of saying that "all parody marriages" are equally a matter of non-secular religious faith. Through the force of intellect and through the testimonials provided by ex-gays, the Plaintiffs drag the question of how the Constitution permits the States to define marriage out of the Fourteenth Amendment box kicking and screaming and place it into the First Amendment box, where it always belonged.[7] If Judge Rosenthal has an emotional problem with that and cannot do her job, she has no business serving on the bench. Period-full stop. The evidence shows that while there is no such thing as an

---

[6] "[Stare Decisis]is at its weakest when [the courts] interpret the Constitution because our interpretation can be altered only by constitutional amendment or by overruling our prior decisions." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 63, 116 S.Ct. 1114, 1127, 134 L.Ed.2d 252 (1996); Payne, supra, at 828, 111 S.Ct., at 2609-2610; *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 94, 56 S.Ct. 720, 744, 80 L.Ed. 1033 (1936) (Stone and Cardozo, JJ., concurring in result) ("The doctrine of stare decisis ... has only a limited application in the field of constitutional law").

[7] (DE 13 Lisa Boucher ¶¶ 1-10; DE 12 Quinlan ¶¶ 1-37; DE 21 Pastor Cothran ¶¶ 1-50; DE 14 Dr. King ¶¶ 1-20; DE 20 Dr. Cretella ¶¶ 1-20; DE 19 Goodspeed ¶¶ 1-20; DE 11 Grace Harley ¶¶ 1-25; DE 18 Pastor Cuozzo; ¶¶ 1-21; DE 10 Pastor Farr ¶¶ 1-33; DE 17 Pastor Penkoski ¶¶ 1-34; DE 15 Pastor Cairns ¶¶ 1-30;; DE 16 Christian Resistance ¶¶ 1-21; DE _ Special Forces Of Liberty ¶¶ 1-34). See Amicus Briefs of the Center For Garden State Families; the WW Bridal and the American Family Association of PA; National Alliance of Black Pastors; and the Coalition of Doctors Defending Reparative Therapy. .

ex-black person, there are thousands of ex-gays. That is, there is no such thing as "gay people;" there are only some people who "self-identify" as gay for some period of time. The Plaintiffs have the right to stop the government from endorsing the plausibility of self-asserted sex-based identity narratives that are questionably real, moral, and decent, since those identity narratives are non-secular. The evidence unequivocally shows that the First Amendment Establishment Clause has exclusive jurisdiction over all forms of parody marriage and whether the government can enforce policies that respect LGBTQ ideology. The individual prongs of the *Lemon* test amount to three death nails that crucify the government's decision to enforce policies that treat homosexual orthodoxy as if it is worthy of respect and recognition. The entire effort by the Democratic party and the LGBTQ church to entangle the government with their cult-like religious worldview is doomed now that the legislatures are moving in force and now that Justice Kavanaugh has replaced Justice Kennedy, who specifically stepped down in the wake of the Masterpiece Cakeshop decision so that this judicial disaster could be cured. Given the fact that gay marriage manages to violate all three prongs of *Lemon* by a landslide, gay marriage is perhaps the greatest manipulative non-secular sham ever imposed by Secular Humanist Judges and other government officials who are aligned with the Democratic Party since the inception of American jurisprudence. Drag Queen Storytime sponsored by the Library that Judge Lee Rosenthal supports is just fruit of the poisonous tree. The pattern of abuse comes from uncheck and unelected Judges who have become jaded over time and who allow the Substantive Due Process Clause to be used as a racket of judicial policy making that is consistently based purely on emotion and not on sound legal reasoning whatsoever. See *Roe v. Wade,* 410 U.S. 113 (1973)

and *Dred Scott v. Sandford*, 60 U.S. 393 (1857).[8] Judge Rosenthal's substanless decision to not issue a restraining order is the very kind of judicial narcissism that makes Secular Humanists the greatest internalized threat to American Democracy. This is a simple case where the Plaintiffs are asking Judge Rosenthal to apply the Constitution as it is written and not as Secular Humanists feel like it "ought" to have been written. *Obergefell* at 4 (Scalia Dissenting). There is no question that Justice Scalia was understated when he wrote "I write separately to call attention to this Court's threat to American Democracy." *Id.* at 1. (Scalia dissenting). The Plaintiffs have appeared with standing as victims of the government's endorsement of the LGBTQ church to put an end to the threat.

## II. "IF THIS, THEN THAT" APPLYING LIBERAL LOGIC

Courts are not supposed to be a vacuum of irrational lunacy that Secular Humanists convert into their own private unprincipled makeshift legislator through a series of emotional and intellectually exploitative appeals that are masked to justify objective immorality that erodes community standards of decency. Irrational government actors in the Democrat party have been permitted to erode fundamental freedoms because of non-responsive Judges like Judge Rosenthal, who certainly do not make decisions based on the law and evidence but on irrelevant factors and as a result of their egomania.

If self-identified homosexuals are given the Constitutional right to marry, then so self-identified polygamists and objectophiles must be, if this Court and the Defendants think it would be wise to ingore the Plaintiffs well plead First Amendment Establishment Clause claims.

---

[8] This problem if not resolved by this Court could literally lead to violence. The Plaintiffs themselves have been subject to a series of death threats for simply bringing this action and for telling the truth about the functionality of the United States Constitution.

Justice Roberts could not have made it any clearer in his dissent that if the government had to

legally respect gay marriage, then it would have to legally respect all of the other forms of

parody marriage as well.

One immediate question invited by the majority's position is whether States may retain the definition of marriage as a union of two people. Cf. *Brown* v. *Buhman*, 947 F. Supp. 2d 1170 (Utah 2013), appeal pending, No. 14- 4117 (CA10). Although the majority randomly inserts the adjective "two" in various places, it offers no reason at all why the two-person element of the core definition of marriage may be preserved while the man-woman element may not. Indeed, from the standpoint of history and tradition, a leap from opposite-sex marriage to same-sex marriage is much greater than one from a two-person union to plural unions, which have deep roots in some cultures around the world. If the majority is willing to take the big leap, it is hard to see how it can say no to the shorter one.  It is striking how much of the majority's reasoning would apply with equal force to the claim of a fundamental right to plural marriage. If "[t]here is dignity in the bond between two men or two women who seek to marry and in their autonomy to make such profound choices," *ante*, at 13, why would there be any less dignity in the bond between three people who, in exercising their autonomy, seek to make the profound choice to marry? If a same-sex couple has the constitutional right to marry because their children would otherwise "suffer the stigma of knowing their families are somehow lesser," *ante*, at 15, why wouldn't the same reasoning apply to a family of three or more persons raising children? If not having the opportunity to marry "serves to disrespect and subordinate" gay and lesbian couples, why wouldn't the same "imposition of this disability," *ante*, at 22, serve to disrespect and subordinate people who find fulfillment in polyamorous relationships? See Bennett, Polyamory: The Next Sexual Revolution? Newsweek, July 28, 2009 (estimating 500,000 polyamorous families in the United States); Li, Married Lesbian "Throuple" Expecting First Child, N. Y. Post, Apr. 23, 2014; Otter, Three May Not Be a Crowd: The Case for a Constitutional Right to Plural Marriage, 64 Emory L. J. 1977 (2015). I do not mean to equate marriage between same-sex couples with plural marriages in all respects. There may well be relevant differences that compel different legal analysis. But if there are, petitioners have not pointed to any. When asked about a plural marital union at oral argument, petitioners asserted that a State "doesn't have such an institution." Tr. of Oral Arg. on Question 2, p. 6. But that is exactly the point: the States at issue here do not have an institution of same-sex marriage, either.


For better or worse, because of brainwashed Judges like Judge Rosenthal, if self-identified

polygmists must be afforded the same benefits and treatment under the law based on their

self-asserted sex-based identity narratives that self-identified homosexuals are permitted to enjoy

or, otherwise, Judge Rosenthal must act like and adult and stop the lie and hold that Drag Queen

Storytime and legally recognized gay marriage is a sham and enjoin the defendants under the Establishment Clause. In appealing to what is left of this Court's common sense, the Plaintiffs will analyze *Obergefell* through an "if this, then that" approach in helping the Court, the Defendants, and the public to determine whether either the First Amendment or Fourteenth Amendment should control the outcome of this action.

(1) The Majority in *Obergefell* stated: "For the history of marriage is one of both continuity and change. As new dimensions of freedom have become apparent to new generations, the institution of marriage has been strengthened by evolution over time." *Obergefell* at 6. In applying liberal logic, if marriage "has been strengthened by evol[ving] over time," legally recognizing person-object, person-animal, and more than two people marriages will make marriage much "stronger." Id. at 6. If it is unlawful to force that which is in the hearts of self-identified homosexuals "to remain unspoken," it is unlawful for that which is in the hearts of zoophiles, pediafiles, machinists, and polygamists to "remain unspoken as well." *Obergefell* at 7. Perhaps it is better to just admit that Jeremiah 17:9 is true.[9]

(2) The Secular Humanist on the bench in *Obergefell* stated: "The Constitution promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons, within a lawful realm, to define and express their identity." *Obergefell* at 2. In light of that liberal logic, the self-identified polygamists must be permitted to "express their identity," just as self-identified homosexuals are permitted. *Obergefell* at 1. Otherwise, legally recognized gay marriage is a non-secular sham that violates the Establishment Clause for the same reason that the Library's favorite event, Drag Queen Storytime for children does.

---

[9] "The heart is deceitful above all things and beyond cure. Who can understand it? " Jeremiah 17:9

(3) If "marriage is essential to our most profound hopes and aspirations" for self-identified homosexuals, the same is true for self-identified polygamists, zoophiles, and objectophiles. Id. at 3. Otherwise, legally respected gay marriage is a sham that is based on emotional non-sense that is invalidated by the Establishment Clause. So is Judge Rosenthal's October 24, 2018 order that makes a total mockery of the Judiciary and the rule of law itself.

(4) The Secular Humanist Majority in *Obergefell* stated, "[Self-identified Homosexuals] ask for equal dignity in the eyes of the law and the Constitution grants them that right." *Obergefell* at 28. If that that is true, then the "Constitution grants" self-identified polygamists, zoophiles, and pedaphiles "that right" as well based on their "asking." Otherwise, gay marriage and all other pro-gay policies are sham that violates the Establishment Clause of the First Amendment of the United States Constitution. Accordingly, the Library's decision to sponsor the Drag Queen Storytime for children is a per se sham for the same reasons that Judge Lee Rosenthal's October 24, 2018 order is.

**Fundamental Right For Polygamists And Machinists Too Or It Is A Sham**
(5) If legally respected parody marriage is a "fundamental right" for self-identified homosexuals, legally recognized parody marriage must be a fundamental right for self-identified polygamists and self-identified objectophiles on identical legal bases. *Loving* v. *Virginia*, 388 U. S. 1, 12 (1967) *Zablocki* v. *Redhail*, 434 U.S. 374, 384 (1978), *Turner* v. *Safley*, 482 U.S. 78, 95 (1987)., *M. L. B.* v. *S. L. J.*, 519 U.S. 102, 116 (1996); *Cleveland Bd. of Ed.* v. *LaFleur*, 414 U.S. 632, 639–640 (1974);; *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535, 541 (1942); *Meyer* v. *Nebraska*, 262 U.S. 390, 399 (1923). *Obergefell* at 11. Otherwise, Secular Humanist on the bench were merely monkeying with the Fourteenth Amendment unlawfully, and all pro-gay policies must be done away with by a straightforward application of the First Amendment

Establishment Clause. Judge Rosenthal's decision to play games and to suggest that the Plaintiffs motions for temporary restraining orders "had no basis" proves that she does not make decisions based on the law and facts but based on politics. Accordingly, the Plaintiffs have a basis to treat her like a political hack in an effort to defend the Constitution from judiciary tyranny.

(6) *Obergefell* Majority stated, "The limitation of marriage to opposite-sex couples may long have seemed natural and just, but its inconsistency with the central meaning of the fundamental right to marry is now manifest." Id. at 4. That stream of logic reasoning not only permits self-identified homosexuals to legally marry with the government's stamp of approval, but self-identified polygamists and objectophiles as well with the government's stamp of approval.

(7) The Secular Humanist Majority stated: "The marriage laws at issue are in essence unequal: [self-identified homosexuals] are denied benefits afforded [to individuals in man-woman marriage] and are barred from exercising a fundamental right. Especially against a long history of disapproval of their relationships, this denial works a grave and continuing harm, serving to disrespect and subordinate [self-identified] gays and lesbians." Id. at 4. If that logic permits self-identified homosexuals to legally marry to normalize their ideological beliefs, it permits self-identified polygamists and objectophiles to marry as well and to partner with the Library to put Story time of their own, since self-identified polygamists and objectophiles have also faced a "long history of disapproval." Otherwise, legally recognized gay marriage policies and all other pro-gay policies and the Library's actions regarding Drag Queen Storytime are a sham that the government must disentangle itself from completely.

**Individual Right For Polygamists And Objectophiles Too Or It Is A Non-secular Sham**

(8) The Majority in *Obergefell* stated, "The Due Process Clause of the Fourteenth Amendment long has been interpreted to protect certain fundamental rights central to individual dignity and autonomy." Id. at 12. While relying on *Loving*, the Majority also stated, "the first premise of the Court's cases is that the right to personal choice regarding marriage is inherent in the concept of individual autonomy." Id. In applying that liberal logic here promoted by Judge Rosenthal's refusal to think logically, a self-identified polygamist is an "individual" who has the "autonomous right" to marry two people as a matter of "dignity" and "personal choice." Id. The bottomline is that the Supreme Court in *Obergefell* was lying, and those lies have naturally lead to secondary harmful effects, like the systematic violent persecution of Christians and efforts by desensitized Secular Humanists to infiltrate elementary schools and public libraries through "Drag Queen Storytimes" with the sole purpose of indoctrinating minors to religious worldview on sex, faith, morality, and marriage that is damaging, dehumanizing, depersonalizing, and destructive. Judge Rosenthal has zero basis to pretend otherwise and her attempts to avoid the merits of this case are direct proof that she is incapable or unwilling to comply with her Article III and Article VI duties. That is what the record reflects.

**Existing Right For Polygamists Too Or It Is A Non-Secular Sham**
(9) The *Obergefell* Majority floated: "The dynamic of our constitutional system is that individuals need not await legislative action before asserting a fundamental right. The Nation's courts are open to injured individuals who come to them to vindicate their own direct, personal stake in our basic charter. An individual can invoke a right to constitutional protection when he or she is harmed, even if the broader public disagrees and even if the legislature refuses to act." *Obergefell* at 25. Just as self-identified homosexuals did not have to wait to assert the individual and fundamental right to marry, neither do self-identified polygamists, if Judge Rosenthal's

irrational logic is to be enforced. Id. at 5. The Majority in *Obergefell* stated that "the past alone does not rule the present," which means that self-identified polygamists must enjoy the same right to marry as self-identified homosexuals at present. *Obergefell* at 11. Despite the fact that Secular Humanists in office are more like immature children who lack common sense and a basic understanding of right and wrong, they cannot have it both ways. If Judge Rosenthal is going to pretend that a case lacks a basis at least she should try to provide an explanation instead of proving for Senate oversight that she is incapable of handling the duties of a traditional Article III Judge.

**Intimate Choice For Self-identified Polygamists Too Or It Is A Sham**
(10) The Majority in *Obergefell* stated, "Like other choices protected by the Due Process Clause, decisions concerning marriage are among the most intimate that an individual can make." *Obergefell* at 3. Just as marriage is "intimate" for self-identified homosexuals, it follows that marriage is is an "intimate" choice for self-identified objectophiles, zoophiles, and polygamists too. *Lawrence*, supra, at 567. *Obergefell* at 14. Using "intimacy" as a basis to justify legally recognized gay marriage is another emotional appeal to shoehorn the dogma of the religion of Secular Humanism into a legal reality that violates the Establishment Clause under *Holloman*, 370 F.3 1252 at 1285-1286 for being based purely on emotion. Judge Rosenthal - the wordsmith - has no basis to suggest otherwise without further exposing the illegitimacy of the judicial branch. As Ben Shapiro often says, "facts do not care about feelings." The Constitution does not care about the emotions of Secular Humanists. Plaintiff Sevier certainly does not care about the emotional feelings of Judge Rosenthal who self-identifies an adult and Article III Judge, Plaintiff Sevier is deeply concerned with the safety, health, and welfare of the chidlren of the city of Houston. The Court needs to concern itself with Constitutional integrity and not

mind-numbing empathy. If the Court wants to show empathy, it can do so by showing empathy for its oath of office and following it so that Plaintiff Sevier will not have to prod the Senate to be start purging Judges who are keeping this putch alive off of the benc for their verifiable lack of character and fitness.

(11) The *Obergefell* Majority stated, "In *Lawrence v. Texas*, the Court held that private intimacy of same-sex couples cannot be declared a crime, yet it does not follow that freedom stops there." *Obergefell* at 14. Additionally, it "does not follow that freedom stops there" for self-identified polygamists, zoophiles, pedafiles, and objectophiles either, whose ideology is as equally as non-secular as the orthodoxy that the Library has promoted in partnership with Drag Queen Storytime. Either all individuals in the non-obvious class of sexual orientation are to be provided civil rights to marry or the Secular Humanist Majority in *Obergefell* was just monkeying with the Fourteenth Amendment like the Secular Humanists in the Majority in *Roe v. Wade*, 410 U.S. 113 (1973) were in a calculated effort to sidestep the fact that the Establishment Clause has exclusive jurisdiction over Secular Humanism and all of its doctrinal dogma. The Majority in *Obergefell* stated, "outlaw to outcast may be a step forward, but it does not achieve the full promise of liberty." Applying that liberal logic here for the benefit of a clearly irrational Jurist, self-identified polygamists and self-identified objectophiles should be allowed to progress forward from "outlaw to outcast to the full promise of liberty as well." So what is the real bottomline - the Secular Humanists in the majority in *Obergefell* were outright lying and monkeying with the Fourteenth Amendment.[10] The Secular Humanists in Obergefell majority

---

[10] So was Judge Rosenthal in her October 24, 2018 order when she managed to engage in implied circular reasoning by pretending that the Plaintiffs had not plead a prima facie case pursuant to FRCP 65 to force the Court to do its job and issue a temporary restraining order for the duration of the case like Magistrate Hanna of the Western District of Lousiana did the week before. The next time Judge Rosenthal wants to pretend that a case is without merit, the former Judge Advocate General recommends that she do so when there is not a similar case filed in another state

are the actual "outlaws" who were engaged in an unprincipled egotistic ploy which requires that

their decision by "outcast" by action taken by this Court and legislative bodies across the country

to restore Constitutional order.

**Sexual Orientation Is A Protected Class For All Individuals Or It Is A Sham**
(12) The Majority in *Obergefell* stated, "Indeed, as the Supreme Judicial Court of Massachusetts

has explained the decision whether and whom to marry is among life's momentous acts of

self-definition, and this is true for all persons, whatever their sexual orientation." *Goodridge v.*

*Department of Public Health*, 440 Mass. 309, 798 N. E. 2d 941 (2003); *Goodridge,* 440 Mass., at

322, 798 N.E. 2d, at 955. *Obergefell* at 13. In applying that liberal logic "all persons, whatever

their sexual orientation" includes self-identified polygamists. For self-idientified polgyamists and

pedophiles o have the right to legally marry multiple people or a child is "among life's

momentous acts of self-definition" for them too.  What the Secular Humanist Majority in

*Obergefell* and the Massachusetts Supreme Court fail to understand that neither can use

government to enshrine the edicts of expressive individualism and Secular Humanism under the

Establishment Clause under *Torcaso v. Watkins*, 367 U.S. 488 (1961) and *Edwards v. Aguillard,*

482 U.S. 578, 583 (1987).  Just because Secular Humanists are too intellectually blind and

dishonest to see that their entire worldview is religious in nature does not mean that it is not. The

legislatures across the United States have caught on and they are about to all but completely pin

the judicial branch to the wall so that dishonest individuals cannot pretend that a case is without

merit simply because it offends their destructive subscription to postmodern moral relativism and

expressive individualism. Likewise, just because self-identified homosexuals believe that there is

---

within the 5th Circuit. Any politican knows that is an idiotic idea that can lead to an interal circuit split. Maybe that is what some of the Plaintiffs want. So becareful not to throw bair rabbit in the briar patch.

more than two genders does not mean that such a contention is undone by self-evident observable facts that are neutral, natural, and non-controversial.

**Irrelevant Emotion Appeals To Impose Gay Marriage Is Undone By *Holloman***
(13) The third reason why the Supreme Court expanded the marriage to parody forms was because because "the right to marry safeguards children." *Obergefell* at 15. Yet, "many [self-identified homosexuals, polygamists, and machinists] provide loving and nurturing homes to their children, whether biological or adopted" too. Just as in the case with self-identified homosexuals, there are a lot of children being raised by self-identified and self-identified polygamists as well. "Excluding [self-identified polygamists and self-identified objectophiles] from marriage thus conflicts with the central premise of the right to marry, inflicting stigma, uncertainty, and humiliation on the children of [self-identified polygamists and self-identified objectophiles] through no fault of their own." That this kind of emotional appeal that is being used to enshrine the religious edicts of Secular Humanism is invalidated by the reasoning in *Holloman,* at 1285-1286.

(14) The *Obergefell* Majority stated, "No union is more profound than marriage, for it embodies the highest ideals of love, fidelity, devotion, sacrifice and family." If that is true for self-identified homosexuals, it is true for self-identified polygamists, zoophiles, and objectophiles too. But that position is more of the same emotionalism that fails to get gay marriage policies and all other pro-gay policies around the Establishment Clause under the reasoning in *Holloman,* at 1285-1286.


On balance, anyone with a semblance of common sense can see after applying the liberal logic floated by Secular Humanist in the Majority who align with the Democratic Party in *Obergefell*

that all self-asserted sex-based identity narratives that are questionably moral, legal, and real are not covered by the Equal Protection and Due Process Clauses whatsoever. Neither is the Drag Queen Storytime which Judge Rosenthal is defending without any legal basis whatsoever becuase the truth is that after nearly three decades on the bench, she has no earthly idea what she is doing. That is what Plaintiff Sevier is putting in his report to Senate Special investigation so at least Judge Rosenthal's apathy for her role to prevent individuals from taking self-help measures has managed to accomplish that with convincing clarity.

Personal attacks aside, the Article III courts lacked subject matter and personal jurisdiction in *Obergefell*, which means that Stare Decisis does not apply nor does it save *Obergefell*.[11] Judge Rosenthal's plan to pretend that the Library's partnership with Drag Queen Storytime is not government endorsement of religion is an implausible one. The *Obergefell* decision was based on emotion and not sound legal reasoning just like Judge Lee Rosenthal's October 24, 2018 order. *Oberegefell* cannot be used to stop the Plaintiffs from forcing the Defendants to get out of the parody marriage business and to disentangle itself completely from the LGBTQ church.[12] Justice Holmes once said that a page of history is worth a volume of logic. *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921). But Judge Rosenthal's refusal to take her job seriously in a case of Constitutional intepretation where children are involved, shows that Justice Holmes was dead wrong. Go figure. If the courts are incapable of logic reasoning, they

---

[11] *Obergefell* at 1-28 and *Kitchen v. Herbert*, 755 F. 3d 1193, 1223 (CA10 2014). Stare Decisis means "applying similar law" to "similar facts." Garbage in; Garbage out. The courts cannot be expected to reinvent the wheel in every case. Stare Decisis should apply in normal controversies but the *Obergefell* case was rife with intellectual dishonest and intentional Constitutional malpractice.

[12] A decision about whether the Establishment Clause is violated cannot entail a decision about the ultimate usefulness of the of the religion of moral relativism flowing from the LGBTQ church; the sole question must be whether the State's aid and endorsements can be squared with the dictates of the Constitution. *Americans United for Separation of Church &. State v. Prison Fellowship Ministries*,.432 F. Supp. 2d 862 (S.D. Iowa 2006). They cannot. Doctrinal entanglement involves government in religion's very spirit, in its core decisions on matters of belief cannot be justified. *Duffy v. State Personnel Board*, 232 Cal. App. 3d. 1, 17 (Cal. App. 1991).

are incapable of respect, and must be stripped of power for cause. The federal and state legislators who are reading this pleading agree with the Plaintiffs, and whether Judge Lee Rosenthal likes it or not, these responsible law makers are taking a concerted step to permanently cure an ego driven judicial putsch that is obvious and has lead to a litany of secondary harmful effects. All government actors who played a role in this Constitutional abuse should be held civilly liable, regardless of any flimsy immunity defense, because children are being confused and targeted by deeply immoral members of the LGBTQ community who fail to understand the basis differences between real and fake, right and wrong, and secular and non-secular because of an intellectual blindness that is dangerous. Judge Rosenthal cannot provide a single sentance to suggest otherwise because the facts, the law, and common sense are against her charade. It is also against the Mayor's immense dishonesty in this area.

### III. GAY MARRIAGE AND PRO-GAY POLICIES VIOLATE THE *LEMON* TEST

The Court should catch its October 24, 2018 order on fire because the fact that the Library's actions violate the Lemon Test is the legal basis for why Judge Rosenthal should take out her pen and must the integrity to follow the lead of the Western District of Louisana and issue a temporary injunction against the Library for the duration of the case. The First Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment, provides that "[the legislative, the executive, and the judicial branch] shall make no law respecting an establishment of religion." U.S. CONST. amend. I. The First Amendment Establishment Clause applies to the State defendants through the Fourteenth Amendment. Further, this provision, among other things, "prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any

way to a person's standing in the political community.'"[13] The government must "remain

secular" and must "'not favor religious belief over disbelief.'" Id. at 610. *Cnty. of Allegheny v.*

*ACLU,* 492 U.S. 573, 593-94 (1989). To pass muster under the Establishment Clause, a practice

must satisfy the *Lemon* test, pursuant to which it must:

 (1) have a valid secular purpose; (2) not have the effect of advancing, endorsing, or inhibiting
religion; and (3) not foster excessive entanglement with religion. Id. at 592 (citing *Lemon v.
Kurtzman,* 403 U.S. 602 (1971)). *Edwards,* 482 U.S. 583, *Agostini v. Felton,* 521 U.S. 203, 218
(1997).

Judge Lee Rosenthal has a serious problem as does the Mayor because government

action"violates the Establishment Clause fails to satisfy any of these prongs." Because the

Defendants enforcement or even potential enforcement (1) gay marriage policy, (2) sexual

orientation discrimination statutes like CADA, (3) conversion therapy bans, (4) government paid

for sex-change operations, (5) government sanctions transgender bathroom ordinances, (6)

government forced changing of pronouns, (7) government sanctioned Drag Queen Story Hour

"fails to satisfy" even one of the three prongs, the Lemon test is a three pronged death nail to the

government's entanglement with the LGBTQ church, hammering the coffin shut.[14]  If Judge

Rosenthal is unable to explain otherwise and if a single individual is injured on October 27,

2018, Plaintiff Sevier will -  without a doubt - offer a watertight explanation to Senate oversight

why the blame falls exclusively on the Lee Rosenthal because that is what the evidence will

show.

---

[13] *County of Allegheny v. ACLU,* 492 U.S. 573, 594 (1989) (quoting *Lynch v. Donnelly,* 465 U.S. 668, 687
(1984)(O'Connor, J., concurring)).
[14] The final approach to Establishment Clause jurisprudence is the "coercion test" derived from the Court's decisions
in *Santa Fe Independent School District v. Doe,* 530 U.S. 290 (2000), and *Lee v. Weissman,* 505 U.S. 577, 627, 112
S.Ct. 2649, 120 L.Ed.2d 467 (1992). Although it is not clear where this test "belongs in relation to the *Lemon* test,"
the test itself "seeks to determine whether the state has applied coercive pressure on an individual to support or
participate in religion." *Doe v. Elmbrook Sch. Dist.,* 687 F.3d 840 (7th Cir. 2012).

To save Judge Rosenthal from personal liability for intentional dereliction of duty, self-identified transvestites should be ordered to go back beneath the rock from whence they came to conduct their story hour in private, but they cannot use the government assets as a makeshift pulpit to prosthelytize minors, sermonizing about the merits of their religious beliefs on sex, faith, marriage, and morality that do not even check out with the way we are and the way things are.

## A. PRONG ONE: LEGALLY IMPOSED GAY MARRIAGE IS A NON-SECULAR SHAM IN EVERY RESPECT FOR THE SAME REASONS THAT THE LIBRARY'S PARTNERSHIP WITH DRAG QUEEN STORY HOUR IS

If this Court wants some "new insights" and "societal understandings" here they are: homosexuality, polygamy, zoophilia, and objectophilia marriage and ideology are equally "not secular" and for the government to legally recognize, favor, or respect any form of these parody marriages or identity narratives has the effect of enshrining the religion of Secular Humanism, evangelical atheism, western postmodern moral relativism, and expressive individualism as the supreme national religion direct violation of the Establishment Clause. The United States Supreme Court has already resolved that Secularism is a religion for purposes of the Establishment Clause in *Torcaso* and reconfirmed in *Edwards*.[15] Just about all of the United States Courts of appeals have resolved the same. But if that is not enough, nearly every legislative body is preparing to introduce a concurrent resolution that Secular Humanism is a religion for the purpose of the Establishment Clause.[16] Judge Rosenthal will have to get used to

---

[15] *Torcaso,* 367 U.S. 495; *Obergefell* at 5;; *Kirchberg v. Feenstra*, 450 U.S. 455, 460–461 (1981); See, e.g., *M. L. B. v. S. L. J.*, 519 U.S. 102, 120–121. (1996)

[16] See secularhumaismresolution.com and marriagerestorationact.com. The resolution that declares that Secular Humanism is a religion, which the Governor of this state is expected to sign, supports the Marriage And Constitution Restoration Act and the Life Appropriation Act, written by the Special Forces Of Liberty and De Facto Attorney Generals. The Governor is also expected to sign the Stop Social Media Censorship Act, the Human

the fact that she will be required to interprepate the very laws that Plaintiff Sevier and Tex Christopher are writing because that is what Article III requires. Judge Rosenthal should get ahead of the curb and begin to do so now in an attempt to restore what is left of the judicial branch's respectability.

At the core of the "Establishment Clause is the requirement that a government justify in secular terms its purpose for engaging in activities which may appear to endorse the beliefs of a particular religion." *ACLU v. Rabun Cnty. Chamber of Commerce, Inc.,* 698 F.2d 1098, 1111 (11th Cir. 1983). This secular purpose must be the "pre-eminent" and "primary" force driving the government's action, and "has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary Cnty, Ky. v. ACLU of Ky.,* 545 U.S. 844, 860 (2005). It should be preliminary determined what is "secular" for purposes of Establishment Clause. After all, "secularism" is having a full blown crisis because any reasonable person can see that there is nothing "secular" about most of "secularism," since most of secularism is predicated on a series of unproven faith-based assumptions and naked assertions that are at the very least implicitly religious and can only be taken on faith. The United States Supreme Court itself has "taken notice of the fact [over and over again] that recognized religions' exist that 'do not teach what would generally be considered a belief in the existence of God, to include [Atheism], Buddhism, Taoism, Ethical Culture, Secular Humanism and 'others.'" *Torcaso,* 367 U. S. 495.[17] The laws and policies of the state and federal government must be exclusively based on neutral,

Trafficking And Child Exploitation Prevention Act, the Admission Act, the Elevated Marriage Act, and others - all of which are set for introduction in this state at the 2019 legislative session by members of the House and Senate. https://soundcloud.com/user-822371764-748606778/secular-humanism-is-a-religion-resolution
[17] See also *Washington Ethical Society v. District of Columbia,* 101 U.S. App. D.C. 371, 249 F.2d 127 (1957); 2 Encyclopaedia of the Social Sciences, 293; J. Archer, Faiths Men Live By 120—138, 254—313 (2d ed. revised by Purinton 1958); Stokes & Pfeffer, supra, n. 3, at 560. Welsh v. U.S, 1970398 U.S. 333 (U.S. Cal. June 15); *Edwards,* 482 U.S. 592.

non-controversial, natural, and self-evident truth and not the faith-based private moral code of Secular Humanists. After all, despite how the Mayor of Houston and the Houston Librarian feels, the government is not a church nor a redeemer. The Houston Public Libraries are not a make-shift sunday school for the LGBTQ cult and the religion of Secular Humanism. All "religion" amounts to is a set of unproven answers to the greater questions, like "why are we here" and "what should be doing as humans." The Establishment Clause was never designed to only single out institutionalized religions from legal recognition, but it also prevents the unproven truth claims of non-institutionalized religions from being enshrined as well, if not more so.[18]

In *Real Alternatives,* the court stated:

"we detect a difference in the "philosophical views" espoused by [the plaintiffs], and the "secular moral system[s]...equivalent to religion except for non-belief in God" that Judge Easterbrook describes in *Center for Inquiry,* 758 F.3d at 873. There, the Seventh Circuit references organized groups of people who subscribe to belief systems such as Atheism, Shintoism, Janism, Buddhism, and secular humanism, all of which "are situated similarly to religions in everything except belief in a deity." *Id.* at 872. These systems are organized, full, and provide a comprehensive code by which individuals may guide their daily activities.[19]

The LGBTQ community that the Houston Library has partnered with to put on the Drag Queen Storytime is "organized, full, and provide[s] a comprehensive code by which individuals may guide their daily activities." Id. Instead having a cross or the ten commandments, the LGBTQ church has the gay pride flag and their own commandments, such as if you disagree with

[18] Justice Kennedy summarized the core doctrine of secular humanism when he attempted to enshrine the modern view by stating "at the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe." *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 84748 (1992). Justice Kennedy's worldview amounts to the German Proverb, "Jedem das Seine," which means "to each his own," which was of course what the sign over Buchenwald concentration camp read. Secular Humanism is responsible for the holocaust and most of the worst atrocities since the inception of humanity. If Nature is all that there is, there is nothing more natural than violence. And if truth is relative, then there is nothing to stop those in power from crushing those who are not.
[19] *Real Alternatives, Inc. v. Burwell,* 150 F. Supp. 3d 419, 440–41 (M.D. Pa. 2015), *aff'd sub nom. Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.,* No. 16-1275, 2017 WL 3324690 (3d Cir. Aug. 4, 2017)

LGBTQ ideology you are a bigot worth marginalizing. The unproven naked truth claims

evangelized by the LGBTQ church such as (1) there is a gay gene, that (2) people can be born in

the wrong body, that (3) same-sex sexual activity checks out with the human design, that (4)

same-sex buggery is not immoral, and that (5) people come out of the closest baptized gay

consists of a series of unproven faith based assumptions that are implicitly religious. Those truth

claims take a huge amount of faith to believe that they are even real, since those truth claims

buck common sense and are more likely than not shallow qualifiers hoping to justify immoral

sexual conduct that is indecent, immoral, and questionably legal.[20] The Plaintiffs in this action

have supplied this Court with sworn statements from former homosexuals who sincerely bought

into the gospel narratives prosthelytized by the LGBTQ church only to completely convert to a

brand new self-asserted sex-based identity narrative after radically transformative encounters

with the personalized truth of the central figure of the New Testament gospel narrative.[21] After

living the lifestyle for decades as radical LGBTQ activists, these ex-gays have attested with

convincing clarity under oath through declarations submitted by the Plaintiffs that homosexuality

is a religious ideology that has nothing to do with immutability. Id. Judge Lee Rosenthal's

substanceless order floated on October 24, 2018 is clearly calculated to relegate ex-gays to

second class citizen status. The Plaintiffs also provided sworn statements from medical

professionals that align with countless medical studies that demonstrate without any political or

---

[20] *Lawrence v. Texas*, 539 U.S. at 579 overturned *Bowers v. Hardwick*, 478 U. S. 186 (1986);; *Miller v. California*, 413 U.S. 15, 3034 (1973). Just because self-identified homosexuals are sincere in their belief that they are born in the wrong body or born with gay genes, does not make it true anymore than it is true that a sincere Islamic suicide bomber is advancing human flourishing by blowing himself up to kill infidels.

[21] (DE 13 Lisa Boucher ¶¶ 1-10; DE 12 Quinlan ¶¶ 1-37; DE 21 Pastor Cothran ¶¶ 1-50; DE 14 Dr. King ¶¶ 1-20; DE 20 Dr. Cretella ¶¶ 1-20; DE 19 Goodspeed ¶¶ 1-20; DE 11 Grace Harley ¶¶ 1-25; DE 18 Pastor Cuozzo; ¶¶ 1-21; DE 10 Pastor Farr ¶¶ 1-33; DE 17 Pastor Penkoski ¶¶ 1-34; DE 15 Pastor Cairns ¶¶ 1-30;; DE 16 Christian Resistance ¶¶ 1-21; DE _ Special Forces Of Liberty ¶¶ 1-34). See Amicus Briefs of the Center For Garden State Families; the WW Bridal and the American Family Association of PA; National Alliance of Black Pastors; and the Coalition of Doctors Defending Reparative Therapy.

religious agenda that there is no evidence of a gay gene.[22] These medical professions do not want their profession hijacked any longer by dishonest Secular Humanist who are blinded by guilt and their refusal to think rationally, feel entitled to entangle our government with their destructive worldview. Yet, the Plaintiffs are not necessarily out to "prove" nor "disprove" whether a gay gene exists or whether the LGBTQ gosepel narratives are "wise." The Plaintiffs have shown in conjunction with the public record that the idea that "sexual orientation is immutable" is at the very least unsettled question of religious faith for purposes of the Establishment Clause to assume exclusive jurisdiction. If Judge Rosenthal was interested in behaving like an Article III Judge, instead of a politician, she would have the integrity to agree.

The evidence shows that (1) homosexuality, polygamy, zoophilia, and objectophile ethos are all part of the religion of Secular Humanism, postmodern western moral relativism, and expressive individualism and that (2) the Establishment Clause balanced with the Free Exercise Clause have exclusive jurisdiction over all self-asserted sex-based identity narratives that are questionably moral, questionably legal, and questionably part of reality. The fact of the matter is that man-man, woman-woman, person-object, person-animal, and more than two person marriages are all equally part of the religion of Secular Humanism. The government cannot respect any of those parody forms of marriage because doing so is an evil that the Establishment Clause will not allow. Additionally, the Plaintiffs are not merely picking on gay marriage. The fact of the matter is that all parody marriages are all equally questionably moral, legal, and obscene and are by definition non-secular and not recognizable for purposes of the Establishment Clause. The *Obergefell* Majority said that "marriage offers unique fulfillment to those who find

---

[22] DE 14 Dr. King ¶¶ 1-20; DE 20 Dr. Cretella ¶¶ 1-20

meaning in the secular realm." Id. at 1. But in this action, the Secular Humanist in *Obergefell*

completely dissolved the "secular realm" by enshrining parody forms of marriage that establish

the United States as a nation under the oppressive thumb of the religion of Secular Humanism

and moral relativism.  Id. at 4. America might not officially be a Christian Nation, insofar as the

government must never mandate a belief in Christianity which can only be accepted as a free

give, but America sure as "hell" cannot be turned into a Secular Humanist nation either.

### (1) THE MISUSE OF SUBSTANTIVE DUE PROCESS TO IMPOSE GAY MARRIAGE AND PRO-GAY ON ALL 50 STATES IS A NON-SECULAR SHAM FOR THE PURPOSES OF THE ESTABLISHMENT CLAUSE

In untwisting distorted truth, "Substantive Due Process" was one of two legal basis under the

Fourteenth Amendment to impose gay marriage on all 50 states, therefore, it should be

preliminarily defined so everyone can understand how we really got here.  Justice Roberts

defined Substantive Due Process in *Obergefell* when he stated:

The Supreme Court has interpreted the Due Process Clause to include a "substantive" component that protects certain liberty interests against state deprivation "no matter what process is provided." *Reno* v. *Flores*, 507 U.S. 292, 302 (1993). The theory is that some liberties are "so rooted in the traditions and conscience of our people as to be ranked as fundamental," and therefore cannot be deprived without compelling justification. *Snyder* v. *Massachusetts*, 291 U.S. 97, 105 (1934).  Our precedents have accordingly insisted that judges "exercise the utmost care" in identifying implied fundamental rights, "lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court." *Washington* v. *Glucksberg*, 521 U.S. 702, 720 (1997). *Obergefell* at 11 (Roberts dissenting)

Yet, in applying Substantive Due Process to the facts, man-man, woman-woman, person-animal,

person-object, and man-multiperson marriage are all equally not "objectively, deeply rooted in

this Nation's history and tradition," and are not "implicit in the concept of ordered liberty, such

that neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U. S., at

720–721 (internal quotation marks omitted) *Obergefell* at 14 (Roberts Dissenting).[23] Instead all parody marriages involve lifestyles and faith-based beliefs that are questionably moral, legal, subversive, obscene, and "removed from reality." See *Brenner v. Scott*, 2014 WL 1652418 (2014) the order denying Plaintiff Sevier's intervention demand. Policies that respect homosexual orthodoxy and Substantive Due Process have nothing to do with each other whatsoever. [24]

    The real American History of homosexuality, pedaphilia, polygamy, objectophilia, and zoophilia is that they are self-asserted sex-based identity narratives that are either currently illegal or they were illegal until recently and just about all of them involve conduct that materially threatens to erode community standards of decency. Homosexuality practice was

---

[23] See, *e.g.*, *District Attorney's Office for Third Judicial Dist.* v. *Osborne*, 557 U. S. 52, 72 (2009); *United States* v. *Salerno*, 481 U. S. 739, 751 (1987); *Moore* v. *East Cleveland*, 431 U. S. 494, 503 (1977) (plurality opinion); see also *id.*, at 544 (White, J., dissenting) ("The Judiciary, including this Court, is the most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or even the design of the Constitution."); *Troxel* v. *Granville*, 530 U.S. 57, 96–101 (2000) (KENNEDY, J., dissenting) (consulting "'[o]ur Nation's history, legal traditions, and practices'" and concluding that "[w]e owe it to the Nation's domestic relations legal structure . . . to proceed with caution" (quoting *Glucksberg*, 521 U. S., at 721)

[24] Besides confusing terms sometimes deployed by jaded Secular Humanist Judges to pass off their quest to enshrine religious dogma of secular humanism as valid Constitutional rights, the Plaintiffs pause to preliminary define what Substantive Due Process and the Equal Protection Clause are and when the causes apply.  Basically, "substantive due process" means that some rights are so obviously fundamental that no amount of procedure can stop the individual from obtaining those rights. In short, substantive due process is the lack of procedural substance. Substantive due process is an unquenchable fire that melts away any and all procedure so that all individuals can enjoy a right that a hand full of lawyers say is fundamental often times for ulterior political and religious purposes. Substantive due process is dangerously used as a well for jaded secular humanist justices to draw new Constitutional rights out of under the veneer of Constitutional legitimacy in an effort to impose their oppressive religious worldview on the whole of society.  It is of no surprise that the first time substantive due process was used as a conduit to concocted fake outcomes was by White Supremacists secular humanist Judges who aligned with the the Democratic party in *Dred Scott v. Sandford*, 60 U.S. 393 (1857)(a case where the Supreme Court found that Black people were not human enough to be citizens). Unsurprisingly, Secular Humanist Judges who align with the Democratic Party again used substantive due process to read the fake right of abortion into the Constitution in *Roe v. Wade*, 410 U.S. 113 (1973).  As expected dishonest Secular Humanist Judges who align with the Democratic Party misused Substantive Due Process in *Obergefell* in pretending that sexual orientation was a matter of immutability and that homosexuality was legitimate part of American Heritage to read parody marriage into the Constitution as a fundamental right. What *Dred Scott*, *Roe*, and *Obergefell* all have in common is the fact that (1) they do not have a single sentence of sound legal reasoning, (2) they are decisions made purely on emotion, and (3) they are a cover for Secular Humanist to legislate their moronic and downright evil worldview into a legal reality that is a catalyst for widespread corruption, suffering, and the erosion of freedom.

basically illegal until 2003 when *Lawrence,* 539 U.S. 578 overturned *Bowers v. Hardwick,* 478

U.S. 186 (1986). The Supreme Court of the United States prior to the *Obergefell* putsch found

that "to simply adjust the definition of obscenity to social realities has always failed to be

persuasive before the Courts of the United States."[25] Yet, the *Obergefell* majority did not even

attempt to hide the fact that they believed that imposing gay marriage on the Nation would create

more "dignity" and "respect" for the religion of Secular Humanism that they themselves adhere

to in order to make up for the fact that the belief system is so irrational that parts of it were

illegal until recently. Homosexual speech, while faith-based in nature, has more in common with

harmful unprotected obscene speech and than with Constitutionally protected religious free

speech. *Obergefell* at 7. "The starkly religious message" of the Secular Humanist in *Obergefell*

does not escape the notice of "reasonable observers" in the legislative and executive branch who

align with the republican party, as the Democrats on the court attempted to normalize their

beliefs on marriage, sex, and morality. *Trunk v. City of San Diego*, 629 F.3d 1099 (9th Cir.

2011);; *Am. Atheists, Inc. v. City of Starke*, 2007 U.S. Dist. LEXIS 19512 (M.D. Fla. 2007).

Imposing legally recognized parody marriages of any kind on the states does not "dignify"

homosexuals, polygamists, zoophiles, and objectophiles religious ideology. *Obergefell* at 14.

What this imposition attempts to accomplish is to dignification of the religion of Secular

---

[25] *Ginsberg v. New York*, 390 U.S. 629, 639–40, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), *Mishkin v. State of New York*, 383 U.S. 502, 509, 86 S. Ct. 958, 16 L. Ed. 2d 56 (1966), and *Bookcase, Inc. v. Broderick*, 18 N.Y.2d 71, 271 N.Y.S.2d 947, 951, 218 N.E.2d 668, 671 (1966). Only in regards to secular marriage between one man and one woman, the *Obergefell* Majority is correct in explaining that marriage is "'the foundation of the family and of society, without which there would be neither civilization nor progress'" and that marriage has long been "'a great public institution, giving character to our whole civil polity.'" *Obergefell* at 16 quoting *Maynard v. Hill*, 125 U. S. 190, 211 (1888). It is more reason to enjoin the state from legally recognizing parody marriage because all forms of parody marriage are a material threat to community standards of decency and violate the obscenity codes by promoting obscenity. All forms of legally recognized marriage normalize false permission giving beliefs about sex, erode consent, promote vulgarity, encourage sexual exploitation, and are objectively depersonalizing and dehumanizing, eroding liberty interest.

Humanism, but what it actually amounts to is a violation of the Establishment Clause, and it has

cultivated more division and more distrust of Secular Humanists, especially as Secular

Humanists become more entitled and dangerous. *Obergefell* at 14. Because the "stated purpose

[of gay marriage and all other pro-gay policies have] not [been] actually furthered…then that

purpose [must be] disregarded as being insincere or a sham." *Church of Scientology v. City of

Clearwater,*. 2 F.3d 1514, 1527 (11th Cir. 1993).[26]

### (2) THE MISUSE OF THE EQUAL PROTECTION CLAUSE IS A SHAM

---

[26] The history of parody marriages cuts deeply against legally recognizing them under the Establishment Clause. The *Obergefell* Majority admitted, "Until recent decades few persons had even thought about or considered the concept of same-sex marriage. In part, that is because homosexuality was condemned and criminalized by many states through the mid-20th Century. It was deemed an illness by most experts." Id. at 7. The Secular Humanist on the bench do not even hide the fact that they are misused their power to enshrine the doctrine of the LGBTQ church to make it seem more plausible and respectable in view of its tarnished past. The question is not whether homosexuality, transgenderism, zoophilia, polygamy, and machinism marriage are "unthinkable" or evidence of an "illness." Id. The question is whether such marriages are "secular" for purposes of the Establishment Clause. They are not. The second question is whether forcing the states to recognize parody marriages that are questionably moral and legal causes the state itself to promote obscenity and erode community standards of decency. They do. It violates the fundamental First Amendment Right of the State themselves for five irrational desensitized jaded Secular Humanist lawyers on the bench to tell the State that it cannot uphold community standards of decency by forcing the states to promote a worldview that the Supreme Court admits is questionably legal and moral. Doing so violates the USSC's holding in *Paris Adult Theatre I v. Slaton,* 413 US 49, at 63, 69 (1973) that states have a compelling interest to uphold community standards of decency and to offset the secondary harmful effects of indecency. We might indeed "live in a vulgar age," but "American is [not a savage] Nation." *Church of the Holy Trinity v. United States,* 143 U.S. 457 (1892). The Majority in *Obergefell* admits that "same-sex [buggery] long had been condemned as immoral by the state itself in most Western nations, a belief often embodied in the criminal law." *Obergefell* at 7. On balance, the history of homosexuality cuts against gay marriage, and exposes it is as a non-secular sham designed to normalize religious beliefs on sex and morality flowing from the church of moral relativism. In regards to Substantive Due Process, the *Obergefell* Court was never just "interpreting the Constitution" it was using the power of its office to enshrine dogma coming from the church of secular humanism in violation of the Establishment Clause in light of *Torcaso* at 495. *Obergefell* at 10. The *Obergefell* Court states: "The identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution. That responsibility, however, "has not been reduced to any formula." *Poe v. Ullman,* 367 U.S. 497, 542 (1961) (Harlan, J., dissenting) *Obergefell* at 10. But that is another lie floated by the Secular Humanist on the bench. Here is the "formula," if a proposed fundamental right, like abortion or the the right to have parody marriage legally recognized, is implicitly religious for being based on a series of naked assertions and unproven faith based assumptions, then the proposed fundamental right is nothing more than a proposed non-secular sham designed to establish secular humanism as the National religion in violation of the Establishment Clause in a pathetic attempt to justify some kind of atrocious activity that is more likely than not objectively immoral, dehumanizing, asinine, and removed from reality. The fact that the *Obergefell* Court clearly abused substantive Due Process in reading the right of gay marriage into the Constitution proves that the State's implementation of that unconstitutional policy is a sham under prong one of *Lemon*.

Since the Equal Protection Clause served as the second legal basis to impose gay marriage on all 50 states, the Plaintiffs preliminarily pause to identify what it is in a manner that the public can understand and when it can be used. Basically, if the matter at hand involves "immutability" and "genetics," then a Court might have subject matter jurisdiction to determine if a violation of the Equal Protection Clause has been committed by a government actor. For example, it is self-evident that "race" is immutable; so race is a suspect class for purposes of the Equal protection Clause. No state actor can discriminate on the basis of race - no matter what color the person is to include members of non-obvious race classes. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 27879, 96 S. Ct. 2574, 2578, 49 L. Ed. 2d 493 (1976). The Plaintiffs provided sworn statements from ex-gay activists who converted to a totally different identity narrative, which casts doubt on the fake "immutability" narrative, showing that the Majority in *Obergefell* was "playing pretend."[27] In step with recent studies, like the one from the Coalition of Doctors Defending Reparative Therapy, the Plaintiffs provided sworn statements from medical professionals who testify that just as there is no evidence that a "rape gene," there is no evidence that a gay gene exists either.[28] Although the Majority in *Obergefell* said that there is

---

[27] (DE 13 Lisa Boucher ¶¶ 1-10; DE 12 Quinlan ¶¶ 1-37; DE 21 Pastor Cothran ¶¶ 1-50; DE 14 Dr. King ¶¶ 1-20; DE 20 Dr. Cretella ¶¶ 1-20; DE 19 Goodspeed ¶¶ 1-20; DE 11 Grace Harley ¶¶ 1-25; DE 18 Pastor Cuozzo; ¶¶ 1-21; DE 10 Pastor Farr ¶¶ 1-33; DE 17 Pastor Penkoski ¶¶ 1-34; DE 15 Pastor Cairns ¶¶ 1-30;; DE 16 Christian Resistance ¶¶ 1-21; DE _ Special Forces Of Liberty ¶¶ 1-34). See Amicus Briefs of the Center For Garden State Families; the WW Bridal and the American Family Association of PA; National Alliance of Black Pastors; and the Coalition of Doctors Defending Reparative Therapy. The *Obergefell* Majority was outright lying when it said that "due to the immutable nature of homosexuality," self-identified homosexuals warrant the "benefits and privileges of marriage." *Obergefell* at 4.
[28] DE 16 Dr. King ¶¶ 1-20; DE 15 Dr. Cretella ¶¶ 1-20. The Obergefell Majority mischaracterized when they stated, "Only in more recent years have psychiatrists and others recognized that sexual orientation is both a normal expression of human sexuality and immutable." At best, psychiatrists have found no evidence that a gay gene exists or that homosexuality is immutable, if anything it is borderline to suggest that homosexuality is immutable when there are tens of thousands of self-identified homosexuals who have completely converted to a different identity narrative.

"synergy" between the Due Process Clause and the Equal Protection Clause, it "fail[ed] to

provide even a single sentence in explaining how" the Equal Protection Clause applies.[29]

   The Court in *Obergefell* relied heavily on *Loving* in trying to make the case that gay

marriage bans violate the Equal Protection and Due Process Clauses like interracial marriage

bans did. Id. at 12. *Loving* was an action where a white man legally married a black woman but

there was an arbitrary interracial marriage ban that made the marriage illegal. The inter-racial

marriage ban was rightfully struck down on under the Due Process and Equal Protection Clauses.

However, when the Supreme Court rightfully invalidated the state's ban on interracial marriage

in *Loving*, 388 U.S. 1, 12, it did not do so on the fake basis of "sexual orientation" but on the

discrimination of the basis of race through a legitimate application of the Equal Protection and

Due Process Clauses of the Fourteenth Amendment. It is simple, "race" is based on

immutability, "sexual orientation" is based on faith.  By filing this action at great personal

expense to themselves, the Plaintiffs are zealously defending that legitimate application of the

Equal Protection Clause, safeguarding the race-based civil rights movement lead by pastor

Martin Luther King Jr. from dishonest Secular Humanists who seek to exploit it. There is an

insurmountable distinction with a difference between *Loving* and *Obergefell*.  In *Loving* (1) the

man-woman marriage at issue was "secular" for purposes of the Establishment Clause and (2)

---

[29] The Majority in *Obergefell* suggests that there is a "synergy" between the Equal Protection and Due Process Clauses of the Fourteenth Amendment. The *Obergefell* Majority alleged that Due Process and the Equal Protection Clause are connected in a profound way but failed to say how that is true. Obergefell at 19. Judge Robert's description in his dissent is accurate as he stated: The majority goes on to assert in conclusory fashion that the Equal Protection Clause provides an alternative basis for its holding. *Ante*, at 22. Yet the majority fails to provide even a single sentence explaining how the Equal Protection Clause supplies independent weight for its position, nor does it attempt to justify its gratuitous violation of the canon against unnecessarily resolving constitutional questions. See *Northwest Austin Municipal Util. Dist. No. One v. Holder*, 557 U. S. 193, 197 (2009). In any event, the marriage laws at issue here do not violate the Equal Protection Clause, because distinguishing between opposite-sex and same-sex couples is rationally related to the States' "legitimate state interest" in "preserving the traditional institution of marriage." *Lawrence*, 539 U. S., at 585 (O'Connor, J., concurring in judgment.

since race is "immutable," the matter rightfully was decided upon the Fourteenth Amendment, whereas in *Obergefell* (1) the gay marriages at issue were "not secular," failing the Establishment Clause by a landslide and (2) since testimony of ex-gays proves that homosexuality is not immutable, the matter was wrongfully decided upon the Fourteenth Amendment.[30] Accordingly, the holding in *Loving* is valid, whereas, the holding in *Obergefell* was a complete sham that serves as a real danger to the integrity of the valid race-based civil rights movement.[31] Proponent of the government's endorsement of Drag Queen Story Hour and gay marriage are the real bigots, who are engaging in unlawful racial exploitation by falsely equating two plights as if they were equal, while knowing that they are not. It is an evil that the United States Establishment Clause cannot allow. The Plaintiffs are asking the Court and the Defendants to muster the common sense and integrity to put politics aside and admit it.

## B. PRONG TWO: GAY MARRIAGE AND PRO-GAY POLICIES HAVE THE EFFECT OF ENDORING SECULAR HUMANISM

Under this second prong of the *Lemon* test, courts ask, "irrespective of the . . . stated purpose, whether [the state action] . . has the primary effect of conveying a message that the [government] is advancing or inhibiting religion." *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766,

---

[30] *Loving*, 388 U. S. 1, 12;; *Obergefell* at 12.

[31] (DE 13 Lisa Boucher ¶¶ 1-10; DE 12 Quinlan ¶¶ 1-37; DE 21 Pastor Cothran ¶¶ 1-50; DE 14 Dr. King ¶¶ 1-20; DE 20 Dr. Cretella ¶¶ 1-20; DE 19 Goodspeed ¶¶ 1-20; DE 11 Grace Harley ¶¶ 1-25; DE 18 Pastor Cuozzo; ¶¶ 1-21; DE 10 Pastor Farr ¶¶ 1-33; DE 17 Pastor Penkoski ¶¶ 1-34; DE 15 Pastor Cairns ¶¶ 1-30;; DE 16 Christian Resistance ¶¶ 1-21; DE _ Special Forces Of Liberty ¶¶ 1-34). See Amicus Briefs of the Center For Garden State Families; the WW Bridal and the American Family Association of PA; National Alliance of Black Pastors; and the Coalition of Doctors Defending Reparative Therapy. *Obergefell* at 3.While it is not "loving" to pretend that "gay rights" are civil rights, it is also Constitutional malpractice that amounts to racism in kind perpetrated by Secular Humanist Judges who align with the Democratic party. The Majority's in *Obergefell* reliance on *Loving* to justify its religious judicial policy making is the kind of intentional judicial malpractice that in and of itself shows that legally impose gay marriage is a non-secular sham that violates the Constitution under prong 1 of *Lemon*. *Lemon*, 403 U. S. 657. For the *Obergefell* majority to pretend that gay-rights are like race-based civil rights, which are actually based on immutability, only to not really mean it, is the kind of fraud and racial animus in kind as a result of a refusal to think logically that demands that the Secular Humanist on the bench be impeached under Judicial Improvements Act of 2002 under Art. I, § 2, cl. 5 for violating 18 U.S.C. § 2381.

771 (7th Cir. 2001). The "effect prong asks whether, irrespective of government's actual purpose," *Wallace v. Jaffree,* 472 U.S. 38, 56 (1985), the "symbolic union of church and state...is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *School Dist. v. Ball*, 473 U.S. 373, 390 (1985); *see Larkin v. Grendel's Den*, 459 U.S. 116, 126-27 (1982)(even the "mere appearance" of religious endorsement is prohibited).  When Chief Justice Roberts stated in his dissent in *Obergefell* "the truth is that today's decision rests on nothing more than the majority's own conviction that same-sex couples should be allowed to marry because they want to, and that "'it would disparage their choices and diminish their personhood to deny them this right,'" what the Chief Justice was really saying was that the Majority was - once again - wrongfully enshrining their "own [religious] conviction" flowing from the church of Secular Humanism in a continuing malicious effort to haul the United States under the caliphate of global Secular Humanism in violation of the Establishment Clause under *Torcaso,* 367 U. S. 495 in a manner that "diminishes" the Constitutional rule of law and "disparages" the integrity of the Fourteenth Amendment.[32]  "Sincerity of belief" in the plausibility of parody marriages does not permit the Defendants to legally recognize them because doing so has the effect of entangling government with the religion of western postmodern moral relativism and expressive individualism, i.e. Secular Humanism.[33] While there

---

[32] *Obergefell* at 19;;  *Torcaso* at 495

[33] In his dissent Chief Justice Roberts stated: "The majority's driving themes are that marriage is desirable and petitioners desire it. The opinion describes the "transcendent importance" of marriage and repeatedly insists that petitioners do not seek to "demean," "devalue," "denigrate," or "disrespect" the institution. *Ante*, at 3, 4, 6, 28. Nobody disputes those points. Indeed, the compelling personal accounts of petitioners and others like them are likely a primary reason why many Americans have changed their minds about whether same-sex couples should be allowed to marry." As a matter of constitutional law, however, the sincerity of petitioners' wishes is not relevant under *Holloman*, 370 F.3 1252  at 1285-1286.

has not been the promised land rush on gay marriage in the wake of *Obergefell*, there has been a landrush on the persecution of Christians. DE 13 Lisa Boucher ¶¶ 1-10; DE 17 Pastor Penkoski ¶¶ 1-34. The *Obergefell* majority straight up lied when it stated:

"Indeed, with respect to this asserted basis for excluding same-sex couples from the right to marry, it is appropriate to observe these cases involve only the rights of two consenting adults whose marriages would pose no risk of harm to themselves or third parties." *Obergefell* at 27.

Gay marriage licenses, with the state's imprimatur, are a license for devout disciples of Secular Humanism to harangue, marginalize, and oppress non-observers of the religion of Secular Humanism through any means available. As if copied from Orwell's book 1984, legally recognized gay marriage is "an indefensible legal weapon that no [non-observer] can obtain" that can be used to control thought and speech. *City of Boerne v. Flores,* 521 U.S. 507 (1997). In the wake of *Obergefell,* there have been hundreds of thousands of documented and undocumented controversies where Secular Humanist are persecuting Christians with no end in sight.[34] The evidence shows that when a brainwashed Secular Humanist floats that "love is love" what they really mean is that they are perfectly ok with government assets being used to crush anyone who does not respect their jaded Secular Humanist religious orthodoxy, which is categorically "unloving." In response to filing this case, the Plaintiffs have been bombarded with threats from phony tolerant LGBTQ and transgender activists, who prove that the government's endorsement of their worldview only plunged them into a deeper state of deception, entitlement, and confusion to the point that they are now proactively breaking the law and becoming a danger to

---

[34] *Moore v. Judicial Inquiry Commission of the State of Alabama*, 200 F.Supp.3d 1328 (M.D.Ala. 2016);; *Patterson v. Indiana Newspapers,* Inc., 589 F.3d 357 (C.A.7 (Ind.) 2009);; *Gadling-Cole v. West Chester University,* 868 F.Supp.2d 390, (E.D.Pa. 2012);; *Miller v. Davis,* 123 F. Supp. 3d 924 (E.D. Ky. 2015), appeal dismissed, Nos. 15-5880, 15-5978, 2016 WL 3755870 (6th Cir. July 13, 2016);; *Elane Photography, LLC v. Willock,* 2013 N.M. Lexis 284 at (N.M. Aug. 22, 2013);; *Cervelli v. Aloha Bed & Breakfast,* No. 11–1–3103–12 ECN (Haw. Cir. Ct. Dec. 19, 2011).

themselves and others. The only real take away from the Obergefell and Windsor putsch is that (a) people who are intolerant of intolerant people are intolerant, (b) people who are judgmental against judgmental people are judgmental, and (c) people who are dogmatic about not being dogmatic are the most dogmatic.  There are millions of Americans, who self-identify as Christ Followers, who will never support parody marriages no matter how much coercion Secular Humanists in and out of office attempt to impose on them.  Period-full stop. These Christ followers believe that to encourage immorality is itself an act of immorality.  It is irrelevant whether other religious groups "condone" parody marriages, what matters is that parody marriages are religious and to legally recognize them is unlawful under the Establishment Clause because it has a coercive effect on taxpayers for the government to do so. *Obergefell* at 27. The Secular Humanist Majority in *Obergefell* stated, "of course, those who oppose same-sex marriage, whether on religious or secular grounds, they continue to advocate that belief with the utmost conviction." *Obergefell* at 27. The Plaintiffs do not "oppose" legally recognized parody marriage on either "religious" or "secular grounds." No indeed!  The Plaintiffs "oppose" legally recognized the enforcement of gay marriage policy and all other pro-gay policies that respect homosexual orthodoxy because they are unequivocally non-secular shams, that create indefensible legal weapons against the non-observes of the religion of Secular Humanism, while excessively entangling the government with the religion of Secular Humanism. The *Lemon* Test does not only keep the government from endorsing the unproven truth claims of Christianity, it also applies to stop the government from endorsing the unproven truth claims of Secular Humanist cults, like the LGBTQ community.  It is the Secular Humanist on the bench and throughout the Democratic party who lack the "utmost conviction" to honor their oath to uphold

the Constitution. It is why they must be impeached, the state enjoined, and *Obergefell* overruled

by this Article III Court immediately because the right Constitution prescription is finally being

brought to bare on this matter to resolve how the government must treat parody marriages and

self-asserted sex-based identity narratives that do not even check out with the way things are and

the way we are as humans. By filing this action, the Plaintiffs are fighting to restore

Constitutional rights that have been trampled by the government's imposition of rights that are

fake and serve to make Secular Humanism the national religion. Now that the dynamic of the

Supreme Court is changing, the attempted Constitutional overthrow by LGBTQ activits is going

to collapse in on itself. See the Marriage And Constitution Restoration Act.

marriagerestorationact.com. To prevent a violent reaction by the LGBTQ community, which

prides itself on not believing in right and wrong, the Court and the Defendants should put their

personal welfare aside and lead the way to undo the government's entanglement with the LGBT

Secular Humanist religion immediately.

## C. PRONG THREE: THE CREATION AND ENFORCEMENT OF GAY MARRIAGE AND PRO-GAY POLICIES PROMOTES EXCESSIVE ENTANGLEMENT

Under Prong three, the government cannot foster excessive entanglement with religion

and establish one religion as the supreme national religion. *In re Young*, 141 F.3d 854 (8th Cir

1998); *Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338, 349 (2d Cir. 2007). It

is not just that the imposition of gay marriage on all 50 states has cultivated in excess

entanglement of government and the religion of Secular Humanism somewhat, the entire

Democratic Party's platform is relentlessly fixated on identity politics, which is merely an

emotionally exploitative imperialistic power play. Besides promoting identity politics, the

Democratic party offers little in the way of substantive solutions. For example, some of the

members of the Special Forces Of Liberty recently sued four Democratic Congressmen for displaying the Gay Pride Rainbow Colored Flag in the public hallways of Cannon and Longworth. *Sevier v. Lowenthal* 17-cv-570 (D.C. Cir 2017). The plaintiffs in that case assert that the manner in which the flags are displayed are as unconstitutional as Judge Moore's display of the Ten Commandments in his Courtroom. *Glassroth v. Moore*, 335 F.3d 1282 (11th Cir. 2003). In response to the plaintiffs lawsuit against the Congressmen, several of these Democrat leaders took to the media to stir up hatred towards the plaintiffs by maliciously publishing false statements, calling them "the voices of hatred and bigotry" for asking that the Congressional members merely comply with their duty under Article VI of the Constitution to uphold it. The self-help misconduct of these inept members of Congress - alone - show that legally recognized gay marriage is a sham for purposes of the Establishment Clause. The Democrats are not hiding the fact that they consider LGBTQ ideology a religion.[35] The Special Forces Of Liberty are going to return back to D.C. to unleash a new round of a massive amount of litigation against the Democrats now that they have sharpened their arguments and formed an army of supporters.

Furthermore, while there has been no "landrush" on gay marriage, there has been a "land rush" by Secular Humanist to infiltrate public schools and public libraries with the intent to indoctrinate minors to a sexualized worldview that does not check out with the human design and that was illegal until recently. The logic behind that unconstitutional misconduct is that Secular Humanists are exploiting the government's endorsement of their faith-based and obscene worldview view to abuse the integrity of government as a vehicle for indoctrination. It is a form of rape by trick that is obscene, non-secular, and objectively evil. If Judge Rosenthal cannot see that, then like Mayor Turner, she is unfit for office.

---

[35] https://www.jerseyconservative.org/blog/2017/9/3/democrats-rally-with-wiccan-symbol-on-flag

The misuse of public schools and public libraries by intellectually blind Secular Humanists is not cultivating unity and tolerance, it is traumatizing children and opening the door to sexual exploitation by the normalization of false permission giving beliefs that erode consent. It is a violent act that possibly warrants the use of hostile force under the transferred right of self-defense by parents in the protection their children. Unless this Court and the Defendants want to be culpable for possible hostile acts and insurmountable constitutional malpractice, they should grant the plaintiffs' request in full and hogtie the transgender community form using the government to sexualize and indoctrinate minors to their obscene religious orthodoxy. Failure to do so amounts to an internalized assault on the United States Constitution.

It was at all times foreseeable by the Secular Humanist on the United States Supreme Court that while the issuance of a gay marriage license condoned fake marriage, it amounted to a very real permit for desensitized Secular Humanists to infiltrate public elementary schools and public libraries for the sole purpose of converting minors to their exploitative faith that violates the obscenity codes. While self-identified homosexuals are certainly not second class citizens, they are objectively promoting a second class lifestyle based on intellectual dishonesty. The United States Supreme Court has emphasized that there are "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools," *Lee*, 505 U.S. at 592, and the federal courts have thus "been particularly vigilant in monitoring compliance with the Establishment Clause" in the public-school context, see *Edwards*, 482 U.S. 578- 583. The Public Libraries, like public elementary schools, are taxpayer funded government institutions that cannot be misused by religious organizations to recruit converts.

There are millions of taxpayers who are fed up with government actors pretending that LGBTQ community is not non-secular and that it is not promoting a gospel narrative of obscenity that erodes community standards of decency inside of public schools. (DE 18 Pastor Penkoski ¶¶ 1-28). In looking at motives of the heart, the reason why Secular Humanists try desperately to entangle our government with their religion is because they are full of shame and guilt and feelings of inadequacy. Secular Humanists have no place to put their shame and guilt, and they ceaselessly seek to turn government into their own personal church to justify the plausibility of their ideology that violates transcultural universal law. But the Government of the United States is not a redeemer. It is not a church. The government cannot be used by Secular Humanists in an effort to explain away the natural feelings of shame and guilt that naturally come from putting Secular Humanist principles into practice. The State and Federal Government is secular and can only base its laws and policies on neutral and self-evident truth that accords with natural law.

The Plaintiffs assert that "American is [not officially] a Christian Nation" insofar as making Christianity mandatory would cultivate the very legalism that Christ Himself was so adamantly opposed to. *Church of the Holy Trinity v. United States*, 143 U.S. 457 (1892).[36] Christianity is a free gift predicated on a relationship with a trinity undertaken by faith. Christianity is not about keeping all of the moral rules. Yet, it could be suggested that "America is [unofficially] a Christian Nation" insofar as laws and policies that coincidently parallel the restrictions advocated by the personalized centralized figure of the radically transformative New Testament Gospel Narrative are not rendered unconstitutional automatically because they also

---

[36] After all, Christians repent not only of their sins but of their righteousness. In Europe the state was in the church and that crushed the church there.

happen to parallel neutral self-evident universal transcultural truth, like the kind of universal

truth that was the legal basis used to condemn the conduct of Nazis at the Nuremberg trials at the

end of World War II. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 154 (2d Cir. 2010).[37]

The doctrines of Secular Humanism is not based on natural universal truth. Secular Humanist

truth claims appear to be nothing more than a pathetic effort to rationalize and justify activity

that is objectively depersonalizing, dehumanizing, desensitizing, destructive, damaging, and

dumb. While the Government has to avoid entanglement with the doctrines of Secular

Humanism, it certainly cannot impose policies that promote it. The government must remain

detached when it comes to respecting identity narratives. If a person uses the Free Exercise

Clause to self-identify as a wizard, they can. But that does not mean that the government can

undertake any government action to respect that individuals belief that he is a wizard. The

government certainly cannot appropriate any tax dollars that affirm a person's belief that he is a

wizard. (See also the Life Appropriation Act).

### The Unbalanced Distribution Of The Constellation of Benefits Exclusively To Self-Identified Homosexuals Discriminates Against "Religion And Religion" And Entangles Government With The Religion Of Secular Humanism In Violation Of Prong III Of *Lemon*

The final reason that gay marriage was imposed was because the Majority found that the

self-identified homosexuals deserved a "constellation of benefits" to pay respect to their

ideological faith-based identity narratives.[38] Unlike legally marriage self-identified

homosexuals, self-identified polygamists and self-identified objectophiles who seek legal respect

---

[37] In his letters from a Birmingham jail, Dr. Martin Luther King wrote that the way that he knew that a law was unjust is if it offended a "higher law" or a "divine law." Divine law is transcultural.

[38] The Secular Humanist Majority in *Obergefell* stated:"marriage is a keystone of our social order, thus just as a couple vows to support each other, so does society pledges to support the couple, offering symbolic recognition and material benefits, including tax benefits, hospital visitation rights, child custody and support rules and adoption rights. Yet, by virtue of the challenged law same-sex couples are denied the constellation of benefits states have linked to marriage." *Obergefell* at 4 and 17 and See *Maynard v. Hill*, 125 U.S. 190, 211.

for their proposed marriages are denied that same "constellation of benefits" for reasons that can only be described as arbitrary, if *Obergefell* was good law.[39]  Homosexuality, polygamy, zoophilia, and objectophilia are all merely different denominational sects within the overall church of Secular Humanism, western postmodern moral relativism, and expressive individualism.[40] Self-identified polygamists, zoopohiles, objectophiles, and pedophiles are entitled to the same "constellation of benefits" that self-identified homosexuals are, but a Constitutional problem remains. The evidence shows that to legally recognize polygamy and objectophile marriage in order to save legally recognized gay marriage would only further violate the Establishment Clause by only further putting "religion over non-religion," constituting a deeper violation of the First Amendment Establishment Clause.[41]  That is, for the government to legally recognize and respect polygamy marriage and objectophile marriage would only further entangle the government with the religion of Secular Humanism in manner that would further erode the freedom of Christians, Muslims, and Jews.  There are millions of Americans who object to their tax dollars going to support the LGBTQ ideology. The fact that benefits are going to the LGBTQ believers who legally marry violates prong three of *Lemon* for excessive entanglement.  Here is how the legal reasoning goes: since the Plaintiffs and millions of other taxpayers believe that homosexual orthodoxy and practices are immoral, it also follows that they believe that to endorse acts of immorality is itself a act of immorality. When

---

[39] *Obergefell* at 4 and 17;; *McCreary Cnty*, 545 U.S. at 844 - 864; *Engel,* 370 12 U.S. 431 - 436.

[40] (DE 13 Lisa Boucher ¶¶ 1-10; DE 12 Quinlan ¶¶ 1-37; DE 21 Pastor Cothran ¶¶ 1-50; DE 14 Dr. King ¶¶ 1-20; DE 20 Dr. Cretella ¶¶ 1-20; DE 19 Goodspeed ¶¶ 1-20; DE 11 Grace Harley ¶¶ 1-25; DE 18 Pastor Cuozzo; ¶¶ 1-21; DE 10 Pastor Farr ¶¶ 1-33; DE 17 Pastor Penkoski ¶¶ 1-34; DE 15 Pastor Cairns ¶¶ 1-30;; DE 16 Christian Resistance ¶¶ 1-21; DE _ Special Forces Of Liberty ¶¶ 1-34). See Amicus Briefs of the Center For Garden State Families; the WW Bridal and the American Family Association of PA; National Alliance of Black Pastors; and the Coalition of Doctors Defending Reparative Therapy.

[41] Just as government officials may not favor or endorse one religion over others, so too officials "may not favor or endorse religion generally over non-religion." *Lee,* 505 U.S. at 592(Souter, Justice, concurring)(citing *County of Allegheny v. ACLU,* 492 U.S. 573, 589-94, 109 S.Ct. 3086, 106 L. Ed. 2d 472 (1989)

self-identifies homosexuals legally marry, they are entitled to what has been referred to by the *Obergefell* Majority as a "constellation of benefits." The Defendants in this case in some part oversee the distribution of some of those constellation of benefits that flow from the coffers of the general fund to to self-identified homosexuals. The Plaintiffs and other taxpayers who believe that homosexual is immoral and implausible are wrongfully paying the cost for the unconstitutional appropriation of those benefits and for the benefits themselves. This unconstitutional appropriations arrangement causes the Plaintiffs to violate their own conscious through the simple act of paying taxes. It is an evil at the United States Constitution does not allow. If Judge Rosenthal cannot see that, she is unfit to serve on the bench.

Since the Plaintiffs are responsible for authoring tax legislation, entitled the Human Trafficking And Child Exploitation Prevention Act and the Admission Act, that will generate millions of dollars for the state annually, they have a logical nexus to enjoin the state from engaging in non-secular action that promotes the erosion of community standards of decency and that misuses tax dollars more so than just about any other individual in the state. If the Court or Defendants attempt to disagree, it will create bad precedent that the Plaintiffs will turn into a sword that they will turn around an use in a way that neither will like.

The Plaintiffs are not just asking the Court to shut down this flagrant Constitutional and political malpractice that the Defendants are guilty of. No indeed! The Defendants themselves have an immediate duty to stop the conduct complained of by the Plaintiffs pursuant to Article VI.

## IV. MAN-WOMAN MARRIAGE IS SECULAR AND THEREFORE NOT CHALLENGED UNDER THE ESTABLISHMENT CLAUSE

The Special Forces Of Liberty and De Facto Attorney Generals are like the honest version of the ACLU. The Plaintiffs in this action do not move the Court to enjoin the State actors from legally recognizing man-woman marriage for the reasons set forth in the Marriage And Constitution Restoration Act and the concurrent resolution that four states introduced last session and that nearly every state - to include this one will introduce and pass. Now that Justice Kennedy has stepped down because the Masterpiece Cakeshop case required it, the Marriage And Constitution Restoration Act will become the law of the land simply because it reflect exactly what the First Amendment Establishment and Free Exercise Clause of the United States Constitutional already says. Take note that the Plaintiffs are getting tired of doing the job of inept Attorney Generals.

While the States are prohibited from legally recognizing any form of parody marriage, the States can permissibly legally recognize, respect, endorse, and enforce man-woman marriage policies because man-woman marriage itself and man-woman marriage policies are natural, neutral, non-controversial, and secular in nature. It is not as if there would be public outrage if Dr. Emerson Eggerichs, the author of "Love and Respect," held a story hour at the public library to discuss ways to strengthen actual marriages between a man and a woman. The same cannot be said when it comes to the public library hosting "Drag Queen Story Hour" for children. Just because the country clerks are issuing man-woman marriage licenses, does not mean that cake bakers, like Jack Phillips, or bridal shop owners, like Victoria Miller from WW Bridal, are willing to lose their businesses for refusing to take a scalpe to the Bible and carve out the parts that some say are no longer culturally relevant.

While the Plaintiffs have moved to enjoin the State from legally recognizing gay marriage under the Establishment Clause, the Plaintiffs do not move to enjoin the State from

legally recognizing man-woman marriage because it is the only secular form of marriage that

exists for purposes of the Establishment Clause.[42] The fact of the matter is that Man-woman

marriage is neutral, natural, non-controversial and predicated on the same self-evident truth that

the Constitution of the United States itself is based on. As the Majority in *Obergefell* put it:

"[Secular marriage] has existed for millennia and across civilizations between one man and one
woman. Marriage between one man and one woman is the foundation of the family and of
society, without which there would be neither civilization nor progress," *Maynard v. Hill*, 125 U.
S. 190, 211 (1888). We later described marriage between one man and one woman is
fundamental to our very existence and survival." *Obergefell* at 16.

The Majority in *Obergefell* stated that "this court has held the right to marry as fundamental. Of

course in doing so it resumed an opposite sex union, one man, one woman," but that is too

simplistic to be true. The right to marry at best could be considered fundamental for those who

wish to enter into a secular marriage not a faith-based parody marriage, since the Establishment

Clause prohibits that. Nowhere in the Constitution does it say that marriage is not a fundamental

right. Just like many Secular Humanists imagine that there are more than two genders, they

imagine that there are things that in the Constitution that simply are not there. According to the

written Establishment Clause, the States cannot respect parody marriages but the States are not

prohibited from respecting man-woman marriages, which actually fulfill compelling state

interests and do not erode community standards of decency. The Court is asked to find as much.

43

---

[42] Besides writing the Marriage And Constitution Restoration Act, the Plaintiffs have authored the Elevated
Marriage Act, which cures the criticism of the Covenant Marriage Act that was originally written by Tony Perkins
of the Family Research Counsil.

[43] **THE BRIGHT LINE RULE IN *STATE V. HOLM* IS THE SOLUTION**
There is an absolute final answer as to how all 50 states must legally define marriage. The answer comes through the
bright line rule which was created out of *State v. Holm*, 137 P.3d 726, 734 (Utah 2006). The bright line rule strikes
the perfect balance between the Freedom of Expression Clause and the Establishment Clause both of which are part
of the First Amendment. Under the Freedom of Expression Clause and in view of the bright line rule, any individual
can self-identify as a homosexual, transgender, zoophile, objectophile, pansexual, wizard, unicorn, and so forth.
These individuals can have as many wedding ceremonies as they would like. However, under the Establishment

## VI. CONCLUSION

Judge Lee Rosenthal has been on the bench for nearly three decades and has demonstrated with a single substanceless sentence that she is a political hack. Dishonesty never pays. Because Judge Rosenthal thought it was smart to intentionally abuse her discretion now Gabriella Banks - a reporter who has stalked and harassed Plaintiff Sevier for years - has spread the Judge Lee Rosenthal's imperialistic abuse throughout the entire city of Houston.

At 8:42 she wrote:

A federal judge in Houston swiftly ended a chapter Wednesday for a group of conservative Christian activists seeking to stop the Drag Queen Story Hour at a local public library. Chief U.S. District Judge Lee H. Rosenthal put it simply in her four sentence order, issued just days after the lawsuit — blasting gay marriage and transgender public events— was filed against Mayor Sylvester Turner and Rhea Lawson, the head of the city's library system. The judge explained the four litigants applied for injunction to halt the story hour on the grounds that it violated the freedom or religion clause in the Constitution and said, "There is no basis to support the requested relief. The application is denied." The four individuals behind the case have not hired a lawyer. Mayor Sylvester Turner had a succinct reaction to the news on Wednesday that the group's request had been denied: "It's a frivolous lawsuit," he said, adding that no public money is used to fund the event, which was created by community members at the Freed-Montrose Library. Turner recently touted Houston as "the most diverse city in America." "We acknowledge and celebrate that diversity in all its dimensions," he said. "As mayor of this city I want us to be diverse and inclusive and I want to live in a city where people can be who they are and we can be tolerant of people's opinions, ideologies, sexual orientation, ethnicities, religion and... cultures." The story hour, one of many such events that is held around the country, is meant to inspire children to read and offer diverse role models, according to its organizers.

---

Clause and in view of the bright line rule, the government cannot legally recognize any of these self-asserted sex-based identity narratives or any parody marriage because doing so excessively entangles the government with the religion of Secular Humanism and has terrible secondary harmful effect that erodes freedom. While "gay marriage" is "fake marriage," the persecution following the government's decision to respect it is very real. If this Court chooses to tell the truth and enforce the bright line rule, the Honorable Justice Roberts will remain correct: "same-sex couples [will] remain free to live together, to engage in intimate conduct, and to raise their families as they see fit. No one is 'condemned to live in loneliness' by the laws challenged in these cases—no one." *Obergefell* at 17 (Roberts Dissenting). Yet, the trajectory of the First Amendment Establishment Clause is that legally recognized gay marriage must be done away with in a single instance by the both the Federal and State governments. When it comes to parody marriages, the Establishment Clause is the ultimate DOMA § 3 and it is the National Marriage ban.

Meanwhile, the Plaintiffs have repeatedly informed this Court that they will appeal any decision made by this Court and by the Western District of Louisiana to the Fifth Circuit Court of appeals. The Plaintiffs have repeatedly put this Court on direct notice that the Western District of Louisiana has enjoined the Lafayette public library during the duration of the litigation. And allow the Plaintiffs to save Judge Rosenthal the suspense, the Plaintiffs will prevail in Louisiana and they will ultimately prevail due to the fact that countless Red States are lining up to pass the Marriage And Constitution Restoration Act at the 2019 legislative session. The President is aware of that. The Plaintiffs do not care what Gabrielle Banks feels, the Supreme Court will uphold the Marriage And Constitution Restoration Act. This Court has been repeatedly warned that the planned protesters who will protest the Drag Queen Storytime have been threatened with serious acts of violence by the phony tolent the anti-diversity Secular Humanists. If the Court refuses to issue the temporary restraining order for implausible reasons that Judge Rosenthal lacks the ability and intelligence to explain, then true patriots in Texas may warrant the right to use any and all means necessary to ensure that the Houston Public Library does not trample their Constitutional rights. This Court should reconsider, do its job, and issue the temporary restraining order for the reasons set forth in this memorandum.

/s/Chris Sevier Esq./
DE FACTO ATTORNEY GENERALS
SPECIAL FORCES OF LIBERTY
ghostwarsmusic@gmail.com
BPR# 026577
1720 Bissonnet, Houston,
Texas 77005
(615) 500-4411
Bravo Three Zero

/s/Tex Christopher/
1720 Bissonnet, Houston,
Texas 77005 (832) 233-8879
Bravo Three Zero
(For will be represented by Eric Dick Esq.)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document and attached exhibits were mailed with adequate postage to the Defendants in this actions on October 24, 2018 to Mayor Sylvester Turner City of Houston P.O. Box 1562 Houston, TX 77251;; Defendant Lawson, 500 McKinney Street Houston, Texas 77002 (832) 393-1313

/s/Chris Sevier Esq./

 **Gmail**                                      Special Forces Of Liberty <ghostwarsmusic@gmail.com>

---

## Drag Queen Story Hour Lawsuit

**Banks, Gabrielle** <Gabrielle.Banks@chron.com>                    Wed, Oct 24, 2018 at 5:07 PM
To: Special Forces Of Liberty <ghostwarsmusic@gmail.com>

I'd welcome a comment on the denial of the injunction today by Judge Rosenthal. Could you tell me how many city libraries you have sued? Is this the first? Also I'm assuming this is Chris Sevier, of laptop fame, yes? Can you remind me where you live and how old you are?

**From:** Special Forces Of Liberty [mailto:ghostwarsmusic@gmail.com]
**Sent:** Saturday, October 20, 2018 8:05 PM
**To:** Banks, Gabrielle <Gabrielle.Banks@chron.com>
**Subject:** Drag Queen Story Hour Lawsuit

[Quoted text hidden]

**Breaking Now**



## NYC mayor hails quick work of security guard

### Mexican police arrest suspect in Houston security guard's murder

### 3-year-old's death in hot van ruled a homicide

### Mattis expected to send hundreds of troops to border

TEXT CHRON TO 77453 FOR BREAKING NEWS TEXT ALERTS



https://www.chron.com/news/houston-texas/houston/article/Houston-library-sued-by-anti-gay-
activists-over-13322045.php

# Houston library sued by anti-gay activists over Drag Queen Story Hour

By Gabrielle Banks   Updated 2:51 pm CDT, Sunday, October 21, 2018



**IMAGE 1 OF 8**

Tatiana Mala-Niña is shown before a performance at Rich's Houston, 2401 San Jacinto St., Sunday, Sept. 23, 2018, in Houston. Tatiana Mala-Niña said when she first started reading to youths there were no protesters, and the kids were excited to see her as a larger-than-life character.

---

A crew of anti-gay protesters rallied outside the federal courthouse Friday afternoon, announcing they have sued the Houston Public Library over a **city-sponsored Drag Queen Story Hour** which they say violates their freedom of religion.

Opponents of the story hour have also turned out to protest the library events, which began last summer in Montrose, the city's historic gay enclave. Similar drag queen events have been hosted around the country with the aim of providing role models for children.

Recommended Video

The lawsuit was filed Friday by a group who has vocally opposed

marriage equality and
that would have lifted
a federal judge to halt the
atrons.

ed as defendants,
." The lawsuit says the
storytelling sessions advertised as appropriate for patrons of all ages at the
Freed-Montrose Neighborhood branch should not be funded with taxpayer
dollars since the library would not host a "man-woman marriage storytelling
hour."

The group behind the lawsuit identify themselves as "Christ followers," taxpayers
and card-carrying library patrons. One of those bringing the lawsuit is Tex
Christopher, who says he homeschooled his children using library books.

Another plaintiff is Chris Sevier, who has filed a number of lawsuits across the
country, including one in Houston for the right to marry his laptop. If men can
marry men, he has argued, why can't he marry a computer. The plaintiffs also
include an evangelical minister and a woman who says she got into a custody
battle with her husband after he left her for a transgender woman.

*gabrielle.banks@chron.com*

© 2018 Hearst Communications, Inc.

**HEARST**

## NYC mayor hails quick work of security guard

### Mexican police arrest suspect in Houston security guard's murder

### 3-year-old's death in hot van ruled a homicide

### Mattis expected to send hundreds of troops to border

TEXT 'CHRON' TO 77453 FOR BREAKING NEWS TEXT ALERTS



https://www.chron.com/news/houston-texas/houston/article/Judge-rejects-conservative-Christian-group-s-13334135.php

# Judge rejects conservative Christian group's request to halt Drag Queen Story Hour

By Gabrielle Banks   Updated 6:58 am CDT, Thursday, October 25, 2018



**IMAGE 1 OF 9**

Tatiana reads a book to children during the monthly Drag Queen Story Time at Freed-Montrose Neighborhood Library, Saturday, September 29, 2018, in Houston. Saturday marked the one-year anniversary of the story
... more

A federal judge in Houston swiftly ended a chapter Wednesday for a group of conservative Christian activists seeking to stop the Drag Queen Story Hour at a local public library.

Chief U.S. District Judge Lee H. Rosenthal put it simply in her four sentence order, issued just days **after the lawsuit — blasting gay marriage and transgender public events— was filed against Mayor Sylvester Turner and Rhea Lawson,** the head of the city's library system. The judge explained the four litigants applied for injunction to halt the story hour on the grounds that it violated the freedom or religion clause in the Constitution and said, "There is no basis to support the requested relief. The application is denied."

Tex Christopher, a 45-

**Recommended Video**

year-old Houston businessman who is one of the people who filed the lawsuit, said he is taking the judge's denial in stride and looking forward to making his arguments in court that drag queens and transgender storytellers indoctrinate children to believe in another religion, which he identifies as Secular Humanism.

"I'm taking a stand for righteousness," Christopher said. "I'm calling out Mayor Turner."

**'I LOVE IT': Drag Queen story time events draw critics, fans at Houston libraries**

He said the group fears the storytellers are grooming children to be transgender.

"Why would they want to do that? Transgender (people) have the highest suicide rate. Why would we want to groom our children to be transgender?" he said.

Mayor Sylvester Turner had a succinct reaction to the news on Wednesday that the group's request had been denied: "It's a frivolous lawsuit," he said, adding that no public money is used to fund the event, which was created by community members at the Freed-Montrose Library.

Turner recently touted Houston as "the most diverse city in America."

"We acknowledge and celebrate that diversity in all its dimensions," he said. "As mayor of this city I want us to be diverse and inclusive and I want to live in a city where people can be who they are and we can be tolerant of people 's opinions, ideologies, sexual orientation, ethnicities, religion and... cultures."

The story hour, one of many such events that is held around the country, is meant to inspire children to read and offer diverse role models, according to its organizers.

*Gabrielle Banks covers federal court for the Houston Chronicle. Follow her on* **Twitter** *and send her tips at gabrielle.banks@chron.com.*

© 2018 Hearst Communications, Inc.

**H E A R S T**

# U.S. District Court
## Western District of Louisiana (Lafayette)
## CIVIL DOCKET FOR CASE #: 6:18-cv-01232-RRS-PJH

Guidry et al v. Elberson et al                          Date Filed: 09/18/2018
Assigned to: Judge Robert R Summerhays                  Jury Demand: None
Referred to: Magistrate Judge Patrick J Hanna           Nature of Suit: 440 Civil Rights: Other
Cause: 42:1983 Civil Rights Act                         Jurisdiction: Federal Question

**Plaintiff**

**Aaron Guidry**                          represented by   **Aaron Guidry**
                                                           1000 Renaud Dr Lot 163
                                                           Scott, LA 70583
                                                           337-277-6558
                                                           PRO SE

**Plaintiff**

**Mark Christopher Sevier**               represented by   **Mark Christopher Sevier**
                                                           1000 Renaud Dr Lot 163
                                                           Scott, LA 70583
                                                           615-500-4411
                                                           PRO SE

**Plaintiff**

**John Gunter, Jr**                       represented by   **John Gunter, Jr**
                                                           1000 Renaud Dr Lot 163
                                                           Scott, LA 70583
                                                           801-654-5973
                                                           PRO SE

**Plaintiff**

**Whitney Kohl**                          represented by   **Whitney Kohl**
*TERMINATED: 10/16/2018*                                   1000 Renaud Dr Lot 163
                                                           Scott, LA 70583
                                                           PRO SE

**Plaintiff**

**Joan Grace Harley**                     represented by   **Joan Grace Harley**
*TERMINATED: 10/16/2018*                                   1000 Renaud Dr Lot 163
                                                           Scott, LA 70583
                                                           PRO SE

**Plaintiff**

**Rich Penkoski**                         represented by   **Rich Penkoski**
*TERMINATED: 10/16/2018*                                   1000 Renaud Dr Lot 163
                                                           Scott, LA 70583
                                                           PRO SE

V.

**Defendant**

**Teresa Elberson**                       represented by   **Tammy Parker Pratt**
*In her official capacity as Director of Lafayette Public*   Ottinger Hebert
*Library*                                                   P O Drawer 52606
                                                           Lafayette, LA 70505-2606
                                                           337-232-2606
                                                           Fax: 337-232-9867
                                                           Email: tppratt@ohllc.com
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**John Bel Edwards**
*In His Offical Capacity as Governor of Louisiana*
*TERMINATED: 10/16/2018*

**Defendant**

**Jeffrey Martin Landry**
*In His Official Capacity as Attorney General of Louisiana*
*TERMINATED: 10/16/2018*

represented by **Margaret Annette C Collier**
LA Dept of Justice (N 3rd St)
1885 N 3rd St
Baton Rouge, LA 70801
225-326-6403
Fax: 225-326-6495
Email: collierma@ag.louisiana.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander T Reinboth**
LA Dept of Justice (94005)
P O Box 94005
Baton Rouge, LA 70804-9095
225-326-6000
Fax: 225-326-6098
Email: reinbotha@ag.louisiana.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Stuart R Shaw**
*In His Official Capacity as the Red River Parish Clerk*
*TERMINATED: 10/16/2018*

represented by **John Chris Guillet**
Corkern Crews & Guillet
P O Box 1036
Natchitoches, LA 71458-1036
318-352-2302
Fax: 318-352-7548
Email: chris@ccglawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tony Roswarski**
*In His Official Capacity as Mayor of Lafayette*
*TERMINATED: 09/19/2018*

**Defendant**

**Joel Robideaux**
*in his official capacity as Mayor-President of Lafayette*
*City-Parish Consoidated Government*

represented by **Joy C Rabalais**
Borne Wilkes & Rabalais
P O Box 4305
Lafayette, LA 70502-4305
337-232-1604
Fax: 337-232-1837
Email: rabalais@bornewilkes.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Allison McDade Ackal**
Borne Wilkes & Rabalais
P O Box 4305
Lafayette, LA 70502-4305
337-232-1604
Fax: 337-232-1837
Email: ackal@bornewilkes.com
*ATTORNEY TO BE NOTICED*

**Homer Edward Barousse , III**
Borne Wilkes & Rabalais
P O Box 4305
Lafayette, LA 70502-4305
337-232-1604
Fax: 337-232-1837
Email: barousse@bornewilkes.com
*ATTORNEY TO BE NOTICED*

**Kyle Nicholas Choate**
Borne Wilkes & Rabalais
P O Box 4305
Lafayette, LA 70502-4305
337-232-1604
Fax: 337-232-1837

Email: choate@bornewilkes.com
*ATTORNEY TO BE NOTICED*

V.

**Movant**

**Coalition of Doctors Defending Reparative Therapy**          represented by **Anna C Little**
P O Box 382
Highlands, NJ 07732
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**Center for Garden State Families**          represented by **Anna C Little**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/18/2018 | 1 | (*STRICKEN*) COMPLAINT against John Bel Edwards, Teresa Elberson, Jeffrey Martin Landry, Tony Roswarski and Stuart R Shaw (Receipt number 64635007330, filing fee $400) filed by Rich Penkoski, John Gunter, Jr, Mark Christopher Sevier, Grace Harley, Aaron Guidry, Whitney Kohl and Joan Grace Harley. (Attachments: # 1 Exhibits, # 2 Civil cover sheet) (crt,Devillier, W) Modified on 9/21/2018 to reflect submission as Deficient(Williams, L). Modified on 9/25/2018 to remove deficient status; see 24 Corrective Document (Dauterive, C). Modified on 10/17/2018 to reflect stricken. See 100 Order on Motion. (Alexander, E) (Entered: 09/19/2018) |
| 09/18/2018 | | CASE Assigned to Unassigned District Judge and Magistrate Judge Patrick J Hanna. (crt,Thigpen, M) (Entered: 09/20/2018) |
| 09/18/2018 | 1 | (*STRICKEN*) MOTION for Preliminary Injunction by Aaron Guidry, John Gunter, Jr, Mark Christopher Sevier. ADMINISTRATIVE ENTRY to capture motion event requested in 1 Complaint, 5 Amended Complaint. (crt,Williams, L) Modified on 9/21/2018 to assign document number (Williams, L) Modified on 10/17/2018 to reflect stricken. See 100 Order on Motion. (Alexander, E) (Entered: 09/21/2018) |
| 09/19/2018 | 3 | NOTICE of Change of Address by John Gunter, Jr and Mark Christopher Sevier. (crt,Dauterive, C) (Entered: 09/20/2018) |
| 09/19/2018 | 4 | NOTICE of Corrected Complaint, Alternatively, MOTION to Name Correct Defendant, Join Mayor Robideaux and to Nonsuit the Claims Against Mayor Roswarski re 1 Complaint by Mark Christopher Sevier. Motions referred to Magistrate Judge Patrick J Hanna. (crt,Dauterive, C) Modified on 9/20/2018 to edit text (Dauterive, C). (Entered: 09/20/2018) |
| 09/19/2018 | 5 | (*STRICKEN*) AMENDED COMPLAINT against John Bel Edwards, Teresa Elberson, Jeffrey Martin Landry, Stuart R Shaw and Joel Robideaux filed by John Gunter, Jr and Mark Christopher Sevier.(crt,Dauterive, C) Modified on 9/21/2018 to reflect submission as Deficient. (Williams, L) Modified on 9/27/2018 to remove deficient status; see 24 Corrective Document. (Dauterive, C) Modified on 10/17/2018 to reflect stricken. See 100 Order on Motion. (Alexander, E) (Entered: 09/19/2018) |
| 09/19/2018 | 6 | NOTICE of Filing Sworn Statements by Mark Christopher Sevier. (crt,Dauterive, C) (Entered: 09/20/2018) |
| 09/19/2018 | 7 | DECLARATION of Lisa Boucher re 1 Complaint, 5 Amended Complaint filed by Aaron Guidry, John Gunter, Jr, Mark Christopher Sevier. (crt,Dauterive, C) (Entered: 09/20/2018) |
| 09/19/2018 | 8 | DECLARATION of Joshua Busby re 1 Complaint, 5 Amended Complaint filed by Aaron Guidry, John Gunter, Jr, Mark Christopher Sevier. (crt,Dauterive, C) (Entered: 09/20/2018) |
| 09/19/2018 | 9 | DECLARATION of Joan Grace Harley re 1 Complaint, 5 Amended Complaint filed by Aaron Guidry, John Gunter, Jr, Mark Christopher Sevier. (crt,Dauterive, C) (Entered: 09/20/2018) |
| 09/19/2018 | 10 | DECLARATION of Robin Goodspeed re 1 Complaint, 5 Amended Complaint filed by Aaron Guidry, John Gunter, Jr, Mark Christopher Sevier. (crt,Dauterive, C) (Entered: 09/20/2018) |
| 09/19/2018 | 11 | DECLARATION of Jack Cairns re 1 Complaint, 5 Amended Complaint by Aaron Guidry, John Gunter, Jr, Mark Christopher Sevier. (crt,Dauterive, C) (Entered: 09/20/2018) |
| 09/19/2018 | 12 | DECLARATION of Dominick Cuozzo re 1 Complaint, 5 Amended Complaint filed by Aaron Guidry, John Gunter, Jr, Mark Christopher Sevier. (crt,Dauterive, C) (Entered: 09/20/2018) |
| 09/19/2018 | 13 | DECLARATION of Lane Farr re 1 Complaint, 5 Amended Complaint filed by Aaron Guidry, John Gunter, Jr, Mark Christopher Sevier. (crt,Dauterive, C) (Entered: 09/20/2018) |
| 09/19/2018 | 14 | DECLARATION of Charlene E Cothran re 1 Complaint, 5 Amended Complaint filed by by Aaron Guidry, John Gunter, Jr, Mark Christopher Sevier. (crt,Dauterive, C) (Entered: 09/20/2018) |
| 09/19/2018 | 15 | DECLARATION of Michelle Cretella re 1 Complaint, 5 Amended Complaint filed by Aaron Guidry, John Gunter, Jr, Mark Christopher Sevier. (crt,Dauterive, C) (Entered: 09/20/2018) |
| 09/19/2018 | 16 | DECLARATION of Tara M King re 1 Complaint, 5 Amended Complaint filed by Aaron Guidry, John Gunter, Jr, Mark Christopher Sevier. (crt,Dauterive, C) (Entered: 09/20/2018) |

| 09/19/2018 | 17 | DECLARATION of Gregory Quinlan re 1 Complaint, 5 Amended Complaint filed by Aaron Guidry, John Gunter, Jr, Mark Christopher Sevier. (crt,Dauterive, C) (Entered: 09/20/2018) |
|---|---|---|
| 09/19/2018 | 18 | DECLARATION of Rich Penkoski re 1 Complaint, 5 Amended Complaint filed by Aaron Guidry, John Gunter, Jr, Mark Christopher Sevier. (crt,Dauterive, C) (Entered: 09/20/2018) |
| 09/20/2018 | 2 | SUMMONS ISSUED as to John Bel Edwards, Teresa Elberson, Jeffrey Martin Landry, Tony Roswarski, Stuart R Shaw (crt,Thigpen, M) (Entered: 09/20/2018) |
| 09/21/2018 | 19 | NOTICE of Deficiency directed to Cynthia Burris as to Joan Grace Harley, Whitney Kohl, Rich Penkoski regarding 1 DEFICIENT? Complaint, 5 DEFICIENT? Amended Complaint. Reason: Cynthia Burris is rejected as counsel of record. Further, the document was signed by an attorney not admitted to practice before this court. If eligible, and your admission cannot be accomplished within ten days, you may provide a new signature page signed by a member of the bar of this court. See Fed.R.Civ.P.11 and LR11.1. Please refer to LR83.2.6 for specific requirements for pro hac vice admission. (crt,Williams, L) (Entered: 09/21/2018) |
| 09/21/2018 | 20 | ELECTRONIC ORDER. It has come to the undersigned's attention that the clerk's office has received numerous phone calls regarding this case. Given that the complaint, as amended, has been filed, this lawsuit will run its course without the need for any further communication by telephone, which serves to needlessly waste limited resources. While no further phone calls are necessary, any such calls should be directed to Magistrate Judge Hanna's chambers, not the clerk's office. It is further ordered that the plaintiffs' request to seal the docket sheet is hereby denied. Signed by Magistrate Judge Patrick J Hanna on 9/21/2018. (crt,Gardner, Caroline) (Entered: 09/21/2018) |
| 09/21/2018 | 21 | (*STRICKEN*) MOTION for Leave to File Excess Pages by Mark Christopher Sevier. Motions referred to Magistrate Judge Patrick J Hanna. (Attachments: # 1 Proposed Emergency Motion for an Ex Parte Preliminary Injunction and Motion for a Permanent Injunction and Declaratory Relief and Alternatively Motion for Summary Judgment, # 2 Proposed Memorandum in Support, # 3 Proposed Exhibits)(crt,Williams, L) Modified on 9/25/2018 to indicate Notice of Filing Corrective Document with Corrected Motion filed as document 25 . (Dauterive, C) Modified on 10/17/2018 to reflect stricken. See 100 Order on Motion. (Alexander, E) (Entered: 09/21/2018) |
| 09/22/2018 | 24 | CORRECTIVE DOCUMENT entitled Signature Page filed by Aaron Guidry, John Gunter, Jr, Joan Grace Harley, Whitney Kohl, Rich Penkoski, Mark Christopher Sevier regarding 1 Complaint. (crt,Dauterive, C) (Entered: 09/25/2018) |
| 09/22/2018 | 25 | CORRECTIVE DOCUMENT entitled Notice of Filing Corrective Document filed by Mark Christopher Sevier regarding 21 MOTION for Leave to File Excess Pages. (Attachments: # 1 Corrected Motion for Leave to File Excess Pages)(crt,Dauterive, C) (Entered: 09/25/2018) |
| 09/22/2018 | 26 | MOTION for Leave to File Excess Pages by Joan Grace Harley. (Attachments: # 1 Proposed Emergency Motion for Temporary Restraining Order, # 2 Proposed Memorandum in Support, # 3 Proposed Exhibits)(crt,Dauterive, C) (Entered: 09/25/2018) |
| 09/22/2018 | | Motions Transferred regarding 26 MOTION for Leave to File Excess Pages. Motions referred to Judge Robert R Summerhays. (crt,Dauterive, C) Modified on 9/25/2018 to correct filed date (Dauterive, C). (Entered: 09/25/2018) |
| 09/22/2018 | 27 | DECLARATION by John Gunter, Jr, Joan Grace Harley, Whitney Kohl, Mark Christopher Sevier. (Attachments: # 1 Exhibits) (crt,Dauterive, C) (Entered: 09/25/2018) |
| 09/22/2018 | 28 | DECLARATION by Joan Grace Harley. (crt,Dauterive, C) (Entered: 09/25/2018) |
| 09/24/2018 | 22 | (*STRICKEN*) MOTION for Temporary Restraining Order, MOTION for Preliminary Injunction, MOTION for Oral Argument by Aaron Guidry. Motions referred to Magistrate Judge Patrick J Hanna. (Attachments: # 1 Memorandum in Support, # 2 Exhibits, # 3 Declaration of Aaron Guidry, # 4 Proposed Temporary Restraining Order, # 5 Proposed Order regarding Oral Argument)(crt,Dauterive, C) Modified on 10/17/2018 to reflect stricken. See 100 Order on Motion. (Alexander, E) (Entered: 09/24/2018) |
| 09/25/2018 | 23 | ELECTRONIC MINUTE ENTRY issued by the Clerk. Case reassigned to Judge Robert Summerhays. Unassigned District Judge no longer assigned to case. All deadlines and hearings remain as set pending further review by the court. All future filings should bear the name of the new judge assignment. Approved by Chief Judge S Maurice Hicks, Jr on 9/25/2018. (crt,Reeves, T) (Entered: 09/25/2018) |
| 09/25/2018 | 31 | MOTION to Electronically File through ECF in this case only by Mark Christopher Sevier. Motions referred to Magistrate Judge Patrick J Hanna. (Attachments: # 1 Proposed order)(crt,Dauterive, C) (Entered: 09/27/2018) |
| 09/25/2018 | 32 | NOTICE of Filing Corrective Document re 21 MOTION for Leave to File Excess Pages by Mark Christopher Sevier (Attachments: # 1 Proposed Order)(crt,Dauterive, C) (Entered: 09/27/2018) |
| 09/25/2018 | 33 | NOTICE of Filing Corrective Document re 26 MOTION for Leave to File Excess Pages by Joan Grace Harley (Attachments: # 1 Proposed order)(crt,Dauterive, C) (Entered: 09/27/2018) |
| 09/25/2018 | 34 | NOTICE of Filing Corrective Document re 4 Notice of Corrected Complaint, 5 Amended Complaint by Aaron Guidry, John Gunter, Jr, Joan Grace Harley, Whitney Kohl, Mark Christopher Sevier (Attachments: # 1 Verifications by Chris Sevier, Rich Penkoski, John Gunter, Jr, Whitney Kohl and Joan Grace Harley)(crt,Dauterive, C) (Entered: 09/27/2018) |
| 09/25/2018 | 35 | (*STRICKEN*) DEFICIENT MOTION for Leave to File and to Permit the Coalition of Doctors Defending Reparative Therapy to Appear Amici Curiae in Support of the Plaintiffs by Coalition of Doctors Defending Reparative Therapy. Motions referred to Magistrate Judge Patrick J Hanna. (Attachments: # 1 Proposed order, # 2 Proposed Amici Brief)(Attorney Anna C Little added to party Coalition of Doctors Defending Reparative Therapy(pty:mov))(crt,Dauterive, C) Modified on 10/19/2018 to reflect stricken. See 108 Order. (Alexander, E) (Entered: 09/27/2018) |
| 09/26/2018 | 30 | ORDER denying 22 Motion for TRO, deferring ruling on 22 Motion for Preliminary Injunction. The Motion for Preliminary |

| | | |
|---|---|---|
| | | Injunction is REFERRED to the Magistrate Judge for report and recommendation. Signed by Judge Robert R Summerhays on 9/26/2018. (crt,Dauterive, C) (Entered: 09/27/2018) |
| 09/26/2018 | | Motions referred to Magistrate Judge for Report and Recommendations: 1 MOTION for Preliminary Injunction, 22 MOTION for Preliminary Injunction, MOTION for Oral Argument. Motions referred to Magistrate Judge Patrick J Hanna. See 30 Order. (crt,Dauterive, C) (Entered: 09/27/2018) |
| 09/26/2018 | 37 | SUMMONS Returned Unexecuted by Aaron Guidry as to John Bel Edwards, Teresa Elberson, Jeffrey Martin Landry. Service of the complaint is not considered properly executed. Service within the State of Louisiana cannot be effected through certified mail. (Attachments: # 1 Summons Return Unexecuted as to John Bel Edwards, # 2 Summons Returned Unexecuted as to Teresa Elberson)(crt,Williams, L) (Entered: 09/27/2018) |
| 09/27/2018 | 29 | ORDER denying 26 Motion for Leave to File Excess Pages. Signed by Judge Robert R Summerhays on 9/26/2018. (crt,Jordan, P) (Entered: 09/27/2018) |
| 09/27/2018 | 36 | NOTICE of Deficiency to Anna C Little on behalf of Coalition of Doctors Defending Reparative Therapy regarding 35 MOTION for Leave to File and to Permit the Coalition of Doctors Defending Reparative Therapy to Appear Amici Curiae in Support of the Plaintiffs. Reason: Anna C Little is rejected as counsel of record. Further, the document was signed by an attorney not admitted to practice before this court and submitted without reference to an attorney identification number as required by LR 11. If eligible, and your admission cannot be accomplished within ten days, you may provide a new signature page signed by a member of the bar of this court. See Fed.R.Civ.P.11 and LR11.1. Please refer to LR83.2.6 for specific requirements for pro hac vice admission. (crt,Dauterive, C) (Entered: 09/27/2018) |
| 09/27/2018 | 38 | MOTION for Temporary Restraining Order, MOTION for Oral Argument by Rich Penkoski. Motions referred to Magistrate Judge Patrick J Hanna. (Attachments: # 1 Memorandum / Brief, # 2 Exhibit, # 3 Proposed Order (TRO), # 4 Proposed Order (Oral Argument))(crt,Williams, L) (Entered: 09/27/2018) |
| 09/27/2018 | | Motions Transferred regarding 38 MOTION for Temporary Restraining Order MOTION for Oral Argument. Motions referred to Judge Robert R Summerhays. (crt,Williams, L) (Entered: 09/27/2018) |
| 09/27/2018 | 39 | (*STRICKEN*) DEFICIENT MOTION for Leave to File and Permit the Center for Garden State Families to Appear Amici Curiae in Support of the Plaitniffs by Center for Garden State Families. Motions referred to Magistrate Judge Patrick J Hanna. (Attachments: # 1 Proposed order, # 2 Proposed Amici Brief of the Coalition of Doctors Defending Reparative Therapy) (crt,Williams, L) Modified on 9/28/2018 to edit text(Williams, L). Modified on 10/19/2018 to reflect stricken. See 109 Order. (Alexander, E) (Entered: 09/28/2018) |
| 09/28/2018 | 40 | NOTICE of Deficiency to Anna C Little on behalf of Center for Garden State Families regarding 39 DEFICIENT? MOTION for Leave to File and Permit the Center for Garden State Families to Appeal Amici Curiae in Support of the Plaitniffs. Reason: Anna C Little is rejected as counsel of record. Further, the document was signed by an attorney not admitted to practice before this court and submitted without reference to an attorney identification number as required by LR 11. If eligible, and your admission cannot be accomplished within ten days, you may provide a new signature page signed by a member of the bar of this court. See Fed.R.Civ.P.11 and LR11.1. Please refer to LR83.2.6 for specific requirements for pro hac vice admission. (crt,Williams, L) (Entered: 09/28/2018) |
| 09/28/2018 | 41 | ORDER SETTING 1 MOTION for Preliminary Injunction, 22 MOTION for Preliminary Injunction: Motion day set for 10/16/2018 09:30 AM in Lafayette, Courtroom 7 before Magistrate Judge Patrick J Hanna. Signed by Magistrate Judge Patrick J Hanna on 9/28/2018. (crt,Williams, L) Modified on 10/1/2018 to edit text to remove TRO language - motion previously ruled upon - language contributed to text from motion event selected at time of docketing relief requested(Williams, L). (Entered: 09/28/2018) |
| 09/28/2018 | 42 | ORDER denying 38 Motion for TRO, Motion for Oral Argument. Signed by Judge Robert R Summerhays on 9/28/2018. (crt,Williams, L) (Entered: 09/28/2018) |
| 09/28/2018 | 43 | MOTION to Waive Security Bond by Mark Christopher Sevier. (Attachments: # 1 Exhibits)(crt,Dauterive, C) (Entered: 10/01/2018) |
| 09/28/2018 | 44 | MOTION to Waive Security Bond by John Gunter, Jr, Joan Grace Harley, Whitney Kohl and Rich Penkoski. (Attachments: # 1 Exhibits)(crt,Dauterive, C) (Entered: 10/01/2018) |
| 09/28/2018 | | Motions Transferred regarding 43 MOTION to Waive Security Bond and 44 MOTION to Waive Security Bond. Motions referred to Judge Robert R Summerhays. (crt,Dauterive, C) (Entered: 10/01/2018) |
| 09/28/2018 | 45 | SECOND DECLARATION of Rich Penkoski and Mark Christopher Sevier. (Attachments: # 1 Exhibits)(crt,Dauterive, C) (Entered: 10/01/2018) |
| 09/30/2018 | 46 | SUMMONS Returned Unexecuted by Aaron Guidry as to Joel Robideaux and Stuart R Shaw. Service of the complaint is not considered properly executed. Service within the State of Louisiana cannot be effected through certified mail. (crt,Dauterive, C) (Entered: 10/01/2018) |
| 09/30/2018 | 47 | EMERGENCY MOTION for Temporary Restraining by John Gunter, Jr and Mark Christopher Sevier. (Attachments: # 1 Memorandum in Support, # 2 Exhibits part 1 of 4, # 3 Exhibits part 2 of 4, # 4 Exhibits part 3 of 4, # 5 Exhibits part 4 of 4) (crt,Dauterive, C) (Entered: 10/01/2018) |
| 10/01/2018 | 48 | ORDER denying 47 Motion for TRO; denying as MOOT 43 Motion to Waive Security Bond; denying as MOOT 44 Motion to Waive Security Bond. Signed by Judge Robert R Summerhays on 10/1/2018. (crt,Dauterive, C) Modified on 10/2/2018 to edit text (Dauterive, C). (Entered: 10/02/2018) |
| 10/01/2018 | 49 | MOTION for Reconsideration styled "Notice of Filing $10,000 Security Bond and Motion to Reconsider" re 30 Order on Motion for Preliminary Injunction, Order on Motion for TRO, Order on Motion for Hearing by Aaron Guidry. (Attachments: # |

| | | |
|---|---|---|
| | | 1 Memorandum in Support, # 2 Copy of SureTec Insurance Co Bond No. 3340266, # 3 Copy of SureTec Insurance Co Limited Power of Attorney #1810028)(crt,Dauterive, C) Modified on 10/2/2018 to edit text (Dauterive, C). (Entered: 10/02/2018) |
| 10/01/2018 | | Motions Transferred regarding 49 MOTION for Reconsideration re 30 Order on Motion for Preliminary Injunction, Order on Motion for TRO, Order on Motion for Hearing. Motions referred to Judge Robert R Summerhays. (crt,Dauterive, C) (Entered: 10/02/2018) |
| 10/01/2018 | 50 | NOTICE OF FILING EXHIBITS Part 1 of 7 by Mark Christopher Sevier (Attachments: # 1 Letters to the Lafayette Parish Library and Lafayette City/Parish Council)(crt,Dauterive, C) (Entered: 10/03/2018) |
| 10/01/2018 | 51 | NOTICE OF FILING EXHIBITS Part 2 of 7 by Mark Christopher Sevier (Attachments: # 1 Letters to the Lafayette Parish Library and Lafayette City/Parish Council)(crt,Dauterive, C) (Entered: 10/03/2018) |
| 10/01/2018 | 52 | NOTICE OF FILING EXHIBITS Part 3 of 7 by Mark Christopher Sevier (Attachments: # 1 Letters to the Lafayette Parish Library and Lafayette City/Parish Council)(crt,Dauterive, C) (Entered: 10/03/2018) |
| 10/01/2018 | 53 | NOTICE OF FILING EXHIBITS Part 4 of 7 by Mark Christopher Sevier (Attachments: # 1 Letters to the Lafayette Parish Library and Lafayette City/Parish Council)(crt,Dauterive, C) (Entered: 10/03/2018) |
| 10/01/2018 | 54 | NOTICE OF FILING EXHIBITS Part 5 of 7 by Mark Christopher Sevier (Attachments: # 1 Letters to the Lafayette Parish Library and Lafayette City/Parish Council)(crt,Dauterive, C) (Entered: 10/03/2018) |
| 10/01/2018 | 55 | NOTICE OF FILING EXHIBITS Part 6 of 7 by Mark Christopher Sevier (Attachments: # 1 Letters to the Lafayette Parish Library and Lafayette City/Parish Council)(crt,Dauterive, C) (Entered: 10/03/2018) |
| 10/01/2018 | 56 | NOTICE OF FILING EXHIBITS Part 7 of 7 by Mark Christopher Sevier (Attachments: # 1 Letters to the Lafayette Parish Library and Lafayette City/Parish Council)(crt,Dauterive, C) (Entered: 10/03/2018) |
| 10/02/2018 | 57 | COPY of SureTec Insurance Co Bond No. 3340266 (with additional signature) and Copy of SureTec Insurance Co Limited Power of Attorney #1810028 filed by Aaron Guidry; see Attachments to 49 Motion for Reconsideration. (crt,Dauterive, C) (Entered: 10/03/2018) |
| 10/02/2018 | 58 | MOTION for Reconsideration re 48 Order on 47 Motion for TRO, by Mark Christopher Sevier. (Attachments: # 1 Memorandum in Support)(crt,Dauterive, C) (Entered: 10/03/2018) |
| 10/02/2018 | 59 | Unopposed MOTION for Oral Argument for 10/5/2018 re 49 MOTION for Reconsideration on 30 Order on Motion for Preliminary Injunction, Order on Motion for TRO, Order on Motion for Hearing and 58 MOTION for Reconsideration on 48 Order on Motion for TRO by Mark Christopher Sevier. (crt,Dauterive, C) (Entered: 10/03/2018) |
| 10/02/2018 | | Motions Transferred regarding 58 MOTION for Reconsideration re 48 Order on Motion for TRO and 59 MOTION for Oral Argument for 10/5/2018 re 49 MOTION for Reconsideration on 30 Order on Motion for Preliminary Injunction, Order on Motion for TRO, Order on Motion for Hearing and 58 MOTION for Reconsideration on 48 Order on Motion for TRO. Motions referred to Judge Robert R Summerhays. (crt,Dauterive, C) (Entered: 10/03/2018) |
| 10/02/2018 | 60 | SUMMONS Returned Executed by Aaron Guidry. John Bel Edwards served on 9/26/2018, answer due 10/17/2018; Teresa Elberson served on 9/24/2018, answer due 10/15/2018; Jeffrey Martin Landry served on 9/24/2018, answer due 10/15/2018; Joel Robideaux served on 9/25/2018, answer due 10/16/2018; Stuart R Shaw served on 9/26/2018, answer due 10/17/2018. (crt,Dauterive, C) (Entered: 10/03/2018) |
| 10/03/2018 | 61 | RULING AND ORDER denying 49 Motion for Reconsideration re 30 Order on Motion for Preliminary Injunction, Order on Motion for TRO, Order on Motion for Hearing. Signed by Judge Robert R Summerhays on 10/3/2018. (crt,Dauterive, C) (Entered: 10/03/2018) |
| 10/03/2018 | 62 | ORDER denying 58 Motion for Reconsideration re 48 Order on Motion to Waive Security Bond, Order on Motion for TRO; denying 59 Motion for Oral Argument. Signed by Judge Robert R Summerhays on 10/3/2018. (crt,Dauterive, C) (Entered: 10/04/2018) |
| 10/03/2018 | 63 | Emergency MOTION for Restraining Order by Aaron Guidry, Joan Grace Harley, Rich Penkoski, Mark Christopher Sevier. (Attachments: # 1 Memorandum in Support, # 2 Appendix, # 3 Exhibits)(crt,Dauterive, C) (Entered: 10/04/2018) |
| 10/03/2018 | 64 | MOTION for Hearing on Rule 11 Sanctions, MOTION for Recusal of Judge Summerhays by Mark Christopher Sevier. (crt,Dauterive, C) (Entered: 10/04/2018) |
| 10/03/2018 | | Motions Transferred regarding 64 MOTION for Hearing on Rule 11 Sanctions, MOTION for Recusal, 63 MOTION for Restraining Order. Motions referred to Judge Robert R Summerhays. (crt,Dauterive, C) (Entered: 10/04/2018) |
| 10/04/2018 | 65 | NOTICE of Intent to File an Appearance by Aaron Guidry (crt,Williams, L) (Entered: 10/05/2018) |
| 10/04/2018 | 66 | MOTION for Reconsideration re 48 ORDER denying 47 Motion for TRO; denying as MOOT 43 Motion to Waive Security Bond; denying as MOOT 44 Motion to Waive Security Bond by John Gunter, Jr. Motions referred to Magistrate Judge Patrick J Hanna. (crt,Williams, L) (Entered: 10/05/2018) |
| 10/04/2018 | | Motions Transferred regarding 66 MOTION for Reconsideration Motions referred to Judge Robert R Summerhays. (crt,Williams, L) (Entered: 10/05/2018) |
| 10/04/2018 | 67 | MOTION for Temporary Restraining Order by Whitney Kohl. (Attachments: # 1 Exhibit)(crt,Williams, L) (Entered: 10/05/2018) |
| 10/07/2018 | 69 | (*STRICKEN*) MOTION for Preliminary Injunction, MOTION for Permanent Injunction by Aaron Guidry. (Attachments: # 1 Memorandum in Support, # 2 Appendix, # 3 Exhibits)(crt,Dauterive, C) Modified on 10/17/2018 to reflect stricken. See 100 Order on Motion. (Alexander, E) (Entered: 10/09/2018) |

| | | |
|---|---|---|
| 10/07/2018 | 70 | DEFICIENT MOTION for Cynthia B Burris to Appear Pro Hac Vice by Joan Grace Harley, Whitney Kohl, Rich Penkoski. Motions referred to Magistrate Judge Patrick J Hanna. (Attachments: # 1 Proposed Order)(crt,Dauterive, C) Modified on 10/17/2018 to remove "?". See 100 Order on Motion. (Alexander, E) (Entered: 10/10/2018) |
| 10/07/2018 | 71 | DEFICIENT MOTION for Cynthia B Burris to Appear Pro Hac Vice by Joan Grace Harley, Whitney Kohl, Rich Penkoski. Motions referred to Magistrate Judge Patrick J Hanna. (Attachments: # 1 Proposed Order)(crt,Dauterive, C) Modified on 10/17/2018 to remove "?". See 100 Order on Motion. (Alexander, E) (Entered: 10/10/2018) |
| 10/09/2018 | 68 | MOTION for Extension of Time to File Answer re 5 Amended Complaint, 1 Complaint, with consent by Stuart R Shaw. Motions referred to Patrick J Hanna. (Attachments: # 1 Proposed order)(Attorney John Chris Guillet added to party Stuart R Shaw(pty:dft))(aty,Guillet, John) Modified on 10/10/2018 to reflect "with consent"; see 73 Corrective document indicating consent (Dauterive, C). (Entered: 10/09/2018) |
| 10/10/2018 | 72 | NOTICE of Deficiency to Joan Grace Harley, Whitney Kohl, Rich Penkoski regarding 70 MOTION for Cynthia B Burris to Appear Pro Hac Vice and 71 MOTION for Cynthia B Burris to Appear Pro Hac Vice. Reasons: (1.) Not signed by local counsel; an original signature of an attorney is required by Fed.R.Civ.P.11., (2.) Requires a Certificate of Good Standing pursuant to LR83.2.6 and (3.) LR83.2.6 requires that visiting attorneys shall pay a $105.00 fee to the clerk of court. (crt,Dauterive, C) (Entered: 10/10/2018) |
| 10/10/2018 | 73 | CORRECTIVE DOCUMENT entitled Unopposed Motion for Extension filed by Stuart R Shaw regarding 68 MOTION for Extension of Time to File Answer re 5 Amended Complaint, 1 Complaint,, with consent sought but not yet obtained CONSENT OBTAINED. (Attachments: # 1 Exhibit A - email, # 2 Proposed order)(aty,Guillet, John) (Entered: 10/10/2018) |
| 10/11/2018 | 74 | MOTION for the Court to Waive the Pro Hac Vice Rules so that Cynthia Burris can Appear on Behalf of the Non-Attorney Plaintiffs by Mark Christopher Sevier. Motions referred to Magistrate Judge Patrick J Hanna. (Attachments: # 1 Envelope) (crt,ThomasSld, T) (Entered: 10/11/2018) |
| 10/11/2018 | 75 | ORDER granting 68 Motion for Extension of Time to Answer re 5 Amended Complaint, 1 Complaint. Signed by Magistrate Judge Patrick J Hanna on 10/11/2018. (crt,Alexander, E) (Entered: 10/11/2018) |
| 10/11/2018 | 76 | MOTION to Withdraw 66 MOTION for Reconsideration re 48 Order on Motion for TRO 63 MOTION for Temporary Restraining Order, 67 MOTION for Temporary Restraining Order by Aaron Guidry, Joan Grace Harley, Whitney Kohl, Mark Christopher Sevier. Motions referred to Magistrate Judge Patrick J Hanna. (Attachments: # 1 Envelope(crt,Williams, L) (Entered: 10/12/2018) |
| 10/11/2018 | 76 | MOTION to Move October 16 2018 Hearing Until After the Defendants Have Had a Chance to Respond, MOTION for a Telephonic Case Management Conference by Aaron Guidry. ADMINISTRATIVE ENTRY to capture motion events in 76 Motion. Motions referred to Magistrate Judge Patrick J Hanna. (crt,Williams, L) Modified on 10/12/2018 to assign document number (Williams, L). (Entered: 10/12/2018) |
| 10/11/2018 | | Motions Transferred regarding 76 MOTION to Withdraw 66 MOTION for Reconsideration re 48 Order on Motion for TRO 63 MOTION for Temporary Restraining Order, 67 MOTION for Temporary Restraining Order. Motions referred to Judge Robert R Summerhays. (crt,Williams, L) (Entered: 10/12/2018) |
| 10/11/2018 | 77 | (*STRICKEN*) MOTION for Preliminary Injunction, MOTION for Permanent Injunction by John Gunter, Jr, Mark Christopher Sevier. (Attachments: # 1 Memorandum / Brief, # 2 Exhibits, # 3 Envelope)(crt,Williams, L) Modified on 10/17/2018 to reflect stricken. See 100 Order on Motion. (Alexander, E) (Entered: 10/12/2018) |
| 10/11/2018 | 78 | RESPONSE to 68 MOTION for Extension of Time to File Answer re 5 Amended Complaint, 1 Complaint, with consent filed by Aaron Guidry. (Attachments: # 1 Envelope)(crt,Williams, L) (Entered: 10/12/2018) |
| 10/11/2018 | 79 | NOTICE of Joining Plaintiff Guidry re 77 MOTION for Preliminary Injunction MOTION for Permanent Injunction by Mark Christopher Sevier (Attachments: # 1 Exhibits, # 2 Envelope)(crt,Williams, L) (Entered: 10/12/2018) |
| 10/11/2018 | 80 | NOTICE of Non-Suiting by Plaintiff Penkoski Only by Rich Penkoski (Attachments: # 1 Envelope)(crt,Williams, L) (Entered: 10/12/2018) |
| 10/15/2018 | 81 | ORDER, DENIED AS MOOT 63 Motion for TRO; DENIED and WITHDRAWN 66 Motion for Reconsideration ; DENIED AS MOOT 67 Motion for TRO. GRANTED IN PART, DEFERRED IN PART, and DENIED IN PART 76 Motion to Withdraw. The Court REFERS The Motion for 10/16/18 hearing to be moved to Magistrate Judge Hanna for Ruling. Signed by Judge Robert R Summerhays on 10/12/2018. (crt,Jordan, P) Modified on 10/15/2018 to edit text(Jordan, P). (Entered: 10/15/2018) |
| 10/15/2018 | 82 | MOTION to Dismiss Attorney General Jeffrey Landry by Jeffrey Martin Landry. (Attachments: # 1 Memorandum / Brief, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Attorney Margaret Annette C Collier added to party Jeffrey Martin Landry(pty:dft)) (aty,Collier, Margaret) (Entered: 10/15/2018) |
| 10/15/2018 | 83 | NOTICE of Motion Setting regarding: 82 MOTION to Dismiss Attorney General Jeffrey Landry. Motions referred to Judge Robert R Summerhays. (crt,Dauterive, C) (Entered: 10/15/2018) |
| 10/15/2018 | 84 | MOTION for Leave to File Excess Pages by Teresa Elberson, Joel Robideaux. Motions referred to Patrick J Hanna. (Attachments: # 1 Memorandum / Brief, # 2 Proposed order, # 3 Proposed pleading, # 4 Proposed pleading, # 5 Proposed order, # 6 Proposed Exhibit 1, # 7 Proposed Exhibit 2, # 8 Proposed Exhibit 3, # 9 Proposed Exhibit 4, # 10 Proposed Exhibit 5, # 11 Proposed Exhibit 6, # 12 Proposed Exhibit 6A, # 13 Proposed Exhibit 6B, # 14 Proposed Exhibit 6C, # 15 Proposed Exhibit 6D, # 16 Proposed Exhibit 6E (Notice of Manual Attachment), # 17 Proposed Exhibit 7, # 18 Proposed Exhibit 8, # 19 Proposed Exhibit 9, # 20 Proposed Exhibit 10)(Attorney Joy C Rabalais added to party Teresa Elberson(pty:dft), Attorney Joy C Rabalais added to party Joel Robideaux(pty:dft))(aty,Rabalais, Joy) Modified on 10/16/2018 to edit text (Dauterive, C). (Entered: 10/15/2018) |
| 10/15/2018 | | Motions Transferred regarding 84 MOTION for Leave to File Excess Pages. Motions referred to Judge Robert R Summerhays. |

| | | |
|---|---|---|
| | | (crt,Dauterive, C) (Entered: 10/16/2018) |
| 10/16/2018 | | MANUAL ATTACHMENT received from Joy C Rabalais on behalf of Teresa Elberson, Joel Robideaux regarding 84 MOTION for Leave to File Excess Pages . The original manual attachments will be maintained in the division of the presiding judge, until expiration of appeal delays. (crt,ThomasSld, T) (Entered: 10/16/2018) |
| 10/16/2018 | 85 | NOTICE OF NON-SUITING by Aaron Guidry, John Gunter, Jr and Mark Christopher Sevier Against the Mayor if and only if the Mayor is not a Necessary Party. (crt,Dauterive, C) (Entered: 10/16/2018) |
| 10/16/2018 | 86 | NOTICE OF NON-SUITING by Aaron Guidry, John Gunter, Jr and, Mark Christopher Sevier Against the Governor, Attorney General and Red River Clerk Only. (crt,Dauterive, C) (Entered: 10/16/2018) |
| 10/16/2018 | 87 | NOTICE OF NON-SUITING by Joan Grace Harley and Whitney Kohl only, Withdrawing All Claims Against All of the Defendants. (crt,Dauterive, C) (Entered: 10/16/2018) |
| 10/16/2018 | 88 | MOTION to Appear Telephonically at the 10/16/2018 Hearing and Motion to Join Plaintiff Sevier in all of his Responses, Replies and Requests by John Gunter, Jr. Motions referred to Magistrate Judge Patrick J Hanna. (crt,Dauterive, C) (Entered: 10/16/2018) |
| 10/16/2018 | 89 | NOTICE OF DUPLICATE FILING re 88 MOTION to Appear Telephonically at the 10/16/2018 Hearing and Motion to Join Plaintiff Sevier in all of his Responses, Replies and Requests by John Gunter, Jr (crt,Dauterive, C) (Entered: 10/16/2018) |
| 10/16/2018 | 90 | NOTICE OF WITHDRAWING the 76 MOTION to Move the October 16 2018 Hearing by Aaron Guidry (crt,Dauterive, C) (Entered: 10/16/2018) |
| 10/16/2018 | 91 | DECLARATION by John Gunter, Jr re 88 MOTION to Appear Telephonically at the 10/16/2018 Hearing and Motion to Join Plaintiff Sevier in all of his Responses, Replies and Requests. (crt,Dauterive, C) (Entered: 10/16/2018) |
| 10/16/2018 | 92 | DECLARATION by Aaron Guidry re 90 Notice of Withdrawing the Motion to Move the October 16 2018 Hearing and joining Plaintiff Sevier in all responses, requests and replies. (crt,Dauterive, C) (Entered: 10/16/2018) |
| 10/16/2018 | 93 | AMENDED COMPLAINT against Teresa Elberson and Joel Robideaux filed by John Gunter, Jr, Mark Christopher Sevier and Aaron Guidry. (Attachments: # 1 Exhibits)(crt,Dauterive, C) (Entered: 10/16/2018) |
| 10/16/2018 | 93 | MOTION for Preliminary Injunction, MOTION for Permanent Injunction by Aaron Guidry, John Gunter, Jr and Mark Christopher Sevier. ADMINISTRATIVE ENTRY capture requests included within the 93 Amended Complaint. (crt,Dauterive, C) Modified on 10/16/2018 to assign document number (Dauterive, C). (Entered: 10/16/2018) |
| 10/16/2018 | 94 | MINUTES for proceedings held before Magistrate Judge Patrick J Hanna: MOTION HEARING held on 10/16/2018 re 22 MOTION for Preliminary Injunction MOTION for Temporary Restraining Order filed by Aaron Guidry. The Court advised Plaintiff Sevier that, as a non-lawyer, he may not represent other parties in this litigation. Through counsel for Teresa Elberson, in her capacity as the librarian of Lafayette Public Library, the library voluntarily agreed to stand down on planning a Drag Queen Story Hour for the duration of this lawsuit. A written ruling by the Court will issue in due course. (Court Reporter: Cathleen E Marquardt) (crt,Alexander, E) (Entered: 10/16/2018) |
| 10/16/2018 | 95 | ORDER granting 84 Motion for Leave to File Excess Pages. Signed by Magistrate Judge Patrick J Hanna on 10/16/2018. (crt,Alexander, E) (Entered: 10/17/2018) |
| 10/16/2018 | 96 | MOTION to Dismiss Pursuant to F R C P 12 by Teresa Elberson, Joel Robideaux. (Attachments: # 1 Memorandum / Brief, # 2 Exhibits 1 - 10, # 3 Proposed order)(crt,Alexander, E) (Entered: 10/17/2018) |
| 10/16/2018 | 96 | MEMORANDUM in Opposition re 22 MOTION for Preliminary Injunction MOTION for Temporary Restraining Order MOTION for Hearing, 69 MOTION for Preliminary Injunction MOTION for Permanent Injunction, 77 MOTION for Preliminary Injunction MOTION for Permanent Injunction, 93 MOTION for Preliminary Injunction MOTION for Permanent Injunction filed by Teresa Elberson, Joel Robideaux. ADMINISTRATIVE ENTRY as pleading is incorporated within text of 96 Motion to Dismiss Pursuant to F R C P 12. Counsel is reminded that multiple pleadings should not be combined into one document, but should be filed separately. (crt,Alexander, E) (Entered: 10/17/2018) |
| 10/16/2018 | 97 | NOTICE of Motion Setting regarding: 96 Motion to Dismiss Pursuant to F R C P 12. Motions referred to Judge Robert R Summerhays. (crt,Alexander, E) (Entered: 10/17/2018) |
| 10/16/2018 | 98 | ORAL MOTION to Amend/Correct 1 Complaint, 5 Amended Complaint, by Aaron Guidry, John Gunter, Jr, Mark Christopher Sevier. Motions referred to Magistrate Judge Patrick J Hanna. (crt,Alexander, E). Added ORAL MOTION to Strike on 10/17/2018. (Alexander, E) (Entered: 10/17/2018) |
| 10/16/2018 | 99 | SUMMONS Returned Executed by Mark Christopher Sevier. Teresa Elberson served on 10/16/2018, answer due 11/6/2018. (crt,Dauterive, C) (Entered: 10/17/2018) |
| 10/16/2018 | 100 | ORDER: The Clerk of Court is ORDERED to TERMINATE Plaintiffs Rich Penkoski, Joan Grace Harley, and Whitney Kohl, and Defendants John Bel Edwards, Jeffrey Martin Landry, and Stuart R. Shaw, as named in their capacities as the Governor of Louisiana, Attorney General of Louisiana, and Clerk of Court for Red River Parish, respectively. <br><br> The 82 Motion to Dismiss Attorney General Jeffrey Landry and the deficient 70 Motion for Cynthia B. Burris to Appear Pro Hac Vice and 71 Motion or Cynthia B. Burris to Appear Pro Hac Vice, filed by Plaintiffs Rich Penkoski, Joan Grace Harley, and Whitney Kohl are hereby DENIED AS MOOT. <br><br> For reasons stated on the record, the 31 Motion to Electronically File through ECF and the 74 Motionfor the Court to Waive Pro Hae Vice Rules for Cynthia B. Burris to Appear on Behalf of the Non-Attorney Plaintiffs are hereby DENIED. The 88 Motion for Plaintiff John Gunter, Jr. to Appear Telephonically for today's hearing is DENIED AS MOOT. The 98 Oral Motion |

| | | |
|---|---|---|
| | | to Amend/Correct Complaint and to Motion to Strike the previously-filed pleadings and motions for preliminary and/or permanent injunction and filings in support thereof are GRANTED.<br><br>As to the 85 "Notice of Non-Suiting", counsel for Mayor Joel Robideaux is hereby ordered to respond thereto **no later than close of business on Tuesday, October 23, 2018.**<br><br>Plaintiffs are hereby ORDERED to brief the issue of standing as to each of the remaining plaintiffs, Aaron Guidry, John Gunter, Jr., and Mark Christopher Sevier, **no later than Tuesday, November 6, 2018.** Responses by the remaining defendant(s) are due by **Friday, November 16, 2018.** Replies thereto are due by **Friday, November 23, 2018.** In accordance with Local Rule 7.8, the briefs shall not exceed 25 pages in length, exclusive of pages containing a table of authorities or a table of contents, and no reply brief shall exceed 10 pages. Signed by Magistrate Judge Patrick J Hanna on 10/16/2018. (crt,Alexander, E) (Entered: 10/17/2018) |
| 10/16/2018 | | Set Deadlines: Compliance Deadline set for 10/23/2018. Second Compliance Deadline set for 11/6/2018. (crt,Alexander, E) (Entered: 10/17/2018) |
| 10/17/2018 | 101 | MOTION for Preliminary Injunction, MOTION for Permanent Injunction by Aaron Guidry, Mark Christopher Sevier. (Attachments: # 1 Memorandum / Brief, # 2 Exhibits (Part 1 of 2), # 3 Exhibits (Part 2 of 2))(crt,Williams, L) (Entered: 10/18/2018) |
| 10/17/2018 | 102 | MOTION for Preliminary Injunction, MOTION for Permanent Injunction by John Gunter, Jr, Mark Christopher Sevier. (Attachments: # 1 Memorandum / Brief, # 2 Exhibits (Part 1 of 2), # 3 Exhibitis (Part 2 of 2))(crt,Williams, L) (Entered: 10/18/2018) |
| 10/17/2018 | 103 | MOTION to Strike Certain Docket Entries to Clean Up the Docket for Being Functus Offcio re 5 Amended Complaint, 48 Order on Motion for Miscellaneous Relief, Order on Motion for TRO, 78 Response to Motion, 90 Notice (Other), 83 Notice of Motion Setting, 62 Order on Motion for Reconsideration, Order on Motion for Hearing, 42 Order on Motion for TRO, Order on Motion for Hearing, 34 Notice (Other), 93 Amended Complaint, 61 Order on Motion for Reconsideration, 64 MOTION for Hearing MOTION for Recusal, 73 Corrective Document, 65 Notice (Other), 24 Corrective Document, 32 Notice (Other), 46 Summons Returned Unexecuted, 75 Order on Motion for Extension of Time to Answer, 29 Order on Motion for Leave to File Excess Pages, 19 Notice of Deficiency, 30 Order on Motion for Preliminary Injunction, Order on Motion for TRO, Order on Motion for Hearing by Aaron Guidry, Mark Christopher Sevier. Motions referred to Magistrate Judge Patrick J Hanna. (crt,Williams, L) (Entered: 10/18/2018) |
| 10/17/2018 | 104 | DECLARATION Concerning Tax Payer Issues in Lafayette by Mark Christopher Sevier (Attachments: # 1 Exhibits) (crt,Williams, L) (Entered: 10/18/2018) |
| 10/18/2018 | 105 | PROPOSED STRIKE ORDER re 35 Motion for Leave to File, referred to Magistrate Judge Patrick J Hanna. (Public entry, but no electronic notice). (crt,Mitchell, Pam) (Entered: 10/18/2018) |
| 10/18/2018 | 106 | PROPOSED STRIKE ORDER re 39 Motion for Leave to File, referred to Magistrate Judge Patrick J Hanna. (Public entry, but no electronic notice). (crt,Mitchell, Pam) (Entered: 10/18/2018) |
| 10/19/2018 | 107 | ELECTRONIC ORDER. The motion to strike certain docket entries (Rec. Doc. 103 ) is GRANTED as to Motion for Hearing/Recusal (Rec. Doc. 64 ), and DENIED AS MOOT as to all others, which were previously addressed by separate order (Rec. Doc. 100 ). Signed by Magistrate Judge Patrick J Hanna on 10/19/2018. (crt,Gardner, Caroline) (Entered: 10/19/2018) |
| 10/19/2018 | 108 | ORDER striking 35 Motion for Leave to File and to Permit the Coalition of Doctors Defending Reparative Therapy to Appear Amici Curiae in Support of the Plaintiffs. Signed by Magistrate Judge Patrick J Hanna on 10/19/2018. (crt,Alexander, E) (Entered: 10/19/2018) |
| 10/19/2018 | 109 | ORDER striking 39 Motion for Leave to File and Permit the Center for Garden State Families to Appear Amici Curiae in Support of the Plaintiffs. Signed by Magistrate Judge Patrick J Hanna on 10/19/2018. (crt,Alexander, E) (Entered: 10/19/2018) |
| 10/23/2018 | 110 | RESPONSE Brief Pursuant to FRCP 19 Regarding Joel Robideaux, in his Official Capacity as Mayor-President of Lafayette City-Parish Consolidated Government, as a Necessary Party to This Litigation re 85 Notice of Non-Suiting by Joel Robideaux. (Attachments: # 1 Exhibit Ex A, en globo)(aty,Rabalais, Joy) Modified on 10/24/2018 to correctly identify document(Dauterive, C). (Entered: 10/23/2018) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/25/2018 12:19:19 | | |
| **PACER Login:** | ghostwars:3271493:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 6:18-cv-01232-RRS-PJH |
| **Billable Pages:** | 12 | **Cost:** | 1.20 |

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION

| | | |
|---|---|---|
| **TEX CHRISTOPHER et. al.**<br><br>**V.**<br><br>**RHEA LAWSON et. al.** | | **Case No: 4:16-cv-039843**<br><br>**Before Honorable Chief Judge Rothenthal** |

## *AMICI* BRIEF OF THE COALITION OF DOCTORS DEFENDING REPARATIVE THERAPY

### QUESTIONS PRESENTED

1. Does immutability or genetics have anything to do with sexual orientation for purposes of the Fourteenth Amendment's Equal Protection or Substantive Due Process Clauses or is sexual orientation a religious mythology that falls within the exclusive jurisdiction of the Establishment Clause and Free Exercise Clause?
-Sexual orientation has nothing to do with genetics or immutability and, therefore, it has nothing to do with the Equal Protection or Due Process Clause.

2. Is it a medical fact that a gay gene exists or is it an unproven faith-based assumption that is implicitly religious?
-The idea that people are born gay is a faith based assumption that is inseparably linked to the religion of Secular Humanism and is out of step with the medical profession.

### TABLE OF CONTENTS

QUESTIONS PRESENTED
.................................................................................................................i

TABLE OF AUTHORITIES
.................................................................................................................ii

INTEREST OF *AMICUS* CURIAE
.................................................................................................................1

SUMMARY OF THE ARGUMENT

............................................................................................................4

ARGUMENT

............................................................................................................9

I. Sexual Orientation Does Not Define a Discrete and Insular Minority

............................................................................................................9

    A. Threshold Questions Prevent the Court from Defining a Class Based on Sexual Orientation with Sufficient Clarity

............................................................................................................9

    B. Social Science Experts Raise Serious Doubts About the Definability of Sexual Orientation Simply Because Sexual Orientation Is A Religious Dogma Based On Series of Unproven Faith-Based Assumptions And Naked Assertions That Are Inseparably Linked To The Religion Of Secular Humanism

............................................................................................................13

II. Sexual Orientation is Not an Immutable Characteristic But It Is A Religious Concept That Is Barred From The Government's Respect, Recognition, and Endorsement Under The Establishment Clause.

............................................................................................................21

    A. Immutability Means Solely an Accident of Birth

............................................................................................................21

    B. Sexual Orientation Is Not Solely An Accident of Birth

............................................................................................................22

    C. Sexual Orientation Can and Often Does Change Over Time And The Current Legal Constitutional Basis for Gay Marriage Is Intellectually Dishonest

............................................................................................................26

CONCLUSION

............................................................................................................34


**TABLE OF AUTHORITIES**

*ACLU v. Rabun Cnty. Chamber of Commerce, Inc.,*
698 F.2d 1098 (11th Cir. 1983)

............................................................................................................28

*Ben-Shalom v. Marsh,*
881 F.2d (7th Cir. 1989)

............................................................................................................9

*Citizens for Equal Prot. v. Bruning,*
455 F.3d 859 (8th Cir. 2006)

............................................................................................................9

*City of Boerne v. Flores,*
521 U.S. 507 (1997)

................................................................................7

*City of Cleburne, Tex. v. Cleburne Living Center,*
473 U.S. 432 (1985)

..........................................................................11, 12

*Cleveland Bd. of Educ. v. LaFleur,*
414 U.S. 632 (1974)

..............................................................................27

*County of Allegheny v. ACLU,*
492 U.S. 573 (1989)

..........................................................................15, 35

*Edwards v. Aguillard,*
482 U.S. 578 (1987)

..........................................................................11, 25

*Equality Found. of Greater Cincinnati, Inc. v.*
*City of Cincinnati,* 128 F.3d 289 (6th Cir. 1997)

................................................................................9

*Frontiero v. Richardson,*
411 U.S. 677 (1973)

..............................................................................21

*Gomez v. Perez,*
409 U.S. 535 (1973)

..............................................................................21

*Graham v. Richardson,*
403 U.S. 365 (1971)

..............................................................................21

*Johnson v. Johnson,*
385 F.3d 503 (5th Cir.2004)

................................................................................9

*Larkin v. Grendel's Den,*
459 U.S. 116 (1982)

..............................................................................20

*Lawrence v. Texas,*
539 U.S. 558 (2003)

............................................................................9, 27

*Lee v. Weissman,*
505 U.S. 577 (1992)

..........................................................................15, 35

*Lofton v. Sec'y of Dep't of Children & Family Servs.,*
358 F.3d 804 (11th Cir. 2004)

................................................................................9

*Loving v. Virginia,*
388 U.S. 1 (1967)

..............................................................................27

*Lyng v. Castillo,*
477 U.S. 635 (1986)

........................................................................................11, 21

*Mass. Bd. of Ret. v. Murgia,*
427 U.S. 307 (1976)

........................................................................................5, 11, 12

*Massachusetts v. Dep't of Health & Human Servs.,*
682 F.3d 1 (1st Cir. 2012)

........................................................................................9

*Milligan-Hitt v. Bd. of Trustees of Sheridan County Sch. Dist.*
*No. 2,* 523 F.3d 1219 (10th Cir. 2008)

........................................................................................9

*Obergefell v. Hodges,*
135 S.Ct. 2584 (2015)

........................................................................................5, 6, 9, 10, 19, 35

*Oyama v. California,*
332 U.S. 633 (1948)

........................................................................................21

*Parham v. Hughes,*
441 U.S. 347 (1979)

........................................................................................21

*Plyler v. Doe,*
457 U.S. 202 (1982)

........................................................................................21

*Quiban v. Veterans Administration,*
928 F.2d 1154 (D.C. Cir. 1991)

........................................................................................21, 26

*Reed v. Reed,*
404 U.S. 71 (1971)

........................................................................................21

*Romer v. Evans,*
517 U.S. 620 (1996)

........................................................................................9

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
411 U.S. 1 (1973)

........................................................................................5

*Steffan v. Perry,*
41 F.3d 677 (D.C. Cir. 1994)

........................................................................................10

*Thomasson v. Perry,*
80 F.3d 915 (4th Cir. 1996)

........................................................................................9

*Wallace v. Jaffree,*
472 U.S. 38 (1985)
..................................................................................................20

*Washington Ethical Society v. District of Columbia,*
101 U.S. App. D.C. 371, 249 F.2d 127 (1957)
....................................................................................................2

*Welsh v. U.S,*
1970398 U.S. 333 (U.S. Cal. June 15)
....................................................................................................3

*Windsor v. United States,*
699 F.3d 169 (2d Cir. 2012)
.............................................................................................10, 12

*Witt v. Dep't of Air Force,*
527 F.3d 806 (9th Cir. 2008)
....................................................................................................9

*Woodward v. United States,*
871 F.2d 1068 (Fed. Cir. 1989)
..................................................................................................10

*Zablocki v. Redhail,*
434 U.S. 374 (1978)
..................................................................................................27

**OTHER AUTHORITIES:**

Am. Psychiatric Ass'n, *LGBT-Sexual Orienta-tion*, http://www.psychiatry.org/mental-health/ people/lgbt-sexual-orientation (last visited Jan. 11, 2012)
..................................................................................................25

Am. Psychol. Ass'n, *Sexual Orientation and Homosexuality: Answers to Your Questions for a Better Understanding, What Is Sexual Orientation?*, http://www.apa.org/topics/sexuality/ orientation.aspx?item=2 (last visited Jan. 11, 2012)
..................................................................................................14

M.V. Lee Badgett, *Money, Myths, & Change: The Economic Lives of Lesbians & Gay Men* 4 (2001)
..................................................................................................14

M.V. Lee Badgett, *Sexual Orientation Discrimination: An International Perspective* (2007)
..................................................................................................24

Peter S. Bearman & Hannah Bruckner, *Opposite-Sex Twins and Adolescent Same-Sex Attraction*, 107 Am. J. Soc. 1179 (2002)
..................................................................................................22

Gail S. Bernstein, *Defining Sexual Orientation,* Selfhelp Magazine (Sept. 18, 2012), http://www.selfhelpmagazine.com/articles/sexual_orientation
......................................................................................................................................14

Karen L. Bridges & James M. Croteau, *Once- Married Lesbians: Facilitating Changing Life Patterns*, 73 J. Counseling & Dev. 134 (1994)
......................................................................................................................................33

Sean Cahill et al., *Family Policy: Issues Affecting Gay, Lesbian, Bisexual and Transgender Families*, The National Gay and Lesbian Task Force Policy Institute (2002)
......................................................................................................................................30

C. Charbonneau & P.S. Lander, *Redefining Sexuality: Women Becoming Lesbian in Mid-Life, in Lesbians at Mid-Life* (B. Sang et al. eds., 1991)
......................................................................................................................................33

Committee on Lesbian Health Research Priorities, Inst. of Med., *Lesbian Health* 25 (Andrea L. Solarz ed., 1999)
......................................................................................................................................18

J. Archer, Faiths Men Live By (2d ed. revised by Purinton 1958)
......................................................................................................................................2

Laura Dean et al., *Lesbian, Gay, Bisexual, and Transgender Health: Findings and Concerns*, J. Gay & Lesbian Med. Ass'n, Sept. 2000, Vol. 4
......................................................................................................................................14

John P. DeCecco, *Gay Personality and Sexual Labeling* (1985)
......................................................................................................................................19

Lisa M. Diamond & Ritch C. Savin-Williams, *Explaining Diversity in the Development of Same-Sex Sexuality Among Young Women*, 56 J. Soc. Issues 297 (2000)
...............................................................................................................................28, 33

Lisa M. Diamond & Ritch C. Savin-Williams, *Gender & Sexual Identity, in Handbook Applied Dev. Sci.* 101 (Richard M. Lerner et al. eds., 2003)
......................................................................................................................................16

Lisa M. Diamond, *Female Bisexuality from Adolescence to Adulthood: Results from a 10-Year Longitudinal Study*, 44 Dev. Psychol. 5 (2008)
......................................................................................................................................29

Lisa M. Diamond, *Sexual Fluidity: Understanding Women's Love and Desire* 3 (2008)
......................................................................................................................................29

Lisa M. Diamond, *New Paradigms for Research on Heterosexual and Sexual Minority Dev.*, 32 (4) J. Clinical Child & Adolescent Psychol., 492 (2003)
......................................................................................................................................13

Lisa M. Diamond, *Sexual Identity, Attractions, and Behavior Among Young Sexual-Minority Women Over a 2-Year Period*, 36 Dev. Psychol. 241 (2000)

.................................................................................................28

Nigel Dickson et al., *Same Sex Attraction in a Birth Cohort: Prevalence and Persistence in Early Adulthood*, 56 Soc. Sci. & Med. 1607 (2003)
.................................................................................................24

Richard C. Friedman & Jennifer I. Downey, *Sexual Orientation and Psychoanalysis: Sexual Science and Clinical Practice* (2002)
.................................................................................................26

J.H. Gagnon, *The Explicit and Implicit Use of the Scripting Perspective in Sex Research*, 1 Ann. Rev. Sex Research (1990)
.................................................................................................24

Linda D. Garnets & Letitia Anne Peplau, *A New Look at Women's Sexuality & Sexual Orientation*, CSW Update, Dec. 2006 (2006)
.................................................................................................16

Gary J. Gates et al., *Marriage, Registration and Dissolution by Same-Sex Couples in the U.S.*, Williams Institute (2008)
.................................................................................................30

Gary J. Gates, *How Many People Are Lesbian, Gay, Bisexual, and Transgender?*, Williams Institute (2011)
.................................................................................................32

John C. Gonsiorek & James D. Weinrich, *The Definition and Scope of Sexual Orientation, in Homosexuality: Research Implications for Public Policy* 8 (John C. Gonsiorek & James D. Weinrich eds., 1991)
.................................................................................................16

John C. Gonsiorek et al., *Definition and Measurement of Sexual Orientation, in Suicide and Life-Threatening Behavior* 40 (1995)
.........................................................................................16, 17, 19

G.M. Herek et al., *Internalized Stigma Among Sexual Minority Adults*, 56 J. Counseling Psychol. 32 (2009)
.................................................................................................24

G.M. Herek, *Homosexuality, in 4 Encyclopedia Psychol.* 149 (A.E. Kazdin ed., 2000)
.................................................................................................24

A.F. Jorm et al., *Cohort Difference in Sexual Orientation: Results from a Large Age-Stratified Population Sample*, 49 Gerontology 392 (2003)
.................................................................................................24

Michael R. Kauth & Seth C. Kalichman, *Sexual Orientation and Development: An Interactive Approach, in The Psychology of Sexual Orientation, Behavior, and Identity: A Handbook* 82 (Louis Diamant & Richard D. McAnulty eds., 1995)
.................................................................................................28

Kenneth S. Kendler et al., *Sexual Orientation in a U.S. National Sample of Twin and Nontwin Sibling Pairs*, 157 Am. J. Psychiatry 1843 (2000) ...................................................................................................33

Ian Kerner, "Understanding females' sexual fluidity," CNNHealth (Feb. 9, 2012), http://the chart.blogs.cnn.com/2012/02/09/understanding-females-sexual-fluidity/ ...................................................................................................29

Michael King & Elizabeth McDonald, *Homosexuals Who Are Twins*, 160 Brit. J. Psychiatry 407 (1992) ...................................................................................................23

Alfred C. Kinsey et al., *Sexual Behavior in the Human Male* (1948) ...................................................................................................18

Fritz Klein et al., *Sexual Orientation: A Multi-Variable Dynamic Process*, J. Homosexuality, 11 (1) (1985) ...................................................................................................17

Niklas Langstrom et al., *Genetic and Environmental Effects on Same-sex Sexual Behavior:A Population Study of Twins in Sweden*, Arch. Sexual Behav. 77 (2010) ...................................................................................................23

Edward O. Laumann et al., *The Social Organization of Sexuality: Sexual Practices in the United States* (1994) ...............................................................................17, 24, 25, 30

A.E. Moses & R.O. Hawkins, Jr., *Counseling Lesbian Women and Gay Men: A Life Issues Approach* (1982) ...................................................................................................15

Timothy F. Murphy, *Gay Science: The Ethics of Sexual Orientation Research* (1997) ...................................................................................................18

Letitia Anne Peplau, *Rethinking Women's Sexual Orientation: An Interdisciplinary, Relationship- Focused Approach*, 8 Personal Relationships 1 (2001) ...................................................................................................30

Letitia Anne Peplau et al., *The Development of Sexual Orientation in Women*, 10 Ann. Rev. Sex Research, at 70 (1999) ...................................................................................................16

Letitia Anne Peplau & Linda D. Garnets, *A New Paradigm for Understanding Women's Sexuality and Sexual Orientation*, 56 J. Soc. Issues 329 (2000) ...................................................................................................22

Todd A. Salzman & Michael G. Lawler, *The Sexual Person: Toward a Renewed Catholic Anthropology* (2008) ...................................................................................................18

Joseph P. Stokes et al, *Predictors of Movement Toward Homosexuality: A Longitudinal Study of Bisexual Men*, 43 J. Sex Res. 304 (1997)
.................................................................................................................................29

Ann E. Tweedy, *Polyamory as a Sexual Orientation*, 79 U. Cin. L. Rev. 1461 (2011)
.................................................................................................................................19

Zhana Vrangalova & Ritch C. Savin-Williams, *Mostly Heterosexual and Mostly Gay/Lesbian: Evidence of New Sexual Orientation Identities*, Arch. Sexual Behav. 85 (2012)
.................................................................................................................................17

Williams Institute, http://williamsinstitute.law.ucla.edu/ (last visited Jan. 11, 2012)
.................................................................................................................................17

Williams Institute: Sexual Minority Assessment Research Team, *Best Practices for Asking Questions about Sexual Orientation on Surveys* (Nov. 2009),
http://williamsinstitute.law.ucla.edu/wp-content/uploads/SMART-FINAL-Nov-2009.pdf
.................................................................................................................................17

# INTEREST OF *AMICI CURIAE*

The Coalition of Doctors Defending Reparative Therapy (CDDRT), *Amici* is a group of medical professionals and therapists who want to practice reparative therapy with patients who seek that form of treatment on their own. The Coalition of Doctors Defending Reparative Therapy is chaired by Dr. Tara King, an EdD, MA, LPC, LCADC, and SAC. The *Amici* have a profound interest in the outcome of this case as underscored by Dr. King's sworn declaration that was filed into the record. Dr. King obtained a Bachelor of Arts degree in Counseling from the University of Sioux Falls; a Master of Arts degree in Counseling from Liberty University; a Doctorate of Education in Administration from Nova Southeastern University; and a Master of Arts degree in Special Education from New Jersey City University. She has met the requirements to become a Licensed Clinical Alcohol and Drug Counselor (LCADC); a Licensed Professional Counselor (LPC), and a certified Substance Awareness Counselor (SAC). At age 16, Dr. King was seduced into opening the door to the LGBTQ orthodoxy and began self-identifying as a lesbian. At age 19, she sought conversion/reparative therapy hoping to get out of the lifestyle. Her therapist informed Dr. King that she born gay and that she could not leave the lifestyle under any condition. At age 24, Dr. King discovered conversion/reparative therapy, which is talk therapy that is insight oriented and psychodynamic. The therapy helped her understand why she was making the choices that she was making. She was able to leave the LGBTQ church, and she put on a new identity, converting to Christianity. Having been radically transformed by the personalized truth of Jesus Christ. She left the LGBTQ life behind. After acquiring licenses of her own, Dr. King has engaged in sexual orientation change for clients who have come to her seeking to leave the gay lifestyle. Dr. King and countless other Doctors, some

of whom are part of this Coalition, want to continue to be allowed to engage in conversion/reparative therapy for clients who intentionally come to them for that purpose. The outcome of this action can materially impact medical practices of the CDDRT and the health, safety, and welfare of their clients. Dr. King and other members of the Coalition for reparative therapy have a fundamental right to engage in reparative therapy under the Free Exercise Clause for clients who seek it. Clients who self-identify as homosexula have the fundamental right under the Free Exercise Clause to seek reparative therapy from Doctors like Dr. King. Conversion therapy bans, just like gay marriage policies and sexual orientation discrimination statutes, are coercive, fail all three prongs of the Lemon Test, and violate the Establishment Clause of the First Amendment of the United States Constitution.

Amici appear to address whether sexual orientation, like race and gender, is a clearly definable (discrete) category or a fixed and immutable characteristic – factors that are highly relevant to whether the three branches of government should declare sexual orientation a new suspect class or declare that the First Amendment Establishment Clause prohibits the government from legally endorsing sexual orientation as a basis for policy. Amici concludes based on the current state of scientific knowledge that sexual orientation is nothing more than a religious mythology. (See the Declaration of Dr. Cretella, President of the American College Pediatricians). Sexual orientation is a faith-based dogmatic doctrine that is inseparably linked to western postmodern individualistic moral relativism also referred to by the United States Supreme Court and the legislatures as "Secular Humanism." The Supreme Court in Torcaso v. Watkins, 367 U.S. 488 (1961) and Edwards v. Aguillard, 482 U.S. 578 (1987) recognized that

Secular Humanism is a religion for purposes of the Establishment Clause.[1] So have most of the

Courts of appeals. The Courts, legislatures, and members of the Executive branch are

Constitutionally required to enforce the "Bright Line Rule," which balances the Free Exercise

Clause with the Establishment Clause and reflects the spirit of the Marriage And Constitution

Restoration Act which asserts: while any individual in view of the Free Exercise Clause of the

First Amendment can form any self-asserted sex-based narrative, hold any form of parody

wedding ceremonies, and live any life style in step with their identity narrative, as long as no

crimes are being committed. However, in view of the Establishment Clause, all aspects of the

State and Federal government are prohibited from taking any government action that enforces,

recognizes, favors, or respects self-asserted sex-based identity narratives that are questionably

real, moral, and decent because such government action is a non-secular sham. In fact, such

government action is a non-secular sham that has the effect of endorsing the religion of Secular

---

[1] See also *Washington Ethical Society v. District of Columbia,* 101 U.S. App. D.C. 371, 249 F.2d 127 (1957); 2 Encyclopaedia of the Social Sciences, 293; J. Archer, Faiths Men Live By 120—138, 254—313 (2d ed. revised by Purinton 1958); Stokes & Pfeffer, supra, n. 3, at 560. *Welsh v. U.S,* 1970398 U.S. 333 (U.S. Cal. June 15); *Edwards,* 482 U.S. 592. (The Supreme Court itself has "taken notice of the fact [over and over again] that recognized religions' exist that 'do not teach what would generally be considered a belief in the existence of God, to include [Atheism], Buddhism, Taoism, Ethical Culture, Secular Humanism and 'others.'"). *Real Alternatives, Inc. v. Burwell,* 150 F. Supp. 3d 419, 440–41 (M.D. Pa. 2015), aff'd sub nom. *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, No. 16-1275, 2017 WL 3324690 (3d Cir. Aug. 4, 2017). In *Real Alternatives,* the court stated: "We detect a difference in the "philosophical views" espoused by [the plaintiffs], and the "secular moral system[s]...equivalent to religion except for non-belief in God" that Judge Easterbrook describes in *Center for Inquiry,* 758 F.3d at 873. There, the Seventh Circuit references organized groups of people who subscribe to belief systems such as Atheism, Shintoism, Janism, Buddhism, and secular humanism, all of which "are situated similarly to religions in everything except belief in a deity." *Id.* at 872. These systems are organized, full, and provide a comprehensive code by which individuals may guide their daily activities. Instead having a cross or the ten commandments, the LGBTQ church has the gay pride flag and their own commandments, such as if you disagree with LGBTQ ideology you are a bigot worth marginalizing.

Humanism and serves to excessively entangle the government with the religion of Secular Humanism in a manner that creates indefensible legal weapons against non-observers of the religion of Secular Humanism. All three branches of government must completely stop enforcing gay marriage policies, sexual orientation discrimination policies, transgender bathroom policies, and conversion therapy bans because that is what the Establishment Clause requires.

## SUMMARY OF THE ARGUMENT

Many powerful voices have attempted to persuade the government that sexual orientation is a suspect class, as a matter of scientific facts and genetics. But it is not. Making that finding is not "bigotry," it is "biology." From a medical perspective, there is no such thing as "gay people." There are only some people who self-identity as homosexual for some period. Self-identified homosexuals are not a "people group" for purposes of the Fourteenth Amendment. Self-identified homosexuals are a highly organized religious cult for purposes of the Establishment and Free Exercise Clause of the First Amendment. *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 2017 WL 3324690 (3d Cir. Aug. 4, 2017). Often, times people who self-identify as homosexual or transgender are simply overly conforming to society's messages. While people have the fundamental right to freely express themselves under the First Amendment Freedom Of Expression Clause of the United States Constitution, the Government cannot legally recognize any parody marriage without violating the Establishment Clause because self-asserted sex-based identity narratives that are questionably moral are based on faith, not neutral facts, like genetics. The evidence shows that sexual orientation is a mythology, dogma and doctrine that is inseparably linked to the religion of Secular Humanism. Sexual orientation ideology is based on a series of unproven truth claims, faith-based assumptions, and

naked assertions that are implicitly religious, if nothing more than a surreptitious excuse to explain away deviant sexual conduct that has a tendency to erode community standards of decency. There are compelling reasons against treating sexual orientation rights as a civil rights issue, namely doing so violates the First Amendment Establishment Clause for being a non-secular sham and because pretending that sexual orientation is like race, which is actually based on immutability, erodes the integrity of the civil rights movement lead by Pastor Martin Luther King Jr.. (See the amicus brief of Social Cross and the National Coalition of Black Pastors). Even ignoring the substantial and growing political power of the LGBT-rights movement, sexual orientation is neither a "discrete" nor "immutable" characteristic in the legal sense of those terms. Under longstanding American jurisprudence, therefore, sexual orientation should not be granted the "extraordinary protection from the majoritarian political process" entailed by suspect-class status, as promoted by devout Secular Humanists and the LGBTQ church, who are too intellectually blind to even see that they are part of a religion that is based entirely on faith and emotion, not objective logic reasoning and neutral fact. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 313 (1976) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973)). "Sexual orientation" should either be treated as an ideology that is crafted to normalize false permission giving beliefs about sex to erode community standards of decency or as a religious doctrine that flows out of the religion of Sexual Humanism. Either way, the Establishment Clause is the correct and controlling Constitutional Amendment that informs all three branches of Government that they are prohibited from legally respecting, endorsing, and recognizing any form of parody marriage. Identity narratives that cannot be deduced from self-evident observation because they are semi-religious in nature, and no aspect of government

can treat those identity narratives as if they were real whether through symbolic or direct endorsement because it is an evil that the Establishment Clause of the First Amendment of the United States Constitution does not allow.

The decision in *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015) involved a blatant misapplication of the Equal Protection Clause by five unelected Secular Humanist Judges who subscribe to the same truth allergic religion as that LGBTQ church is part of. The *Obergefell* Court did not provide a single sentence to explain how the Equal Protection Clause even began to justify gay marriage or how it was "synergistic" with the Substantive Due Process Clause of the Fourteenth Amendment because the entire controversy was a religious sham and political power grab drummed up by the Democratic party in step with their endless quest for power for powers sake. The *Obergefell* decision was based purely on emotional appeals offered by self-identified that were faith-based and designed to usurp the Establishment Clause by way of misdirection and red herring.   In sum, the Secular Humanists in the majority on the *Obergefell* Court were monkeying with the Fourteenth Amendment to justify their own personal beliefs in the superiority of the religion of Secular Humanism. The five Secular Humanist Justices made their dishonest decision at the expense of their fiduciary duty to uphold the Constitution under Article III and Article VI. The five Secular Humanist Justices knew or should have known that emotional appeals, even really good ones, do not allow the government to usurp the Establishment Clause. See *Holloman v. Harland*, 370 F.3 1252 (11th Cir. 2004).[2] The so called

---

[2] In *Holloman,* a public school teacher defended a daily moment of silent prayer by arguing that she intended to teach students compassion, pursuant to character education plan mandated by the state. Id. at 1285. The court concluded that this emotional explanation did not constitute a valid secular purpose because the teacher's most basic intent unquestionably was to offer her students an opportunity to pray. "While [the teacher] may also have had a higher-order ultimate goal of promoting compassion, we look not only to the ultimate goal or objective of the behavior, but

original "State's marriage bans" targeted all variations of parody marriages - not just gay

marriage - and were always Constitutionally sound because the ultimate legal basis behind the

ban was the Establishment Clause of the United States Constitution. Furthermore, the other

reason the states exclusively recognized marriage between a man and a woman was because all

forms of parody marriage erode community standards of decency, and states have a compelling

interest to uphold community standards of decency. The original marriage laws should never

have been struck down because numerous decisions express that heightened scrutiny is improper

for classifications that are an insufficiently discrete. Discreteness requires, at least, that a group

or trait be clearly defined. Sexual orientation fails that test, just as all statutes that reference

sexual orientation fail the *Lemon* Test[3] for being an indefensible weapon against non-observers

of the religion of Secular Humanism.[4] A review of scientific studies demonstrates that there is

---

also to the more immediate, tangible, or lower-order consequences a government actor intends to bring about." Id. The unmistakable message of the Supreme Court's teaching in *Holloman* is that the states cannot "employ a religious means to serve an otherwise legitimate secular interests." Id. at 1286. The *Holloman* court further concluded that "a person attempting to further an ostensibly secular purpose through avowedly religious means is considered to have a Constitutionally impermissible purpose." Id., citing *Jagar v. Douglas County School*, 862 F.2d 824, 830 (11th Cir. 1989). ("An intrinsically religious practice cannot meet the secular purpose prong of the *Lemon* test."). The entire basis for gay marriage is predicated on religious emotionalism, which openly seeks to dignify the religion of Secular Humanism through the misuse of Government. The Majority in *Obergefell* did not even attempt to hide their objective in their opinion, which was built completely on emotion and not sound legal reasoning. This makes the Supreme Court look completely inept and untrustworthy.

[3] To pass muster under the Establishment Clause, a practice must satisfy the *Lemon* test, pursuant to which it must: (1) have a valid secular purpose; (2) not have the effect of advancing, endorsing, or inhibiting religion; and (3) not foster excessive entanglement with religion. Id. at 592 (citing *Lemon v. Kurtzman*, 403 U.S. 602 (1971)). *Edwards*, 482 U.S. 583, Agostini v. Felton, 521 U.S. 203, 218 (1997). Government action "violates the Establishment Clause if it fails to satisfy any of these prongs."

[4] The unconstitutional codification of the fake gay civil rights movement amount to an indefensible "legal weapon that no [Christian] or [non-believer in moral relativism] can obtain." *City of Boerne v. Flores*, 521 U.S. 507 (1997). A "gay marriage license" issued by the State

no scholarly consensus on how to define sexual orientation, and that the various definitions proposed by experts produce substantially different classes. In contrast with race and sex, which are well-defined and understood, and despite popular beliefs to the contrary, sexual orientation remains a contested and indeterminate classification. "Immutability" is a necessary characteristic for heightened-scrutiny protection, and that the class-defining trait must be determined solely by accident of birth. Unlike the traits of race and sex, and again despite popular beliefs to the contrary flowing out of the religion of Secular Humanism, no replicated scientific study supports the view that sexual orientation is determined at birth. No one is born homosexual any more than they are born as an pedophile, objectophile, zoophile, or polygamist. (See the Amicus Of the Center For Garden State Families). Studies conclude, instead, that sexual orientation is influenced by complex and unpredictable factors. Sexual orientation is a man-made faith-based construct, not a fact-based matter of science. Even if, contrary to its past decisions, the Courts were to expand the concept of immutability from a trait determined by accident of birth to a personal trait that cannot change – and there are surely many of those – scientific research offers substantial evidence that sexual orientation is far more fluid than commonly assumed. This is true regardless as to whether the culture has been able to successfully brainwashed parts of the society into believing the unproven faith-based assumption that "gay genes exist." There is no evidence that a "gay gene" exists any more than there is that a "rape gene" exists.

This brief takes no position on the proper definition or cause of sexual orientation because it is either an unprincipled ploy or faith-based concept that was designed to mask

---

amounts to a government issued "license to oppress" non-observers to the latest rendition of Secular Humanism.

deviant sexual conduct. See *Amici* Brief of the National Alliance of Black Pastors. This brief takes the position that (1) sexual orientation is nothing more than a faith-based concept, that (2) gay marriage policy, sexual orientation statutes, and transgender bathroom ordinances are all inherently religious in nature, and that, therefore, gay marriage policy and sexual orientation statutes must all be struck down because they violate the First Amendment Establishment Clause for failing all three prongs of the *Lemon* Test. Scholars do not know enough about what sexual orientation is, what causes it, and why and how it sometimes changes because it is a religious mythology that is sermonized by the LGBTQ church and the devout subscribers to the religion of Secular Humanistic. Therefore, the Marriage And Constitution Restoration Act should pass and be upheld because it is a reflection of what the Establishment Clause and Free Exercise Clause already require of the State and Federal government. The United States is a country that is run by a Constitution and not a government run by Hollywood. None of the branches can continue to recognize sexual orientation as a new suspect class or enforce parody marriage policies, conversion therapy bans, sexual discrimination civil rights statutes, Drag Queen Story Hour at the children's library, or transgender bathroom policies because they involve government action that fails all three prongs of the *Lemon* test, violates the Establishment Clause, erases fundamental rights that are real, and erodes the supremacy of the United States Constitution itself. The government's decision to entangle itself with the LGBTQ church has been one of the most dangerous acts to the survivability of our nation since the inception of the nation.

## ARGUMENT

I. **Sexual Orientation Does Not Define a Discrete and Insular Minority.**

A. **Threshold Questions Prevent the Court from Defining a Class Based on Sexual Orientation with Sufficient Clarity.**

It is not fully clear whether the Supreme Court in *Obergefell* resolved that sexual orientation is a suspect class entitled to heightened scrutiny under the Equal Protection Clause,[5] and no fewer than 10 federal circuits have considered and rejected that claim.[6] Only the Second Circuit, in a decision striking down the federal Defense of Marriage Act, has held that "homosexuals compose a class that is subject to heightened scrutiny." *Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012). Of course, *Windsor* was the building block for *Obergefell*, and together Justice Scalia correctly called the cases an "egotistic....judicial putsch" that causes the Secular Humanists in office to represent "a threat to American Democracy." *Obergefell v Hodges*, 135 S.Ct. 2584 (2015)(Scalia Dissenting). Justice Scalia was correct in making that unprecedented statement before his suspicious death. The inherent propensity for Secular Humanists to refuse to use logic reasoning and instead only rely on emotion is a catalyst for intellectual darkness that tends to create a moral superiority complex that has proven to be dangerous. See ANTIFA. The truth allergic approach to think and the practice of making policy based on the unexamined assumption of the superiority of our cultural moment is both arrogant and subversive to human

---

[5] The USSC's leading cases on sexual orientation are *Romer v. Evans*, 517 U.S. 620, 635 (1996), decided on "conventional" rational-basis review, and *Lawrence v. Texas*, 539 U.S. 558, 575 (2003), decided under the Due Process Clause and not as a matter of equal protection.
[6] *See Massachusetts v. Dep't of Health & Human Servs.*, 682 F.3d 1, 9-10 (1st Cir. 2012); *Thomasson v. Perry*, 80 F.3d 915 (4th Cir. 1996); *Johnson v. Johnson*, 385 F.3d 503, 532 (5th Cir. 2004); *Equality Found. of Greater Cincinnati, Inc. v. City of Cincinnati*, 128 F.3d 289 (6th Cir. 1997); *Ben-Shalom v. Marsh*, 881 F.2d 454, 464 (7th Cir. 1989); *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 866 (8th Cir. 2006); *Witt v. Dep't of Air Force*, 527 F.3d 806, 821 (9th Cir. 2008); *Milligan-Hitt v. Bd. of Trustees of Sheridan County Sch. Dist. No. 2*, 523 F.3d 1219, 1233 (10th Cir. 2008); *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 818 & n.16 (11th Cir. 2004); *Steffan v. Perry*, 41 F.3d 677 (D.C. Cir. 1994) (*en banc*); *Woodward v. United States*, 871 F.2d 1068 (Fed. Cir. 1989).

flourishing. It is a practice that is barred by the Establishment Clause of the United States Constitution.

Adding sexual orientation to the catalog of suspect classes is a long and consequential step that the judiciary's established approach to the Equal Protection Clause does not support and that the First Amendment Establishment Clause absolutely prohibits. Adding sexual orientation to the catalog of suspect class has had the effect of excessively entangling the government with the religion of Secular Humanism, which has lead to the marginalization and oppression of non-observers - namely Christians who typically vote Republican and who have the humility and wisdom to believe in absolute truth.[7] Generally, courts apply heightened scrutiny to certain classifications, such as race, alienage, national origin, and gender, to protect " 'discrete and insular' group[s], in need of 'extraordinary protection from the majoritarian political process.'" *Murgia,* 427 U.S. at 313 (quoting *Rodriguez,* 411 U.S. at 28). But the Supreme Court has repeatedly declined to apply heightened scrutiny where discreteness or insularity is lacking. Id. at 313-314 ("old age does not define a 'discrete and insular' group" (quoting *United States v. Carolene Products Co.,* 304 U.S. 144, 152-53 n.4)); *Rodriguez,* 411 U.S. at 25-28 (1973) (explaining the law in question did not discriminate against any "definable category of 'poor' people," but rather against a "large, diverse, and amorphous class"); *Lyng v. Castillo,* 477 U.S.

---

[7] Probably the biggest reason gay marriage policy violates prong three of *Lemon* is because while there has been no land rush on gay marriage, there has been a landrush for the LGBTQ Church to infiltrate elementary schools with the sole purpose of indoctrinating children to their religious worldview on sex, faith, and morality that is questionably real, moral, and obscene. The Supreme Court has emphasized that there are "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools," *Lee v. Weisman,* 505 U.S. 577, 592 (1992), and the federal courts have thus "been particularly vigilant in monitoring compliance with the Establishment Clause" in the public-school context, see *Edwards v. Aguillard,* 482 U.S., 578-583 (1987).

635, 638 (1986) (noting close relatives are not a suspect class because they "do not exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group"); *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 445 (1985) (denying protected status to the mentally disabled in part because they are a "large and amorphous" class). These decisions teach that "where individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued." *City of Cleburne*, 473 U.S. at 441-42.

All three branches of government must be reluctant to create new suspect classes because sexual orientation is a less discrete characteristic than age or poverty, which the United States Supreme Court has already refused to accord suspect-class status. In *Rodriguez,* for instance, the Supreme Court rejected the claim that the Texas statutory regime for allocating funding for public schools violated the Equal Protection Clause by discriminating against the poor. *Rodriguez,* 411 U.S. at 54-55. The Supreme Court sharply criticized lower courts for "virtually assum[ing] their findings of a suspect classification through a simplistic process of analysis: since, under the traditional systems of financing public schools, some poorer people receive less expensive educations than other more affluent people, these systems discriminate on the basis of wealth." Id. at 19. The Supreme Court warned that "[t]his approach largely ignores the hard threshold questions, including whether it makes a difference, for purposes of consideration under the Constitution, that the class of disadvantaged 'poor' cannot be identified or defined in customary equal protection terms." Id. Such "hard threshold questions" determine whether a

class ought to be accorded special treatment under the Fourteenth Amendment – questions that begin with whether the equal protection claim is clothed with a "definitive description of the classifying facts or delineation of the disfavored class." Id.; accord *City of Cleburne*, 473 U.S. at 442 & n.9 (rejecting mental retardation as a suspect class).

In *Windsor* the Second Circuit "ignore[d] the hard threshold questions," by reasoning that a class is sufficiently discrete to qualify for heightened scrutiny if its identifying "characteristic invites discrimination when it is manifest." *Windsor*, 699 F.3d at 184. A test so indeterminate conflicts with *Murgia*, *Rodriguez*, and *City of Cleburne,* because age, poverty, and mental disability can "invite[ ] discrimination when [they are] manifest." Id. Certain types of sexual orientation may invite discrimination in particular circumstances insofar as it's a part of a religious ideology, but it does not follow that sexual orientation is the characteristic of a discrete class. To be sure, sexual orientation characterizes the difference between heterosexuals, gay men, lesbians, polygamists, transgenders, zoophiles, objectophiles and bisexuals. But for reasons *Amici* explain below, sexual orientation also may characterize points along a continuum of sexual attraction, sexual behavior, and sexual identity where individual categories are anything but distinct. For that reason alone, sexual orientation should be rejected as the basis for heightened scrutiny and for civil rights law because it "cannot be identified or defined in customary equal protection terms." *Rodriguez,* 411 U.S. at 19. Most importantly, sexual orientation must be rejected as a basis for law and policy because it is a religious orthodoxy whose ratification by the government violates all three prongs of the *Lemon* test from every angle.

**B. Social Science Experts Raise Serious Doubts About the Definability of Sexual Orientation Simply Because Sexual Orientation Is A Religious Dogma Based On Series of**

**Unproven Faith-Based Assumptions That Are Inseparably Linked To The Religion Of Secular Humanism**

Deep conceptual and empirical difficulties prevent sexual orientation from being used to define a discrete class of persons and from being used as a basis for law and policy. Sexual orientation is a complex, amorphous phenomenon, and religious orthodoxy that often defies consistent and uniform definition because it falls in the realm of nothing more than a psychological projection. "There is currently no scientific or popular consensus . . . that definitively 'qualify' an individual as lesbian, gay, [polygamist], [zoophile], [transgender], [zoophile], or bisexual." Lisa M. Diamond, *New Paradigms for Research on Heterosexual and Sexual Minority Dev.*, 32 (4) J. Clinical Child & Adolescent Psychol., 492 (2003). "Much of the confusion about sexual orientation occurs because [people fail to see that sexual orientation is a religious doctrine based on a series of unproven faith-based assumptions] and because there is no single agreed upon definition of the term. . . . There is no one universally accepted definition of sexual orientation, nor of who is bi- sexual, lesbian, [polymorous], [zoophilic], [objectophilic], or gay."[8]

Scientific literature often mentions three different ways to define homosexuality. "Does it mean someone who engages in same-sex sexual behavior? Someone who fantasizes about such acts? Someone who will identify himself or herself as gay or lesbian?" M.V. Lee Badgett, *Money, Myths, & Change: The Economic Lives of Lesbians & Gay Men* 4 (2001). Most definitions of sexual orientation "include[ ] components of at least one of three" of the

---

[8] " Gail S. Bernstein, *Defining Sexual Orientation,* Selfhelp Magazine (Sept. 18, 2012), http://www.selfhelpmagazine.com/articles/sexual_ orientation. *See also* Todd A. Salzman & Michael G. Lawler, *The Sexual Person: Toward a Renewed Catholic Anthropology* 65 (2008) ("The meaning of the phrase 'sexual orientation' is complex and not universally agreed upon.").

dimensions of behavior, attraction, and identity. Laura Dean et al., *Lesbian, Gay, Bisexual, and Transgender Health: Findings and Concerns*, J. Gay & Lesbian Med. Ass'n, Sept. 2000, Vol. 4, at 135. Some definitions include all three and, additionally, membership in a community defined by sexual orientation. The APA's definition holds that sexual orientation refers to an enduring pattern of emotional, romantic, and/or sexual *attractions* to men, women, animals, objects, multiple people, or both sexes. Sexual orientation ideology also refers to a person's sense of *identity* based on those attractions, related *behaviors*, and *membership in a community* of others who share those attractions." Am. Psychol. Ass'n, *Sexual Orientation and Homosexuality: Answers to Your Questions for a Better Understanding, What Is Sexual Orientation?*, http://www.apa.org/topics/sexuality/orientation.aspx?item=2 (last visited Jan. 11, 2012) (emphasis added). Identity narratives are almost always semi-religious in nature, and identity narratives that are crafted to be a critique on self-evident morality are also implicitly religious in nature. The evidence is overwhelming that self-asserted sex-based identity narratives have little to do with science because they are nothing more naked assertions connected to a spiritual take on reality. If a man self-identifies as Superman and moments later as Batman, such self-identification has little to do with science, but such a self-assertion does have a lot to do with faith-based beliefs. So it goes with sexual orientation mythology, which has more common with the metaphysical superstition than it does with the science of genetics. It is not necessarily the government's job to determine if a set of beliefs are plausible or not. But it is certainly the government's duty to not put "religion over non-religion" by pretending that sexual orientation is a matter of

immutability, just because the Democrats have concluded that lying and exploiting shame is politically expedient. [9]

The government violates the duty owed to the Establishment Clause by respecting gay marriage and by enforcing statutes that treat homosexual ideology as if it was real. The problem with sexual orientation, so defined, from a medical perspective is that many people are not consistent across all three dimensions. "There is a physical orientation, an affectional orientation, and a fantasy orientation, with each of those three further divided into a past (historical) component and a present component. A person's behavior may be totally at variance with all aspects of orientation, and the various parts of orientation may not all agree." A.E. Moses & R.O. Hawkins, Jr., Counseling Lesbian Women and Gay Men: A Life Issues Approach 43 (1982). "The more carefully researchers map these constellations, differentiating, for example, between gender identity and sexual identity, desire and behavior, sexual versus affectionate feelings, early-appearing versus late-appearing attractions and fantasies, or social identifications and sexual profiles, the more complicated the picture becomes because few individuals report uniform intercorrelations among these domains." Lisa M. Diamond & Ritch C. Savin-Williams, Gender & Sexual Identity, in Hand-book Applied Dev. Sci. 101, 102 (Richard M. Lerner et al. eds., 2003). Many other researchers also acknowledge discordance between components of

---

[9] Just as government officials may not favor or endorse one religion over others, so too officials "may not favor or endorse religion generally over non-religion." *Lee v. Weissman*, 505 U.S. 577, 627, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)(Souter, Justice, concurring)(citing *County of Allegheny v. ACLU*, 492 U.S. 573, 589-94, 109 S.Ct. 3086, 106 L. Ed. 2d 472 (1989). While *Amici* filer respect the right of all citizens to formulate identity narratives and religious beliefs, *Amici* expect the State and the Court to honor their Article VI duty to uphold the Establishment Clause, regardless if it is not in step with the current modern cultural narrative - which happens to be narrow, exclusive, and intolerant of the millions of people who have the decency, common sense, and humility to believe that truth is absolute, not relative.

sexual orientation. See John C. Gonsiorek & James D. Weinrich, The Definition and Scope of

Sexual Orientation, in Homosexuality: Research Implications for Public Policy 8 (John C.

Gonsiorek & James D. Weinrich eds., 1991) ("It can be safely assumed that there is no necessary

relationship between a person's sexual behavior and self-identity unless both are individually

assessed."); Letitia Anne Peplau et al., The Development of Sexual Orientation in Women, 10

Ann. Rev. Sex Research, at 70 (1999) ("[T]here is ample documentation that same-sex

attractions and behaviors are not inevitably or inherently linked to one's identity."). In short, it

takes a lot of religious belief to even believe that sexual orientation is a scientific concept -

because it is not. Sexual orientation has far more in common with the supernatural than with the

medical profession.  The fact of the matter is that pretending that sexual orientation is a matter of

science does not make a person tolerant, it makes them intellectually dishonest or misguided.

     Practical consequences follow from these definitional uncertainties.  Different definitions

produce substantially different estimates of the size of the homosexual population. "Sizable

numbers of people reporting only same-sex attraction and/or behavior self-identify as

heterosexual or bisexual.  Similarly, sizable numbers of those who self-identify as gay or lesbian

report some sexual partners of a different sex and/or some level of attraction to different sex

partners." Williams Institute: Sexual Minority Assessment Research Team, *Best Practices for*

*Asking Questions about Sexual Orientation on Surveys*, 6-7 (Nov. 2009), http://williamsinstitute.

law.ucla.edu/ wp-content/uploads/SMART-FINAL-Nov-2009.pdf. [10]  The "Chicago Sex

Survey," considered one of the most reliable scholarly efforts to determine sexual practices in the

United States, reported that of the portion of the population exhibiting at least one of the three

---

[10] The Williams Institute is an LGBT-rights think tank at UCLA Law. *See* Williams Institute,
http://williamsinstitute.law. ucla.edu/ (last visited Jan. 11, 2012).

components of sexual orientation, only 15% of the women and 24% of the men exhibited all three. *See* Edward O. Laumann et al., *The Social Organization of Sexuality: Sexual Practices in the United States* 299 (1994). This and other national studies led one group of researchers to conclude that "[d]epending upon how [the class] is defined and measured, 1-21% of the population could be classified as lesbian or gay to some degree, with the remainder classified as bisexual or heterosexual to some degree." Dean et al., *supra*, at 135.

Even more problematic, the definitional complexity is not limited to the familiar categories of straight, homosexual, bisexual, zoophile, polymorphous, objectophile, and their variations. Some researchers believe that "sexual orientation cannot be reduced to a bipolar or even a tripolar process, but must be recognized within a dynamic and multivariate framework." Fritz Klein et al., Sexual Orientation: A Multi-Variable Dynamic Process, J. Homosexuality, 11 (1), at 35-49 (1985). Others recommend the use of a 17-question, multiple-subpart test to measure sexual orientation. John C. Gonsiorek et al., Definition and Measurement of Sexual Orientation, in Suicide and Life-Threatening Behavior 40 (1995). Still other researchers say that sexual orientation must be analyzed on a continuum because sexual orientation is not a matter of science but of religious faith. See Zhana Vrangalova & Ritch C. Savin-Williams, Mostly Heterosexual and Mostly Gay/Lesbian: Evidence of New Sexual Orientation Identities, Arch. Sexual Behav. 85, 96 (2012) ("Taken together, these data suggest that sexual orientation is a continuously distributed characteristic and decisions to categorize it into discrete units, regardless of how many, may be useful for particular research questions but are ultimately external impositions that are not consistent with reports of individuals."); Committee on Lesbian Health Research Priorities, Inst. of Med., Lesbian Health 25-26 (Andrea L. Solarz ed., 1999) ("In

general, sexual orientation is most often described as including behavioral, affective (i.e., desire or attraction), and cognitive (i.e., identity) dimensions that occur along continua.").  And others, with the caveat that "the concept of sexual orientation is a product of contemporary Western thought," apply a distinct definition for a specific research purpose. Timothy F. Murphy, Gay Science: The Ethics of Sexual Orientation Research 15-24 (1997); Alfred C. Kinsey et al., Sexual Behavior in the Human Male 639 (1948) ("Males do not represent two discrete populations, heterosexual and homosexual.").

Given the complexities of defining sexual orientation, it should not be surprising that some experts openly admit that "the categories of homosexual, gay, [polygamist, objectophile, zoophile,] and lesbian do not signify a common, universal experience." Salzman & Lawler, supra, at 2. Because there is no common experience, one can anticipate arguments for an ever-broadening definition of exactly who belongs in a judicially-protected class founded on sexual orientation. "It will be useful to expand our notions of sexual orientation to include more than just bisexuality, heterosexuality and homosexuality. . . . With respect to various components of sexual orientation, an individual may be heterosexual, homosexual, bisexual, as well as fetishistic, transvestitic, zoophiliac, and so on. It is important to note that these are not mutually exclusive categories." John P. DeCecco, Gay Personality and Sexual Labeling 16 (1985). Even polyamory, "a preference for having multiple romantic relationships simultaneously," has been defended as "a type of sexual orientation for purposes of anti-discrimination law." Ann E. Tweedy, Polyamory as a Sexual Orientation, 79 U. Cin. L. Rev. 1461, 1462 (2011). And "asexuality" – the absence of any sexual attraction – is being discussed as a possible sexual orientation. Id. at 1463 n.4. Its very capaciousness might lead one reasonably to "conclude there

is serious doubt whether sexual orientation is a valid concept at all. Social constructionism suggests that there is nothing 'real' about sexual orientation except a society's construction of it." Gonsiorek et al., supra, at 4.

There is no proof that a gay gene exists just as there is no proof that a "rape gene" exists either, but there is proof that sexual orientation is a matter of religious doctrine promoted by the devout subscribers to the religion of Secular Humanism. *Amici'* position is that the idea that there is a gay gene is merely a religious assertion that cannot be endorsed by the government as a basis for law and policy because the Establishment Clause of the First Amendment of the United States prohibits it. *Amici's* position is that gay marriage policy and all other pro-gay policies are invalidated by the First Amendment Establishment Clause because those policies fail all three prongs of the *Lemon* test in view of a dispassionate assessment of the facts. In order to protect the integrity of the three branches of government and the Constitution, all three branches must overrule *Obergefell* by (1) passing and enforcing the Marriage And Constitution Act and (2) by obeying one's duty under Article VI to enforce the Establishment Clause as it was written to uphold the law. In order to protect the integrity of the *Amici's* medical and scientific field, the *Amici* filers who are part of the coalition, in their capacity as a taxpayer, have standing to sue the state and federal government to force it to disentangle itself from endorsing LGBTQ and other Secular Humanism ideology.[11] *Amici* have standing to make this request under the

---

[11] Under this second prong of the Lemon test, courts ask, "irrespective of the . . . stated purpose, whether [the state action] . . has the primary effect of conveying a message that the [government] is advancing or inhibiting religion." *Indiana Civil Liberties Union v. O'Bannon,* 259 F.3d 766, 771 (7th Cir. 2001). The "effect prong asks whether, irrespective of government's actual purpose," *Wallace v. Jaffree,* 472 U.S. 38, 56 n.42, (1985); the "symbolic union of church and state...is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *School Dist. v. Ball,* 473 U.S. 373, 390 (1985); see also *Larkin v. Grendel's Den,* 459 U.S. 116,

Establishment Clause as taxpayers, but it would be best if the legislature pass the Marriage And Constitution Restoration Act and then groups that are loyal to the Constitution will help the State Attorney Generals defend it. Further, the Constitution requires the Courts to enjoin the government from enforcing any policy that respects homosexual ideology, since the policies fail *Lemon* and violate the United States Constitution. The Courts under Obama were lying, and the Judges who are trying to keep the charade alive, have been acting like children who do not want to admit that they were lying by doubling down, which is only further discrediting the legitimacy of the judicial branch. Nevertheless, the truth must prevail, and here is the truth, all parody marriages, sexual orientation discrimination statutes, conversion therapy bans, transgender bathroom rules, and related policies fail all three prongs of the *Lemon* Test in their making and in their enforcement thereby violating the Establishment Clause of the United States Constitution. If the United States is to continue to call itself a Constitutional republic, all three branches of government on the federal government on the federal and state level must completely disentangle itself from evolving LGBTQ ideology. If America wants to be great again, it can by enforcing the Constitution as it was written.

## II. Sexual Orientation is Not an Immutable Characteristic But It Is A Religious Concept That Is Barred From The Government's Respect, Recognition, and Endorsement Under The Establishment Clause.

### A. Immutability Means Solely An Accident of Birth.

---

126-27 (1982)(even the "mere appearance" of religious endorsement is prohibited). By the states' arbitrarily giving marriage licences to self-identified homosexuals based on their self-asserted beliefs on morality, sex, and marriage and not to objectophiles, zoophiles, and polygamists based on theirs, the states go beyond "mere appearance" and fails the effects test of Lemon entirely.

Sexual orientation also fails the ordinary standards for heightened scrutiny and fails to justify the government's decision to respect, endorse, and recognize any form of parody marriage because it is not immutable. Every class to which the USSC has applied heightened scrutiny is defined by an immutable characteristic. *Parham v. Hughes*, 441 U.S. 347, 351 (1979) (citing McLaughlin v. Florida, 379 U.S. 184 (1964) (race); *Oyama v. California*, 332 U.S. 633 (1948) (national origin); *Graham v. Richardson*, 403 U.S. 365 (1971) (alienage); *Gomez v. Perez*, 409 U.S. 535 (1973) (illegitimacy); *Reed v. Reed*, 404 U.S. 71 (1971) (gender)). Moreover, the Supreme Court has refused to apply heightened scrutiny to classes that are not marked by an immutable characteristic. E.g., *Plyler v. Doe*, 457 U.S. 202, 220 (1982) (undocumented aliens); *Lyng,* 477 U.S. at 639 (close relatives). The Court's jurisprudence makes clear that immutability is a necessary condition for recognizing a new protected class.

The USSC's precedents teach that immutability denotes a characteristic "determined solely by the accident of birth." *Frontiero v. Richardson,* 411 U.S. 677, 686 (1973). As then-Judge Ginsburg explained, "the 'immutable characteristic' notion . . . does not mean, broadly, something done that cannot be undone. Instead, it is a trait 'determined solely by accident of birth.'" *Quiban v. Veterans Administration*, 928 F.2d 1154, 1160 n.13 (D.C. Cir. 1991) (quoting *Schweiker v. Wilson,* 450 U.S. 221, 229 n.11 (1981)). There is no evidence to suggest that as an accident of birth individuals are homosexuals, polygamists, zoophiles, or objectophiles.[12] There is evidence that all people are homoreligious, which means that all people have some kind of semi-religious moral code that they live by. The evidence shows that some

---

[12] There is evidence that a person can cultivate attraction which can be reinforced through the straightforward science of dopamine, beta-fosb, oxytocin, serotonin and other neurotransmitters that are released upon organism. Whatever a person has sex with, they bond with

people who once were gay activists have completely left the lifestyle behind, converting to a new

identity narrative.[13] While there is no such thing as an ex-black person there are thousands of

ex-gays. (See *Amicus* of the Center For Garden State Families).

## B. Sexual Orientation Is Not *Solely* an Accident of Birth

Sexual orientation, unlike race or gender, is not determined solely or even primarily at

birth – there is no convincing evidence that biology is decisive. On the contrary, some

researchers have concluded that biological and genetic factors play little to no role in sexual

orientation. *E.g.,* Letitia Anne Peplau & Linda D. Garnets, *A New Paradigm for Understanding*

*Women's Sexuality and Sexual Orientation*, 56 J. Soc. Issues 329, 332 (2000) ("Although

additional research will fill in gaps in our knowledge, there is no reason to expect that biological

factors play anything other than a minor and probably indirect role in women's sexual

orientation."). Rather, there is "substantial indirect evidence in support of a socialization model

at the individual level." Peter S. Bearman & Hannah Bruckner, Opposite-Sex Twins and

Adolescent Same-Sex Attraction, 107 Am. J. Soc. 1179, 1180 (2002) (finding "no support for

genetic influences on same-sex preference net of social structural constraints.")

Studies of identical twins have confirmed that same-sex attraction is not solely

determined by heredity or other biological factors. *See id.* at 1196- 97 (finding concordance rates

of 6.7% for identical twins); Niklas Langstrom et al., *Genetic and Environmental Effects on*

*Same-sex Sexual Behavior: A Population Study of Twins in Sweden*, Arch. Sexual Behav. 77-78

(2010) (finding concordance rates of 18% for male identical twins and 22% for female identical

---

[13] Just because it may not be politically expedient for the Judiciary and the other branches to admit that they have made a mistake, the Constitution demands that humility over pride. As demonstrated by the LGBTQ church, pride produces intellectual blindness that is destructive.

twins); Kenneth S. Kendler et al., *Sexual Orientation in a U.S. National Sample of Twin and Nontwin Sibling Pairs*, 157 Am. J. Psychiatry 1843, 1845 (2000) (finding concordance rates of 31.6% for identical twins). Because there is not 100% concordance among identical twins, genetic factors are not the sole cause of sexual orientation. *See* Michael King & Elizabeth McDonald, *Homosexuals Who Are Twins*, 160 Brit. J. Psychiatry 407, 409 (1992) (concluding that "genetic factors are insufficient explanation of the development of sexual orientation," because "[t]he co-twins of men and women who identify themselves as homosexual appear to have a potential for a range of sexual expression.").

Other studies have found strong correlations between sexual orientation and external factors, such as family setting, environment, and social conditions, which are difficult if not impossible to explain under exclusively biological theories. Professors at Columbia University reported, for instance, that "[a]mong male [opposite-sex] twins, the proportion reporting a same-sex romantic attraction is twice as high among those without older brothers (18.7%) than among those with older brothers (8.8%)." Bearman & Bruckner, supra, at 1196-97. Researchers in Australia discovered "a major cohort effect in same-gender sexual behavior" and noted that this had "implications for purely biological theories of sexual orientation, because there must be historical changes in environmental factors that account for such an effect." A.F. Jorm et al., Cohort Difference in Sexual Orientation: Results from a Large Age-Stratified Population Sample, 49 Gerontology 392, 393 (2003). The Chicago Sex Survey found that men were twice as likely and women nine times as likely to identify as gay or bisexual if they had completed college. Laumann et al., supra, at 305. Researchers in New Zealand noted a correlation between sexual orientation and certain social conditions: "The overall higher rate of same-sex attraction

and contact for women in New Zealand in relation to other comparable countries, almost certainly represents a recent increase in prevalence. As such it argues strongly against a purely genetic explanation and suggests the environment can have a significant influence. It might be related to social changes which have happened with particular intensity and rapidity in this country." Nigel Dickson et al., Same Sex Attraction in a Birth Cohort: Prevalence and Persistence in Early Adulthood, 56 Soc. Sci. & Med. 1607, 1613 (2003).

Studies like these have led scientists to conclude that sexual orientation is influenced by a variety of factors beyond genetics or biology alone. *See, e.g.*, G.M. Herek, *Homosexuality, in 4 Encyclopedia Psychol.* 149, 150 (A.E. Kazdin ed., 2000) (political or aesthetic values); J.H. Gagnon, *The Explicit and Implicit Use of the Scripting Perspective in Sex Research*, 1 Ann. Rev. Sex Research, at 1-43 (1990) (visible gay and lesbian communities); M.V. Lee Badgett, *Sexual Orientation Discrimination: An International Perspective* 23 (2007) (socioeconomic outcomes); Linda D. Garnets & Letitia Anne Peplau, *A New Look at Women's Sexuality & Sexual Orientation*, CSW Update, Dec. 2006, at 5 (2006) (sexual orientation is shaped by "cultural beliefs about gender and sexuality, by kinship systems, by economic opportunities, by social status and power, by attitudes about women's roles, by whether or not sexual identities are recognized in a given culture, and by attitudes of acceptance versus rejection toward sexual minorities.")[14]

---

[14] It is sometimes suggested that sexual orientation is genetically based, and that its development and expression owe, to some limited extent, to very early life experiences. In this view, sexual orientation is like left-handedness, which surely appears to be both inherited and a product of early childhood developmental. There is, however, little social scientific evidence to support this hypothesis. Indeed, if this hypothesis were sound, one would expect that sexual orientation – like left-handedness – would be randomly and uniformly distributed throughout the population. But it is not so distributed. Laumann and collaborators have shown, for example, that there is a remarkable difference in the rates of male homosexual behavior in America, depending upon

In brief, available evidence casts serious doubt on the simplistic, popular notion floated by the LGBTQ church and Secular Humanists that sexual orientation is biologically determined.[15] There is simply no firm evidence to support that conclusion, only a series of unproven theories that are based on a series of unproven faith-based assumptions that are implicitly religious in nature.[16] As the American Psychiatric Association's latest statement on the issue summarizes: "Currently there is a renewed interest in searching for biological etiologies for homosexuality. However, to date there are no replicated scientific studies supporting any specific biological etiology for homosexuality." See Am. Psychiatric Ass'n, LGBT-Sexual Orientation, http://www.psychiatry.org/mental-health/people/lgbt-sexual- orientation (last visited Jan. 11, 2012) (emphasis added). See also Peplau et al., Development of Sexual Orientation, supra, at 81 ("To recap, more than 50 years of research has failed to demonstrate that biological factors are a major influence in the development of women's sexual orientation. . . . Contrary to popular belief, scientists have not convincingly demonstrated that biology determines women's sexual orientation."). And some research suggests that biology does not even play an important role in determining sexual orientation. See Bearman & Bruckner, supra, at 1180. As such, "the assertion

---

whether the subject lived through adolescence in a rural or an urban area. Whereas only 1.2% of males with rural adolescence had a male sexual partner in the year of survey, those with metropolitan adolescence had nearly four times (4.4%) that rate of male sexual partners. Laumann, et al, *supra*, at 303-04. There is basically no way to avoid the truth that sexual orientation is nothing more than a religious doctrine promoted by the religion of Secular Humanism through the LGBTQ church. While our citizens are absolutely free to believe that sexual orientation ideology is real, the government is prohibited from respecting those beliefs through State action in view of the Establishment Clause.

[15] The evidence shows that sexual orientation as a concept is inherently religious and cannot be used as a basis for any law or policy.

[16] Self-identified homosexuals have a motive to misuse science to treat sexual orientation as a fact-based matter because they are trying to explain away the feelings of shame conduct that was illegal until recently and remains categorically obscene by the state's obscenity codes.

that homosexuality is genetic is so reductionistic that it must be dismissed out of hand as a general principle of psychology." Richard C. Friedman & Jennifer I. Downey, Sexual Orientation and Psychoanalysis: Sexual Science and Clinical Practice 39 (2002).

On balance, the totality of the evidence shows that sexual orientation of self-identified homosexuals, polygamists, zoophiles, and objectophiles is a faith-based concept that is religious in nature and not proven. Sexual orientation is not immutable. Unlike every other class-defining trait accepted by the Courts, such as race or gender, the best available evidence concludes that sexual orientation is not "a trait 'determined solely by accident of birth.'" Quiban, 928 F.2d at 1160 n.13 (Ginsburg, J.). Because sexual orientation is a theocratic dogma that is inseparably linked to the religion of Secular Humanism and because the Supreme Court has recognized that Secular Humanism is a religion for the purposes of the Establishment Clause, the judicial, legislative, and executive branch must stop enforcing any policy that endorses LGBTQ ideology or that even treats it as if it is real.[17]

### C. Sexual Orientation Can and Often Does Change Over Time.

Because Sexual orientation is a matter of self-assertion and expressive individualism sexual orientation, unlike race, can change. Even if the concept of immutability were expanded from a trait determined by accident of birth to a trait that is firmly resistant to change, there is significant evidence that sexual orientation is more plastic than commonly supposed.[18] Changes in sexual

---

[17] *Torcaso v. Watkins*, 367 U.S. 488 (1961)
[18] Of course, the Court has never suggested such an expansive approach, which could potentially lead to dozens of new suspect classes based on personal traits or conditions that are nearly impossible to change, such as certain mental illnesses or physical disabilities. The point is that even under a more liberal approach sexual orientation would not qualify. It is true that if the Court were to pretend that sexual orientation is a suspect class that grants special civil rights to self-identified homosexuals that self-identified polygamists and objectophiles must be entitled to

orientation are difficult to measure because of the definitional ambiguities described above, but researchers have found that all three of the most frequently mentioned dimensions of sexual orientation – attraction, behavior, and identity – are subject to change over time. Moreover, the presence of a large bisexual population is evidence that sexual orientation is, for some people and to some extent, fluid.

Very obviously, in their effort to misappropriate the Fourteenth Amendment, the reason why the Secular Humanists on the courts had to classify marriage as an "individual right," a "fundamental right," and an "existing right," based on a "personal choice" and an "autonomous decision" was to get around the impossible problem that bi-sexual represents. *Zablocki v. Redhail,* 434 U.S. 374, 384 (1978) (fundamental right);; *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 63940 (1974) (personal choice);; *Loving v. Virginia,* 388 U.S. 1, 12 (1967) (existing right/individual right);; *Lawrence v. Texas,* 539 U.S. 558 (2003) (intimate choice);. However, in the face of other court's position against the plausibility of polygamy marriage, the evidence shows that gay marriage is a sham under prong one of *Lemon*[19] and the Secular Humanists on the bench are guilty of judicial malpractice that no reasonable observer can respect.

Research suggests that a person's sexual orientation is not entirely fixed and may be influenced by individual preference or choice. See Lisa M. Diamond & Ritch C. Savin-Williams, Explaining Diversity in the Development of Same-Sex Sexuality Among Young Women, 56 J.

_____

those same special civil rights. Otherwise, gay marriage policy is a sham that violates the Establishment Clause.

[19] At the core of the "Establishment Clause is the requirement that a government justify in secular terms its purpose for engaging in activities which may appear to endorse the beliefs of a particular religion." *ACLU v. Rabun Cnty. Chamber of Commerce, Inc.,* 698 F.2d 1098, 1111 (11th Cir. 1983). This secular purpose must be the "pre-eminent" and "primary" force driving the government's action, and "has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary Cnty, Ky. v. ACLU of Ky.,* 545 U.S. 844, 860 (2005).

Soc. Issues 297, 301 (2000) ("Contrary to the notion that most sexual minorities undergo a one-time discovery of their true identities, 50% of [a study's] respondents had changed their identity label more than once since first relinquishing their heterosexual identity."). Sexual orientation appears to be especially plastic for women. See Peplau et al., Development of Sexual Orientation, supra, at 93 (noting the "astonishing sexual plasticity of the human female"). "Female sexual development is a potentially continuous, lifelong process in which multiple changes in sexual orientation are possible. . . . Women who have had exclusively heterosexual experiences may develop an attraction to other women, and vice versa." Garnets & Peplau, A New Look, supra, at 5. Researchers have found that "both women's identification as lesbian, bisexual, or heterosexual and women's actual behavior can vary over time." Peplau & Garnets, A New Paradigm, supra, at 333; see also Lisa M. Diamond, Sexual Identity, Attractions, and Behavior Among Young Sexual-Minority Women Over a 2-Year Period, 36 Dev. Psychol. 241, 247 (2000) ("Half of the young women . . . relinquished the first sexual-minority identity they adopted."). Indeed, a 10-year study of 79 non-heterosexual women reported that 67% changed their identity at least once and 36% changed their identity more than once. Lisa M. Diamond, Female Bisexuality from Adolescence to Adulthood: Results from a 10-Year Longitudinal Study, 44 Dev. Psychol. 5, 9 (2008).[20]

---

[20] Professor Diamond's seminal research on the fluidity of female sexuality was summarized in a widely-praised book published by Harvard University Press. *See* Lisa M. Diamond, *Sexual Fluidity: Understanding Women's Love and Desire* 3 (2008) ("[O]ne of the fundamental, defining features of female sexuality is its *fluidity*. We are now on the brink of a revolutionary new understanding of female sexuality that has profound scientific and social implications."). Her work on the fluidity of female sexuality has been repeatedly profiled in the mainstream media. *See, e.g.*, Ian Kerner, "Understanding females' sexual fluidity," CNN Health (Feb. 9, 2012), http://thechart.blogs.cnn.com/2012/02/ (Continued on following page)

Research also shows changes over time in the intensity of same-sex attraction. When asked to rate their attraction to members of the same sex on a scale, many individuals vary in their own estimation over time, with some becoming more "gay" and others becoming less "gay." A study of the same-sex attraction of self-identified bisexual men reported that "homosexuality is not some monolithic construct one moves toward or from in a linear way; movement toward homosexuality fails to capture the fluid and contextual nature of sexuality. We also acknowledge that changes in sexual feelings and orientation over time occur in all possible directions." Joseph P. Stokes et al, Predictors of Movement Toward Homosexuality: A Longitudinal Study of Bisexual Men, 43 J. Sex Res. 304, 305 (1997) (finding that 34% of respondents moved toward homosexuality, 17% moved away, and 49% did not change). A study of same-sex attraction in a New Zealand birth cohort revealed "a surprising degree of change over time. Ten percent of men, and nearly a quarter of women, reported same-sex attraction at any time, but this nearly halved for current attraction at age 26. The changes were not just in one direction." Dickson et al., supra, at 1613.

Extensive studies of the real-world experiences of men and women sharply rebut the notion that sexual orientation is unchanging. The Chicago Sex Survey found that of those who had at least one same-sex partner in the last five years, over half of the men and two-thirds of the women also had an opposite-sex partner in the same time period. Laumann et al., supra, at 310-11. Scholarly surveys also show that a significant portion of individuals in same-sex relationships had previously been married to someone of the opposite sex. See, e.g., Gary J. Gates et al., Marriage, Registration and Dissolution by Same-Sex Couples in the U.S., Williams Institute 2 (2008) (reviewing data from three states and finding that "more than one in five

individuals in same-sex couples who marry or register have previously been married to a different-sex partner."); Sean Cahill et al., Family Policy: Issues Affecting Gay, Lesbian, Bisexual and Transgender Families, The National Gay and Lesbian Task Force Policy Institute, at 59 (2002) ("According to the 1990 U.S. Census, 31 percent of lesbians and bisexual women in same-sex relationships and 19 percent of gay or bisexual men in same-sex relationships were once married to a person of the other sex."). One researcher captured the overall direction of the scientific research when she noted that "[a]lthough some may think of sexual orientation as determined early in life and relatively unchanging from then on, growing evidence indicates that the nature of a woman's intimate relationships can change throughout her life and differ across social settings." Letitia Anne Peplau, Rethinking Women's Sexual Orientation: An Interdisciplinary, Relationship-Focused Approach, 8 Personal Relationships 1, 5 (2001). See also Herek et al., Internalized Stigma *Among Sexual Minority Adults*, 56 J. Counseling Psychol. 32, at 37, 39 (2009) (study finding that 13% of gay men, 30% of lesbians, 41% of bisexual men, and 55% of bisexual women report "[s]ome," "fair amount," or "a lot" of choice with respect to their sexual orientation). Professor Herek, one of plaintiffs' experts in the *Hollingsworth* trial, conceded that while current sexual identity is for "betting" purposes a good predictor of future sexual behavior, "you should also realize that for some individuals that would not be the case." Trial Tr. 2211. Indeed, "'if you are trying to predict for any specific individual whether their identity will predict their sexual behavior in the future, especially, that can be problematic.'" *Id.* at 2212 (quoting Prof. Herek's deposition testimony). One of the challenges of research in this evolving area is that, as Professor Herek further admitted, in describing changes in their own sexuality "people don't always have a knowledge of their mental processes." *Id.* at 2213.

Futhermore, the fact that many Secular Humanists and self-identified homosexuals do not realize that their worldview is religious in nature, does not mean that it is not. It just means that "times can blind,"or better stated "culture can brainwash." [21] Nevertheless, the medical field should not be hijacked or misappropriated because Secular Humanists are looking for an excuse to use government to impose their religious worldview on America, as a result of their refusal to think logically.

One might defend the immutability of sexual orientation by insisting that anyone whose sexual orientation changes over time is bisexual and that bisexuality is a discrete category of sexual orientation. But lumping everyone whose behavior does change into a broad residual category conveniently manipulates theory to blot out the primary evidence that sexuality is often mutable and not an essential and fixed characteristic of human behavior. See Diamond, Female Bisexuality, supra, at 5, 6 ("According to an essentialist perspective, individuals are thought to be endowed with fixed, early developing sexual predispositions that manifest themselves in consistent patterns of same-sex or other-sex desire over the life course. . . . Bisexual attractions pose a quandary for this model because such attractions necessarily create the potential for change over time.").

If human sexual preference were generally fluid rather than fixed, one would expect that some individuals would fall at the tails of the bell curve where behavior, attraction, and identity remain exclusively homosexual or heterosexual, but that most would exhibit at least some variation along the sexual orientation continuum with respect to attraction, behavior, and identity. Research confirms this expectation. A recent report by the Williams Institute averaged

---

[21] "Times can blind." Tr. of Oral Arg. on Question 1, at 9, 10 *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015).

the results of five recent population-based surveys, and found that of the 3.5% of the population identifying as LGBTQ, over half (1.8%) identifies as bisexual. Gary J. Gates, How Many People Are Lesbian, Gay, Bisexual, and Transgender?, Williams Institute 1 (2011). Above and beyond those self-reporting an LGB identity, 4.7% of the population admits to some same-sex sexual experience and 7.5% acknowledges some degree of same-sex attraction – numbers that are much higher than the population of self-identified homosexuals. Id.

Another recent survey confirmed the plasticity of sexual orientation by including two additional categories – "mostly heterosexual" and "mostly homosexual" – when asking participants to identify their sexual orientation. Vrangalova & Savin-Williams, *supra*, at 85. Of the 1631 participants, 14% of men and 27% of women chose one of the three non-exclusive identities (mostly heterosexual, bisexual, mostly homosexual), while only 5% of men and 2% of women chose an exclusively homosexual identity. *Id.* at 89. Less than half of those adopting an exclusive identity also reported exclusive behavior and attraction (48% of men and 39% of women). *Id.* at 94. These results suggest that sexual orientation is a fluid concept, not one that in practice denotes entirely distinct or fixed categories.

The notion that choice powerfully influences some persons' sexual orientation is highly controversial, but some studies conclude that for some women self-identity as a lesbian is experienced as a personal choice rather than an immutable constraint. Diamond & Savin-Williams, Explaining Diversity, supra, at 298 (noting that "variability in the emergence and expression of female same-sex desire during the life course is normative rather than exceptional."). Researchers Charbonneau and Lander interviewed 30 women who had spent half their lives as heterosexuls, married, had children, and then in midlife became self-identified

lesbian. Some of these women explained their lesbianism as a process of self-discovery. But a "second group of women . . . regarded their change more as a choice among several options of being lesbian, bisexual, celibate or heterosexual." Karen L. Bridges & James M. Croteau, Once-Married Lesbians: Facilitating Changing Life Patterns, 73 J. Counseling & Dev. 134, 135 (1994) (describing C. Charbonneau & P.S. Lander, *Redefining Sexuality: Women Becoming Lesbian in Mid-Life*, *in Lesbians at Mid-Life*, at 35 (B. Sang et al. eds., 1991)).

In short, scientific research on sexual identity, attraction, and behavior strongly suggests "that sexual orientation is not static and may vary throughout the course of a lifetime," especially in women. Michael R. Kauth & Seth C. Kalichman, Sexual Orientation and Development: An Interactive Approach, in The Psychology of Sexual Orientation, Behavior, and Identity: A Handbook 82 (Louis Diamant & Richard D. McAnulty eds., 1995). These studies show that even if the concept of immutability were extended to mean a substantial resistance to change, available evidence tends to show that sexual orientation is more plastic than commonly supposed.

## CONCLUSION

The misuse of the medical profession in an effort to entangle the government with the religion of Secular Humanism, i.e. postmodern western individualistic moral relativism, is unethical and unconstitutional. Human beings have a remarkable ability to lie to themselves and to distort the truth in order to explain away conduct that naturally produces feelings of shame and inadequacy. There is no evidence that a gay gene exists, just as there is no evidence that a rape gene exists either. There is no such thing as "gay people." There are only people. President Lincoln was right: all people are created equal. But not all people buy into a set of truth claims

that are equal, and not everyone takes the same path in life. Some doors are best left unopened. While the Freedom of Expression Clause allows for people to make unwise decisions with government impunity, the government must not make the objectively unhealthy choice the easy choice. That is not love. That is exploitation. Sexual orientation cannot be recognized as a new suspect class. Sexual orientation should not be used as a basis for law whatsoever because it is an evil that the Establishment Clause of the United States Constitution does not allow the government to respect. While there is no real proof that sexual orientation has anything to do with immutability, there is only proof that self-identified homosexuals wish that there was proof in order to justify their sincere belief in the plausibility of a sexual lifestyle that was illegal until recently. The fact is that the First Amendment Establishment Clause has exclusive jurisdiction over parody marriages and sexual orientation. The evidence shows that gay marriage policy and all other related pro-gay policies are religious shams that fails all three prongs of the *Lemon Test*. The Government's decision to legally recognize gay marriage puts "religion over non-religion" because it establishes the religion of Secular Humanism promoted by the LGBTQ church as the supreme national religion.[22] This wrongful entanglement has eroded the fundamental rights of millions of non-observers of moral relativism, who sincerely believe that homosexual ideology is immoral and that to promote immorality is itself an incredible act of immorality. Gay marriage has nothing to do with immutability or the Equal Protection Clause, and for any government official to pretend otherwise is intellectually dishonest. It was improper for the *Obergefell* majority to allow the Fourteenth Amendment to be used to force the States to respect, endorse,

---

[22] *Lee v. Weissman*, 505 U.S. 577, 627, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)(Souter, Justice, concurring)(citing *County of Allegheny v. ACLU*, 492 U.S. 573, 589-94, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989).

and recognize the most popular form of parody marriage that comes straight out of the the

religion of Secular Humanism, just as it has continued to be wrong for the Secular Humanists to

misuse the medical field to further the charade that sexual orientation is a matter of genetics and

immutability.  This is especially true, since the Supreme Court has already recognized that

Secular Humanism is a religion for the purposes of the Establishment Clause.  See *Torcaso v.*

*Watkins*, 367 U.S. 488, n 11 (1961); *Edwards v. Aguillard*, 482 U.S. 578, n. 6 (1987)(we did

indeed refer to "Secular Humanism" as a "religio[n].").  It takes a huge amount of faith to believe

that truth is relative and that there is no created design. Such a belief is unwise but is protected

under the Free Exercise Clause for good reason.   In contrast with other suspect classes, sexual

orientation is neither discrete (clearly definable) nor immutable. (See the *Amicus* Brief of the

Center For Garden State Families).  There is no scientific consensus on how to define sexual

orientation because it is not a matter of science. Sexual orientation is a matter of religion, and the

various definitions proposed by experts produce substantially different classes. Nor is there any

convincing evidence that sexual orientation is biologically determined; rather, research shows

that at least for some persons sexual orientation is mutable (or at least malleable) over time.

These are not the characteristics of a proper suspect class nor do they stop the three branches of

government from complying with their duty to get out of the parody marriage business. For the

foregoing reasons, neither the Judicial, legislative, or executive branches should conclude that

classifications based on sexual orientation are not subject to heightened scrutiny. John Adams

once said that "facts are stubborn things." The fact of the matter is that gay marriage policy is

greatest non-secular sham ever invented by Secular Humanists working in all three branches of

government, since the inception of American Jurisprudence.  In order to make America great

again, all three branches of government must (1) enforce and uphold the Marriage And

Constitution Restoration Act, (2) obey Article VI by enforcing the Establishment Clause, and (3)

no longer enforcing parody marriage policies, permit Drag Queen Story Hours to take place

Children's public library, enforce sexual orientation discrimination statutes, impose transgender

bathroom ordinances, or enforce conversion therapy bans. This Court should enjoin the Library

from (1) partnering with non-secular organizations from sponsoring the Drag Queen Story Time

and from (2) hosting the Drag Queen Story Hour in the Library.

/s/Nile Copeland/
COPELAND LAW GROUP,
PLLC 5100 Westheimer Road, Suite 200
Houston, Texas 77056
713-382-7980 Office
nile@e-justice.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document and attached exhibits were mailed with adequate
postage to the Defendants in this actions on October 22, 2018 to Mayor Sylvester Turner City of
Houston P.O. Box 1562 Houston, TX 77251;; Defendant Lawson, 500 McKinney Street
Houston, Texas 77002 (832) 393-1313:::

/s/Nile Copeland/

EXHIBIT

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION

| | | |
|---|---|---|
| **TEX CHRISTOPHER et. al.**<br><br>**V.**<br><br>**RHEA LAWSON et. al.** | | **Case No: 4:16-cv-039843**<br><br>**Before Honorable Chief Judge Rothenthal** |

## BRIEF AMICUS CURIAE OF THE CENTER FOR GARDEN STATE FAMILIES IN SUPPORT OF THE MARRIAGE AND CONSTITUTION RESTORATION ACT

https://www.gardenstatefamilies.org/
marriagerestorationact.com

### CORPORATION DISCLOSURE STATEMENT

Amicus states that it does not have a parent corporation, nor does it issue any stock.

### QUESTIONS PRESENTED

1. Should the Library be enjoined from forming a partnership with non-secular organizations to sponsor and promote the Drag Queen Story Time and should the Library be permitted to host the Drag Queen Story Time in the public Library.

### TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE
..............................................................................................1
SUMMARY OF THE ARGUMENT
..............................................................................................2
ARGUMENT
..............................................................................................5
I. Sexual orientation is not an immutable characteristic "determined solely by the accident of birth" and, thus, cannot be a suspect class
..............................................................................................5
II. Recognition of ex-gays as a group, by government authorities and other organizations, undermines the assertion that sexual orientation is immutable

..............................................................................................6

III.  The life stories of ex-gays evidences that sexual orientation is not an immutable characteristic
..............................................................................................9

A. Stephen Black's Story
..............................................................................................10

B. Richard Cohen's Story
..............................................................................................12

C. Melissa A. Ingraham's Story
..............................................................................................14

D. Kristin J. Tremba's Story
..............................................................................................17

IV. The ex-gay community is subject to more animus than any other minority group
..............................................................................................18

CONCLUSION
..............................................................................................25

## TABLE OF AUTHORITIES
**Cases**

*County of Allegheny v. ACLU,*
492 U.S. 573 (1989)
..............................................................................................2

*DeBoer v. Snyder,*
772 F.3d 388 (6th Cir. 2014)
..............................................................................................19, 25

*Edwards v. Aguillard,*
482 U.S. 578, 583 (1987).
..............................................................................................1

*Frontiero v. Richardson,*
411 U.S. 677 (1973)
..............................................................................................6

*Gomez v. Perez,*
409 U.S. 535 (1973)
..............................................................................................4

*Graham v. Richardson,*
403 U.S. 365 (1971)
..............................................................................................5

*Lee v. Weissman,* 505 U.S. 577 (1992)
477 U.S. 635 (1986)
..............................................................................................2

*Lyng v. Castillo,*
477 U.S. 635, 639 (1986)

..................................................................................................6

*McLaughlin v. Florida,*
379 U.S. 184 (1964)
..................................................................................................5

*Oyama v. California,*
332 U.S. 633 (1948)
..................................................................................................5

*Parham v. Hughes,*
441 U.S. 347 (1979)
..................................................................................................5

*Perry v. Schwarzenegger,*
..................................................................................................3

*PFOX v. Government of the District Office of Human Rights,*
No. 2008 CA 003662, slip. op. (D.C. June 26, 2009)
..................................................................................................7

*Plyler v. Doe,*
457 U.S. 202, 220 (1982)
..................................................................................................6

*Quiban v. Veterans Administration,*
928 F.2d 1154 (D.C. Cir. 1991)
..................................................................................................6

*Real Alternatives, Inc. v. Burwell,*
150 F. Supp. 3d 419 (M.D. Pa. 2015)
...............................................................................................2, 3

*Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.,*
2017 WL 3324690 (3d Cir. Aug. 4, 2017)
...............................................................................................2, 3

*Reed v. Reed,*
404 U.S. 71 (1971)
..................................................................................................5

*Romer v. Evans,*
517 U.S. 620 (1996)
..............................................................................................19, 20

*Schweiker v. Wilson,*
450 U.S. 221 (1981)
..................................................................................................6

*U.S. v. Windsor,*
133 S.Ct. 2675 (2013)
...................................................................................4, 18, 19, 20, 24

*Washington Ethical Society v. District of Columbia*,
101 U.S. App. D.C. 371, 249 F.2d 127 (1957)
..................................................................................................................2

*Ward v. Polite*,
667 F.3d 727, 735 (6th Cir. 2012)
................................................................................................................19

*Welsh v. U.S*,
1970398 U.S. 333 (U.S. Cal. June 15)
..................................................................................................................2

**Other Materials**
American Association for Retired People (AARP) recently published an article telling the stories
of senior adults whose sexual attractions and identifications changed over time (Dr. Pepper
Schwartz, "Can Sexual Preference Change With Age?" http://www.aarp.org/home-family/sex-
intimacy/info-2014/gay-lesbian-sexual-preference-schwartz.html?intcmp=AE-HOME-TOENG-
TOGL)
..................................................................................................................8

African American ex-gay Grammy winner Donnie McClurkin removed from singing at Martin
Luther King memorial concert following complaints by gay leaders
(http://www.christianpost.com/news/ex-gay-community-baptist-leadership-say-dc-officials-are-
infringing-on-pastors-civil-rights-102212)
................................................................................................................23

District of Columbia Superior Court orders the D.C. Office of Human Rights to recognize
ex-gays as a protected class for purposes of sexual orientation nondiscrimination (June 26,
2009), (http://pfox.org/Court-Rules-Sexual-Orientation-
Laws-Include-Former-Homosexuals.html)
..................................................................................................................7

Chirlane McCray no longer identifies as a lesbian after marrying and having family with New
York City Mayor Bill de Blasio (http://nypost.com/2012/12/11/bill-wife-speak-out;
http://observer.com/2012/12/the-lesbian-past-of-bill- de-blasios-wife)
..................................................................................................................8

 2 Encyclopaedia of the Social Sciences,
..................................................................................................................2

Ex-gays are reviled, ridiculed, and marginalized
(http://www.christianpost.com/news/former-gay-activist-marries-woman-addresses-critics-who-
condemn-his-new-heterosexual-lifestyle-110736)
................................................................................................................21

Former homosexuals targeted because they exist
(http://www.nytimes.com/2011/06/19/magazine/my-ex-gay-friend.html?pagewanted=all&_r=0)

.................................................................................21

Center for Garden State Families (https://www.gardenstatefamilies.org)

.................................................................................1

Gay leaders criticize presidential candidate Barack Obama for allowing Donnie McClurkin to sing at a fundraiser and insist he drop the singer from the program (http://www.youtube.com/watch?v=A3jkeTdgLrg)

.................................................................................23

Gay, Lesbian and Straight Education Network (GLSEN), American Association of School Administrators, and the Association for Supervision and Curriculum Development Guidelines include recognition of ex-gays. (http://nea- exgay.org/2006/03/15/sexual-orientation-consensus- guidelines-include-ex-gays)

.................................................................................8

Gay rights groups are wielding their considerable political power to aggressively oppose and outlaw counseling and therapy for men, women and children who struggle with unwanted same-sex attraction. These activities, carried on by organizations such as The National Center for Lesbian Rights (http://www.nclrights.org/explore-the- issues/bornperfect/), Southern Poverty Law Center (http://www.splcenter.org/conversion-therapy)

.................................................................................24

Human Rights Campaign (http://pfox- exgays.blogspot.com/2012/05/wacky-wayne- besen.html)

.................................................................................24

 J. Archer, Faiths Men Live By 120—138, 254—313 (2d ed. revised by Purinton 1958)

.................................................................................2

Montgomery County Maryland public schools superintendent acknowledges the contributions of an ex-gay representative on the district's Citizens Advisory Committee for Family Life and Human Development (2011) (http://pfox- exgays.blogspot.com/2011/10/letter-posted.html)

.................................................................................23

NEA recognizes Ex-Gay Educators' Caucus (http://nea-exgay.org/about/)

.................................................................................9

Pepsi Co's Corporate Counsel issues opinion memorandum on December 28, 2012 confirming ex- gays are protected from workplace sexual orientation discrimination (http://pfox.org/CivilRights.pdf)

.................................................................................8

Recent judicial victories in same-sex marriage cases have empowered animus by equating the legalization of same-sex marriage with the justification that ex-gays should therefore be banished from society and not allowed to participate in the public square of ideas and commerce (http://www.huffingtonpost.com/alec-fischer/this-is-what-happened-whe_1_b_6068712.html)

.................................................................................24

U.S. Department of Education's former Assistant Secretary of Safe and Drug Free Schools Kevin Jennings agrees on June 8, 2011 that ex-gays should not be discriminated against during

outreach efforts for students with unwanted same-sex attractions
(http://www.prnewswire.com/news- releases/departing-safe-schools-czar-met-with-pfox-
to-discuss-ex-gays-123447044.html)
.....................................................................................................................7

Washington D.C. Mayor Adrian Fenty, in response to complaints from gay organizations,
apologized for issuing a certificate of appreciation to an ex-gay organization. Yet in signing gay
marriage legislation for the nation's capital, the mayor had promised equality for all D.C.
residents (http://voices.washingtonpost.com/dc/2010/04/fenty_a pologizes_for_honoring.html)
..................................................................................................................23

World Bank removed Amicus Parents and Friends of Ex-gay & Gays, a non-profit corporation,
from its charitable fundraising program after receiving complaints from the Human Rights
Campaign, (http://www.hrc.org/press-releases/entry/hrc-to-
world-bank-remove-pfox-from-your-community- connections-campaign)
..................................................................................................................23

## INTEREST OF AMICUS CURIAE

The mission of the Center for Garden State Families is to protect and promote faith, freedom and the natural family, in culture and through public policy.[1] The Center for Garden State Families is a national non-profit organization that has supported, since its inception, many thousands of families of individuals with unwanted same-sex attraction who have made the personal decision to leave homosexuality, converting to a new identity narrative. The Center for Garden State Families advocates for the ex-gay community and educates the public about sexual orientation. The Center for Garden State Families appears as *Amicus* to address the purported immutability of homosexuality, which is relevant to whether the judicial, legislative, and executive branches should continue to treat sexual orientation as a new suspect class or whether they should treat sexual orientation as a matter of religious mythology that falls within the exclusive jurisdiction of the Establishment Clause.[2] The evidence shows that all forms of pro-parody marriage policies, to include "gay marriage policies," are non-secular and serve to excessively entangle the government with the religion of postmodern-western-individualistic-moral-relativism and expressive individualism, referred to by Federal Courts as "Secular Humanism." In *Torcaso v. Watkins*, 367 U.S. 488 (1961) and *Edwards v. Aguillard*, 482 U.S. 578, n 6. (1987), the United

---

[1] https://www.gardenstatefamilies.org/. The Center for Garden State Families focuses on Freedom of Religion Freedom of Speech, Freedom of the Press, The Right of Assembly Redress of Grievances, and opposing the alleged special rights of sexual minorities (LGBT).
[2] The Center for Garden State Families affirms sexual orientation is a fluid, transient, personal characteristic, and that individuals can and do change their sexual orientation and therefore self-asserted sex-based identity narratives that are questionably real, moral, and legal are not secular and are an extension of the church of Secular Humanism, Postmodern Western Moral Relativism, and Expressive Individualism. While all individuals are free to self-identify as whatever they want, neither the State nor the Federal Government can legally recognize parody marriages because parody marriage policies put the religion of Secular Humanism over non-religion.

States Supreme Court recognized and resolved that Secular Humanism is a religion for purposes

of the First Amendment Establishment Clause.[3] Most of the Courts of Appeals have found the

same. For any branch of government to respect or endorse parody marriages as real or for any

government actor to enforce any policy that treats homosexual orthodoxy as if it was real has the

effect of excessively entangling the government with the religion of Secular Humanism, putting

"religion over non-religion."[4] There are millions of taxpayers, to include the *amicus*, who do not

want their taxpayer dollars going towards the government's efforts to promote endorse

homosexual dogma, thereby, ratify the plausibility of the unproven faith based assumptions that

are inseparably linked to the religion of Secular Humanism. Having worked with thousands of

---

[3] The Supreme Court found that non-institutionalized religions are regulated by the Establishment Clause in *Torcaso v. Watkins*, 367 U.S. 488 (1961) stating that "among religions in this country, which do not teach what would generally be considered a belief in the existence of God, are Buddhism, Toaism, Ethical Culture, Secular Humanism, and others." See also *Washington Ethical Society v. District of Columbia*, 101 U.S. App. D.C. 371, 249 F.2d 127 (1957); 2 Encyclopaedia of the Social Sciences, 293; J. Archer, Faiths Men Live By 120—138, 254—313 (2d ed. revised by Purinton 1958); Stokes & Pfeffer, supra, n. 3, at 560. *Welsh v. U.S*, 1970398 U.S.333 (U.S. Cal. June15); See also *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987)"we did indeed refer to "Secular Humanism" as a "religio[n]."); In *Real Alternatives, Inc. v. Burwell*, 150 F. Supp. 3d 419, 440–41 (M.D. Pa. 2015), aff'd sub nom. *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, No. 16-1275, 2017 WL 3324690 (3d Cir. Aug. 4, 2017), the court stated: "We detect a difference in the "philosophical views" espoused by [the plaintiffs], and the "secular moral system[s]...equivalent to religion except for non-belief in God" that Judge Easterbrook describes in Center for Inquiry, 758 F.3d at 873. There, the Seventh Circuit references organized groups of people who subscribe to belief systems such as Atheism, Shintoism, Janism, Buddhism, and secular humanism, all of which "are situated similarly to religions in everything except belief in a deity. Id. at 872. These systems are organized, full, and provide a comprehensive code by which individuals may guide their daily activities. Instead having a cross or the ten commandments, the LGBTQ church has the gay pride flag and their own commandments, such as if you disagree with LGBTQ ideology you are a bigot worth marginalizing.

[4] Just as government officials may not favor or endorse one religion over others, so too officials "may not favor or endorse religion generally over non-religion." *Lee v. Weissman*, 505 U.S. 577, 627, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)(Souter, Justice, concurring)(citing *County of Allegheny v. ACLU*, 492 U.S. 573, 589-94, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)

ex-gays, the amicus can attest first hand that homosexual and transvestite ideology is predicated on a series of unproven faith based assumptions and naked assertions that are implicitly religious and inseparably linked to the religion of Secular Humanism. The United States is not a pure Democracy, it is a Constitutional Republic. In view of the Establishment Clause of the First Amendment of the United States Constitution, longer enforce or endorse (1) gay marriage policies, (2) sexual orientation discrimination statutes, (3) government paid for sex-change operations, (4) government mandated pronoun changes, (5) Drag Queen story hour in the children's public library, (6) allowing citizens to change their gender on their birth certificate to a gender that does not accord with the anatomy they were born with, (7) pro-transvestite bathroom ordinances. The Amicus, however, respects and defends the right of all adults to cultivate their own self-asserted sex-based identity narrative as permitted under the Free Exercise Clause of the First Amendment of the United States Constitution. It is simply the fact that the Establishment Clause requires the State and Federal Government to get out of the parody marriage business and to disentangle itself with the LGBTQ church completely.

## SUMMARY OF THE ARGUMENT

This brief confirm[5]s the growing recognition of the ex-gay community by the courts, government bodies, and business entities and presents the real-life, personal stories of four individuals who have done exactly what the district court in *Hollingsworth v. Perry*[6] pretended was impossible: they chose to change their sexual orientation and now live in opposite-sex

---

[5] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution to the preparation or submission of this brief.

[6] Finding of fact No. 46 stated: "Individuals do not generally choose their sexual orientation. No credible evidence supports a finding that an individual may, through conscious decision, therapeutic intervention or any other method, change his or her sexual orientation." *Perry v. Schwarzenegger,* 704 F. Supp. 2d 921, 966 (N.D. Cal. 2010).

relationships despite having been previously deeply entrenched in same-sex relationships and engaging in LGBTQ activism in an effort to entangle the government with the LGBTQ religion. These individuals converted to a new identity narrative. "Converted" is the right word to use because sexual orientation orthodoxy is religious in nature. The stories presented here demonstrate that, in fact, sexual orientation is not immutable—either in the sense that it is a trait determined solely by "accident of birth" or in the sense that it cannot be changed—but is a fluid, transient, personal characteristic that can and does change. The testimonials add to the numerous sworn statements by ex-gays that are already in the record here. The testimonies prove that the LGBTQ community is a church - a highly organized faith-based community with its own private moral code and with its own religious symbols and that it is inseparably linked to the religion of Secular Humanism. Millions of people - in fact the majority - find LGBTQ ideology to be non-secular, dishonest, and obscene to the point that homosexual and transvestite speech is not just "religious speech," it is unprotected obscene speech that erodes community standards of decency. The LGBTQ church is "[highly] organized, full, and provide[s] a comprehensive code by which individuals may guide their daily activities." See *Real Alternatives, Inc. v. Burwell*, 150 F. Supp. 3d 419, 440–41 (M.D. Pa. 2015), aff'd sub nom. *Real Alternatives, Inc. v Sec'y Dep't of Health & Human Servs.*, No. 16-1275, 2017 WL 3324690 (3d Cir. Aug. 4, 2017) The gay pride rainbow colored flag is a religious symbol of the LGBTQ and transvestite church. Just as Christians have the cross, Jews have the Ten Commandments, and Muslims have the star and crescent, the LGBTQ church has the gay pride rainbow colored flag. The idea that (1) people are born gay, that (2) people can be born in the wrong body, that (3) people can mystically come out of an invisible closet and be baptized gay, and that (4) if you disagree with those ideas you are

bigot are nothing more than naked assertions and unproven truth claims that take a huge amount of faith to believe are even plausible, and not merely a pathetic attempt to mask objectively immoral sexual practices that do not even accord with the givenness of our nature and the truth about the way things are. .

There are millions of people living in the United States who do not want their taxpayer dollars going towards endorsing or promoting the LGBTQ communities religious beliefs about sex, faith, truth, morality, and marriage to include the *Amicus*. The issue is important because the Establishment Clause forbids the three branches of government from continuing to pretend that sexual orientation is immutable, declaring it a "suspect class" for purposes of the Equal Protection Clause in light of overwhelming evidence that to do so amounts to a Constitutional and political malpractice. Falsely treating sexual orientation as a civil rights matter improperly subjects state laws or state Constitutional provisions to "strict scrutiny" rather than the existing, legally appropriate, "rational basis" review.

This brief does not detail the extensive medical and scientific evidence corroborating that sexual orientation in changeable and mutable, as that issue has been thoroughly briefed by Amicus filers, Dr. Tara King and Dr. Michelle Cretella in the amicus brief filed by the Coalition of Doctors defending Reparative Therapy. Rather, this brief personalizes the scientific and medical evidence via powerful biographical stories representing the actual experiences of many thousands of former homosexuals. This brief was created by a group of former radical gay activists who were radically transformed by the personalized truth of the central figure of the New Testament gospel narrative. This brief concludes with a discussion of the significant animus ex-gays experience, largely at the hands of self-identified homosexuals. While it was

self-identified homosexuals colluding with Secular Humanists in office who plotted to imposed

gay marriage on all 50 states through a series of emotional appeals in *U.S. v. Windsor,* 133 S.Ct.

2675 (2013), *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015), and other cases, it will be testimony

of ex-gays who have been transformed by Christianity that forces all aspects of the Federal and

State government to disentangle itself from endorsing any form of parody marriage or any

pro-gay policy. The wrong Constitutional narrative was being litigated in *Obergefell v. Hodges*,

135 S.Ct. 2584 (2015) at all times. The right Constitutional prescription has been raised by the

Marriage And Constitution Restoration Act and through litigation brought by the Special Forces

of Liberty and De Facto Attorney Generals. The Marriage And Constitutional Restoration will

become the law of the land because it reflects what the United States Constitution already says.

The Marriage And Constitution Restoration Act and supporting litigation balances the Free

Exercise Clause and the Establishment Clause of the First Amendment of the United States

Constitution, informing both the State and Federal government how to respond to marriage

requests of all kinds that do not involve a man and woman and how the government must react to

self-asserted sex-based identity narratives that are questionable real, moral, and indecent.

## ARGUMENT

**I. Sexual orientation is not an immutable characteristic "determined solely by the accident of birth" and, thus, cannot be a suspect class.**

As expounded in the *Amicus* brief by the Coalition of Doctors Defending Reparative

Therapy, sexual orientation fails the judicial standard for heightened scrutiny and fails to have

any connection with the Due Process and Equal Protection Clauses of the Fourteenth

Amendment because sexual orientation has nothing to do with immutability. Both the Federal

and State Courts lack subject matter jurisdiction over all issues dealing with sexual orientation

because the Establishment Clauses bars the government from even coming near the subject because of the fact that sexual orientation is a dogmatic mythology that is predicated on a series of naked assertions and unproven faith based assumptions that are at the very least implicitly religious and inseparably linked to the religion of Secular Humanism.

Every class to which the United States Supreme Court has applied heightened scrutiny and declared a suspect class is defined by an immutable characteristic.[7] Moreover, the Supreme Court has refused to apply heightened scrutiny to classes that are not marked by an immutable characteristic.[8] The Courts' jurisprudence makes clear that immutability is a necessary condition for recognizing a new protected class. The idea of the Supreme Court shoehorning homosexuality into a fake civil rights narrative is an act of overt judicial malpractice and intellectual dishonesty, which shows that gay marriage policy is a non-secular sham in violation of prong one of *Lemon*.[9]

The United States Supreme Court's precedents teach that immutability denotes a characteristic "determined solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). As then-Judge Ginsburg explained, "the 'immutable characteristic' notion . . . does not mean, broadly, something done that cannot be undone. Instead, it is a trait 'determined

---

[7] *Parham v. Hughes,* 441 U.S. 347, 351 (1979) (citing *McLaughlin v. Florida*, 379 U.S. 184 (1964) (race); *Oyama v. California*, 332 U.S. 633 (1948) (national origin); *Graham v. Richardson*, 403 U.S. 365 (1971) (alienage); *Gomez v. Perez*, 409 U.S. 535 (1973) (illegitimacy); *Reed v. Reed*, 404 U.S. 71 (1971) (gender)).

[8] *E.g., Plyler v. Doe*, 457 U.S. 202, 220 (1982) (undocumented aliens); *Lyng v. Castillo*, 477 U.S. 635, 639 (1986) (close relatives).

[9] That is, the manifest dishonesty of Secular Humanists on the bench in allowing the fake gay civil rights plight to be shoehorned into phony Fourteenth Amendment narratives - alone - shows that the gay marriage policies, conversion therapy bans, sexual orientation discrimination statutes are a sham.

solely by accident of birth.'"[10] Far from being an immutable characteristic determined at birth like race or gender, sexual orientation is a complex and amorphous phenomenon that defies consistent and uniform definition. The evidence embodied in this brief adds to the scholarly record amassed by the Coalition of Doctors Defending Reparative Therapy to show that, however defined, sexual orientation, like feelings of anger, can shift over time and does shift for a significant number of people. Indeed, many individuals freely choose to change their sexual orientation. Thus, while the nature and determinants of sexual orientation are not fully understood, sexual orientation is mutable for purposes of Equal Protection analysis, as it is not "determined solely by accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality).

## II. Recognition of ex-gays as a group, by government authorities and other organizations, undermines the assertion that sexual orientation is immutable.

In addition to the compelling personal stories of ex-gays discussed below, a growing number of governmental authorities, organizations, and influential individuals recognize the existence of thousands of ex- gays; that is, that there are individuals who have successfully changed their sexual orientation and are now living as heterosexuals even though they once lived as homosexuals. This is because there is no such thing as a "homosexual," there are only some people who for some period of time self-identify as a "homosexual. " Homosexuality is a religion because identity narratives that are questionably moral are inherently religious in nature and because a person can convert from one identity narrative to another, just like a person can convert from atheism to Christianity. LGBTQ orthodoxy is nothing more than a series of

---

[10] *Quiban v. Veterans Administration,* 928 F.2d 1154, 1160 n.13 (D.C. Cir. 1991) (quoting *Schweiker v. Wilson,* 450 U.S. 221, 229 n. 11 (1981)).

unproven faith based assumptions that can only be taken on faith. Facts do not care about feelings and neither does the Establishment Clause of the United States Constitution. Emotional appeals cannot be used by any religious groupt to usurp the Establishment Clause. See *Holloman v. Harland*, 370 F.3 1252 (11th Cir. 2004).

While there is no such thing as an ex-black person, there are thousands of ex-gays. In *PFOX v. Government of the District Office of Human Rights,* No. 2008 CA 003662, slip. op. at 12 (D.C. June 26, 2009), the District of Columbia Superior Court ordered the D.C. Office of Human Rights to recognize ex-gays as a protected class for purposes of sexual orientation nondiscrimination.[11] Likewise, Kevin Jennings, former Assistant Secretary of Safe and Drug Free Schools, U.S. Department of Education, agreed in 2010 that ex- gays should not be discriminated against during outreach efforts for students with unwanted same-sex attractions.[12] The superintendent of Montgomery County, Maryland public schools, the 17th largest school district in the United States, in 2011 acknowledged the contributions of an ex-gay representative who served on the district's Citizens Advisory Committee for Family Life and Human Development.[13] On December 28, 2012, PepsiCo, a Fortune 500 company, by and through its legal counsel, acknowledged in a written legal opinion memorandum that its workplace policy against sexual orientation discrimination includes non-discrimination against former homosexuals as a protected class.[14] According to Charles Haynes, primary drafter of the Public Schools and Sexual Orientation Consensus Guidelines released by the First Amendment Center,

---

[11]http://pfox.org/Court-Rules-Sexual-Orientation-Laws-Include-Former-Homosexuals.html
[12](http://www.prnewswire.com/news-releases/departing-safe-schools-czar-met-with-pfox-to-discuss-ex-gays-123447044.html).
[13] (http://pfox-exgays.blogspot.com/2011/10/letter- posted.html).
[14] (http://pfox.org/CivilRights.pdf).

the ex-gay viewpoint in public schools should be heard. The Guidelines are endorsed by the Gay,

Lesbian and Straight Education Network (GLSEN), American Association of School

Administrators, and the Association for Supervision and Curriculum Development.[15] And every

year, the National Education Association's officially recognized Ex-Gay Educators Caucus

participates in and hosts a booth at the NEA's conference.[16] Just a as a person can convert from

Judaism to Christianity or Christianity to Islam, a person can convert their sex-based identity

narrative from straight to zoophile to polygamist to heterosexual.[17] Heterosexuality - like natural

marriage - is based on self-evident truth and is, therefore, not religious in nature for purposes of

the Establishment Clause.

On a partner website of the *Amicus* are the video-recorded testimony of twenty three

former homosexuals telling their personal stories of how they came to identify as ex-gay

(http://www.pfox.org/personal- stories), including the journeys of former homosexuals whose

identical twins did not experience same-sex attraction.[18] Transformation of same-sex attraction

is so well recognized that the American Association for Retired People (AARP) recently

published an article telling the stories of senior adults whose sexual attractions and

identifications changed over time.[19] The article notes that some who identified as heterosexuals

---

[15] (http://nea-exgay.org/2006/03/15/sexual-orientation-consensus-guidelines-include-ex-gays).
[16] (http://nea-exgay.org/about)
[17] Chirlane McCray, a former lesbian, is married to New York City Mayor Bill de Blasio. In 1979, McCray wrote a front-page article for Essence magazine declaring, "I am a lesbian." But she met Mr. de Blasio, fell in love, and began a family with him. She no longer identifies as lesbian (http://nypost.com/2012/12/11/bill-wife-speak-out;
http://observer.com/2012/12/the-lesbian-past-of-bill- de-blasios-wife)
[18] https://vimeo.com/100937787; https://vimeo.com/84169427
[19] Dr. Pepper Schwartz, "Can Sexual Preference Change With Age?"http://www.aarp.org/home-family/sex-intimacy/info-2014/gay-lesbian-sexual-preference-schwartz.html?intcmp=AE-HOME-TOENG-TOGL

experience same-sex attractions as senior adults, while some who identified as gay or lesbian later experience opposite-sex attraction. Just because an emotion arises does not mean that the government should encourage the giving into emotions that are subversive to human flourishing, that are questionably moral, that tend to erode community standards of decency, and that fail to check out with the way we are and the way things are. Government is tasked with staying away from matters involving sexual identity and with channeling sexual energy of its citizens in a manner where the objectively natural and healthy choice is the easy choice.

### III. The life stories of ex-gays evidences that sexual orientation is not an immutable characteristic.

Any assertion that homosexuality is immutable is perhaps best disputed by the existence of a multitude of organizations in the United States and around the world who, like Amicus, have helped thousands of men and women leave unwanted homosexuality, change their orientation, and live heterosexual lives.[20] For the Secular Humanists in office to ignore the testimony of the thousands of the ex-gays because it is politically expedient to be in denial, has the effect of relegating ex-gays to second class citizens. The three branches of government cannot engage in intellectual squinting in pretending that gay rights are like "race-based-civil rights," whereas the

---

[20] In addition to Amicus, a partial list of the other organizations who in the United States and around the world provide assistance to those desiring to change their orientation is as follows: Courage (www.couragerc.net); The German Institute for Youth and Society (www.dijg.de); Homosexual Anonymous (www.ha-fs.org); International Healing Foundation (www.comingoutloved.com); Jews Offering New Alternatives for Healing, Inc. (http://jonahweb.org); Alliance for Therapeutic Choice and Scientific Integrity (www.therapeuticchoice.com); Restored Hope Network (www.restoredhopenetwork.com); Voices of Change (www.voices-of-change.org); Witness Freedom Ministries (http://www.witnessfortheworld.org); Parakaleo (www.parakaleo.co.uk); People Can Change (http://www.peoplecanchange.com); Positive Alternatives to Homosexuality (PATH) (http://www.pathinfo.org); True Freedom Trust (http://www.truefreedomtrust.co.uk); VENSER (http://www.venser.org); Regeneration Ministries (http://www.regenerationministries.org).

race-based civil rights plight was actually based on immutability, and not be condemned for engaging in a form of racism in-kind. For Secular Humanists in office to falsely equate the phony gay civil rights plight to the race-based civil rights struggle is an act of fraud that manages to be racially, intellectually, emotionally, and sexually exploitative. It is an evil that the Establishment Clause of the United States Constitution does not allow.

Below are the stories of four individuals, two men and two women, each of whom represents many thousands of others who have successfully made the transition from radical self-identified homosexual to completely straight. The fact that there are well-adjusted former self-identified homosexuals evidences that sexual orientation is not an immutable characteristic, that sexual orientation is a religious mythology inseparably linked to the religion of Secular Humanism, which at least means this: the Establishment Clause and Free Exercise Clause have exclusive jurisdiction over whether the government can respect any form of parody marriage or pro-gay policy. Because the making and enforcement of pro-gay policies fail all three prongs of the Lemon test and, thereby, violate the First Amendment Establishment Clause, all aspects of the State and Federal government are required to drop kick all pro-gay policies immediately.

## A. Stephen Black's Story
### http://firststone.org/

Stephen Black is an ex-gay who, after coming out of the homosexual lifestyle more than thirty years ago, married his wife Robin in 1986. They have three adult married children, one of whom is deceased, and two grandchildren. Stephen is an ordained minister and serves as the Executive Director of First Stone Ministries in Oklahoma. Steve's journey is found at https://vimeo.com/84171226. Following are excerpts from his story, which proves that homosexuality is not immutable and has nothing in common with the Fourteenth Amendment.

"Sex became a distorted issue for me at an early age. I was molested about age six by a male friend of the family who was babysitting me. I was also exposed to some pornography at the same time. The porn was heterosexual, yet very devastating to my understanding of real love and sexuality. Several years later, our next-door neighbors had some out-of-state visitors. I was playing at their house, and was followed into the garage by the adult male visitor. He grabbed me from behind and began to molest me while warning me to keep quiet. After struggling with him for a few minutes, I got away. I was terrified at what had happened. I went home and never told anyone. I thought it was my fault, because in the heat of the summer, I had been wearing cut-off shorts with no shirt. About a year later, my family went on a trip to Colorado. We stayed with friends who had a son several years older than me. At bedtime, he began telling me about a "game" he had learned from a friend. That night, I was molested again, except this time I submitted to it because it was just a "game." A year later, he came to visit at my house and we "played the game" again. As I went through high school, I met other homosexual men and started going to gay bars. Soon I had a new goal: to be "married" to another man. Over the coming years, I pursued a marriage-type relationship with several men. I had one relationship that lasted two years. During this time, I started going back to the Catholic church. I was going to college and began living openly as a homosexual. My lover, Mike, was very wealthy and we lived in a beautiful home. I drove a new convertible and traveled to a lot of places. Several months later, my little brother died. We were only 18 months apart and, for the first time in years, I began praying earnestly. My relationship with Mike ended in a horrible fight; then I joined a health club, where I met a guy I thought was straight. But he had been exposed to homosexuality one other time earlier in his life, and was plagued with gay thoughts. Before long, we were sexually involved, even though he was married. I was torn up with guilt and developed an ulcer. My relationship with Mike ended in a horrible fight; then I joined a health club, where I met a guy I thought was straight. But he had been exposed to homosexuality one other time earlier in his life, and was plagued with gay thoughts. Before long, we were sexually involved, even though he was married. I was torn up with guilt and developed an ulcer. My former lover would call me up, crying over the phone and begging me to reconsider my decision to leave him. But the Lord led me to a wonderful church where people really loved Him. I began meeting weekly with my pastor, who became a spiritual father to me. He helped me to deal with the underlying root issues of my homosexual struggles, such as lust, anger and unforgiveness I also had to deal with the reality of being sexually abused as a child. When the anger and bitterness came pouring out, several men and women in my church prayed with me and ministered God's healing to my broken heart. Some months later, Robin began attending my church. We became friends and were eventually married on May 25, 1986. Today we have a very fulfilling marriage and are parents of three children [one deceased] and [two] grandchild[ren]. Marriage with a woman has brought me a deeper understanding of what it means to be a man. And marriage has revealed how selfish I really was, and how much I need to die to myself every day and love my wife like Christ loves the Church (Eph. 5:25)." [21]

---

[21] https://vimeo.com/84171226

It is clear from Stephen Black's testimony that homosexuality is a religious doctrine embraced peddled by the Secular Humanist church and that sexual orientation has nothing to do with immutability or the Fourteenth Amendment whatsoever. Stephen Black's testimony - alone - shows that the decision in *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015) was a sham that must be overruled by the three branches of government by honoring its duty under Article VI[22] to enforce and uphold the Establishment Clause as it is written. The *Amicus* does not want its taxpayer dollars going towards the continued entanglement with the government with the religion of Secular Humanism and neither does First Stone Ministries. This does not mean that individuals cannot self-identify as they see fit. The Free Exercise Clause allows that. It is simply the case that government cannot legally recognize, respect, favor, endorse, or enforce any parody form of marriage or pro-gay policy.

## B. Richard Cohen's Story

Richard Cohen, M.A., is an ex-gay who is now married with 3 children. He struggled for much of his life with unwanted same-sex attraction. Richard is the founder of the International Healing Foundation (IHF) and the author of Coming Out Straight, Gay Children Straight Parents, Let's Talk About Sex, and Alfie's Home. Richard's journey is found at

---

[22] Article VI reads as follows: This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding. The Senators and Representatives before mentioned, and the members of the several state legislatures, and all executive and judicial officers, both of the United States and of the several states, shall be bound by oath or affirmation, to support this Constitution; but no religious test shall ever be required as a qualification to any office or public trust under the United States.

www.comingoutloved.com/Richard-Cohens- Story. Following are excerpts from his story, which proves that homosexuality is not a matter of immutability but is a matter of religion:

"From middle school, I began to experience same-sex attractions.. . . My same-sex desires got stronger with each passing year. I had more sexual experiences with school friends. For them it was a novelty, but for me it was a growing obsession. At the same time, I tried to act "normal," so I had girlfriends. But this growing obsession for a man continued to haunt me.. . . In my first year of college, I had several boyfriends, each lasting several months. After one visit home, my father wrote a letter that hurt me deeply. At the same time, I felt suffocated by my current boyfriend, Mike. Besides all that, my schoolwork was overwhelming. I decided to take a bottle of Bufferin and end it all. However, I woke up in the middle of the morning sick as a dog, and still alive. I called my sister, who lived nearby. She came over and took me to the emergency room at the hospital where they pumped my stomach and stabilized my condition. I recovered, continued therapy, went back to school, ended my relationship with Mike, changed my major to theater, and felt a bit more hopeful. In my second year of school, I met Tim, an art major. We would become lovers for the next three years  Since I loved Tim, I wanted to see why he loved . . . Jesus so much. For the first time in my life, I began reading the New Testament. As part of my Jewish upbringing, I was both bar- mitzvahed and confirmed, studying only the Old Testament.

I had always been on a spiritual quest, trying to find the meaning and purpose of life. I tried so many kinds of faiths and ways: Judaism, Buddhism, and therapies. Then I met Jesus. He was a remarkable individual. In fact, he was the kind of man I had always wanted to be myself. What I admired in him was that his thoughts, feelings, words, and deeds were one. He was a congruent man, the same inside as he was on the outside. He spoke of forgiveness and God's grace. These were new concepts for me. I wanted to be like him. This began my journey as a Christian. . . .More and more, Tim and I knew that homosexuality was not compatible with God's Word, so we eliminated the physical part of our relationship

In 1982, Jae Sook and I married . . . . The first few months were wonderful. I told her about what I thought was my homosexual past. Then the problem resurfaced. I felt so much rage toward my wife. I projected onto Jae Sook all the pent-up hostility I had previously felt toward my mother.. . . At home, Dr. Jekyll turned into Mr. Hyde, a rageaholic. I had become what I vowed I would never be—just like my father. My wife soon became pregnant with our first child. I knew I must begin therapy again. So, in May 1983, while living in New York City, I went to see a noted psychologist. For one year, I attended weekly individual and group sessions…….. Slowly, my heart began to heal as I grieved the effects of the sexual abuse [from my youth] . . . . However, there was still a deep wound in the pit of my soul. We had had a second child during all this. Jessica was a beautiful girl…..I found a . . . friend who was willing to help me heal the homo- emotional wounds of my past. He himself was quite stable and comfortable in his masculinity. . . .In that instant, the connection between my childhood abuser and I was cut, and I became free for the first time in my life. With that sense of freedom, I sobbed for about an hour in [my friend] David's arms. It was such a release and relief to know that I wasn't responsible for what had happened and that God had forgiven me. In those moments of release, I found my freedom from same- sex desires. Cutting this neurological connection to the sexual desires freed me from thirty years of relentless pain and an endless pursuit of men.

At the same time, I began graduate school to obtain my master's degree in counseling psychology. After graduation . . . I founded the International Healing Foundation. My vision was to establish healing centers throughout the world to help men, women, and children to experience their value as children of God. This is still my vision, as we continue our journey. I began to give public presentations on the process of transitioning from homosexuality to heterosexuality. I thought that, because of my heart toward the homosexual community, they would see that I was not their enemy, but just presenting another possibility for those who desire to change. I was naive. We received death threats at our home and at my office! We received obscene telephone calls at home with angry, venomous words of threat and accusation. The Gay and Lesbian Task Force of the mayor's office in Seattle requested that the American Red Cross fire me from my position as an HIV/AIDS educator. Many in the homosexual community have felt threatened by my work. I understand their fears and their pain. Over the past 21 years, I have traveled extensively throughout the States, giving presentations about the healing of homosexuality on college and university campuses, in churches, in mental health institutions, at therapeutic conferences, and on TV and the radio. Another blessing occurred 15 years ago. God gave us a precious son, Alfie. He came on the foundation of our (God's) battles and victories. Now, Jae Sook and I and our three children are growing more deeply in love.

I love God with all my heart, mind, and soul. I live to end His suffering and pain. I pray the understanding of same- sex attractions and the treatment plan for recovery that I am about to share is a blessing to you and those whose lives you will touch. I have learned over the past twelve years of counseling hundreds of men, women, and adolescents, and working with thousands of people in healing seminars around the world, that no matter what issue or issues we are facing in our lives, our wounds all originate from the same sources. . . ."[23]

The take-away from Richard's personal testimony is that the efforts of Democrats to shoehorn

gay marriage policy into Equal Protection and Substantive Due Process narratives in order to

justify the codification of religious ideology that is questionably real, questionably moral, and

questionably legal is an act of intellectual dishonesty that borders on sedition. The correct

Constitutional narrative is that the government cannot legally recognize or enforce any parody

marriage or pro-gay policies because the Establishment Clause forbids it. Although individuals

are permitted to self-identify as anything they would like and have wedding ceremonies that

accord with their private beliefs about sex, faith, and morality, by endorsing LGBTQ orthodoxy,

the government has marginalized ex-gays, like Mr. Cohen, who were transformed by

---

[23] www.comingoutloved.com/Richard-Cohens-Story.

Christianity, placing them in danger and relegating them to second class citizens, by implying that their conversations were not real simply because the truth is not politically expedient. Without truth, there is no freedom. The United States Constitution prohibits the three branches of government from being "truth allergic."

### C. Melissa A. Ingraham's Story

Melissa A. Ingraham, who formerly identified as a "lesbian," resides with her husband Garry Ingraham, who is ex-gay, and two sons in Maine, New York. Melissa's identical twin sister never struggled with same-sex attraction. Melissa has a Master's degree in Counseling and was licensed as a professional counselor in New York in 2010. Melissa's story can be viewed at https://vimeo.com/84169427. Following are excerpts from her story, which proves that it is an act of intellectual dishonesty and Constitutional malpractice for any of the branches to pretend that sexual orientation is not a religious ideology:

I grew up in a church-going family with an older brother and an identical twin sister. My father's business kept him on the road a lot, and by the time I reached high school, he was no longer coming home regularly. My parents hadn't agreed to separate, and as far as I knew, my mother never confronted him about leaving.I held a lot of anger inside towards my father. I also saw my mother as weak, passive, and a victim for not standing up for herself in the marriage. I vowed never to be like her— emotionally and financially dependent on a man. That vow profoundly impacted my relationships and my view of myself as a woman. In the moment I made that vow, I put a wall between my mother and myself, rejecting everything feminine, both the good and the bad. I believed that it was not safe or advisable to be a woman. This belief was further confirmed through my violent encounters with my brother when we would be home after school. We both had terrible tempers, and fought horribly. I always wound up on the losing end, feeling beat up and unprotected because my parents weren't there. Beginning in high school and continuing through college, I was involved in several long-term, emotionally-dependent, sexual relationships with men. Reflecting on those relationships, I can see that I was searching for the affirmation, acceptance and worth that I had never received from my father. He wasn't around to bless me as a woman, and say, "You are okay, you are beautiful, you are acceptable." Although I claimed to be the one in control, on the inside I desperately needed to be with someone to have an identity. I became engaged in my sophomore year of college, but I wasn't happy. Through conversations and other circumstances, I began to question my sexuality. I broke off the engagement, and after a year of confusion and searching, I entered a lesbian relationship. It lasted only a short time, but it was emotionally intense. I was devastated when it ended. I was

torn. I knew that my lesbian relationship was "wrong", and yet I felt that I had finally found what I was looking for—to be loved and cared for, and to be understood, affirmed, and accepted. The deficit of feminine love caused by my rejection of my mother cried out to be filled in the arms of a woman. Interestingly, right before I left for Christmas break, I confided to a campus minister that I was struggling with lesbianism. He told me it was okay to be gay and Christian. There it was. I could have the best of both worlds. And yet, there was no peace in that answer.

Over Christmas, my sister invited me to attend a Christian conference. I agreed to go, and attended a workshop on sexual wholeness . . . . I gave my life to Christ and repented of my lesbian relationship that day. The veil was lifted from my eyes, and I saw how I had been deceived into thinking that lesbianism was God's best for me because it felt so right. When I joined the Living Waters program offered by Regeneration in 1999, I found a place where I could be real about my sexual struggles and my brokenness. I began to understand the impact of the messages I had received from my family about men, women, and marriage. I also gained a great deal of insight into why I related to people in such broken ways and out of such great need. I learned how to forgive my parents and others, which allowed me to receive love from them in a deeper way. I also learned to confess my sins against God, my family, and others, and to receive forgiveness. Some of the sins I confessed were perfectionism, a need to be in control, relational idolatry, hatred of men, hatred of women, and self- hatred. I received truth about my identity in Christ—that I am a beloved, precious, beautiful, and cherished daughter of the King! My small group leaders and the leadership team affirmed my femininity and the goodness of being a woman. I could now enter into godly relationships with men and women, free to be who God created me to be.

I experienced unparalleled freedom, and God began to birth a desire in me to help others in the healing process. . . .[I] pursue[d] a Masters Degree in Counseling. I graduated in August of 2006 and was licensed as a professional counselor in New York in 2010.. . . . I have wonderful, healthy friendships, and I am closer to my family. In the fall of 2004, I met my husband Garry. We were married in 2007, and now have two sons. It is difficult for me to describe the miracle of our marriage and how it really is an outward reflection of an internal reality. For me, being with Garry is about so much more than not being with a woman. God truly has restored my femininity and sexuality. God has shown me the fullness of a heterosexual relationship where both people are submitted to His will.[24]

The implication of Mrs. Ingraham's testimony is that the First Amendment Establishment Clause of the United States Constitution is the ultimate DOMA sec 3 and national parody marriage ban.

That is, Mrs. Ingraham's testimony - alone - demonstrates that the United States Establishment Clause is the kryptonite to the government's effort to embrace "identity politics." The States have a watertight duty to, at the very most, only allow a marriage between a man and a woman to

---

[24] https://vimeo.com/84169427

have the legal recognition. The States had a compelling compelling interest to limit marriage to a man and a woman because all forms of parody marriage erode community standards of decency. Man-woman marriage and man-woman marriage policies are secular in nature, they accomplish their intended purposes, and they do not put religion over non-religion. While self-identified homosexuals are not second class citizens, the testimony from ex-gays shows that self-identified homosexuality is a second class lifestyle that the government cannot promote without violating the Establishment Clause of the First Amendment of the United States Constitution. "Homosexual" dogma is a trap for the unwary and the government is Constitutionally prohibited from endorsing the efforts of self-identified homosexuals to misuse government in their immoral efforts to seduce citizens into buying into the plausibility of the truth claims they defend for reasons that are based exclusively on emotion and not logic.

### C. Kristin J. Tremba's Story

Kristin J. Tremba, M.Div., is a former self-identified lesbian who is now married with a child. Kristin holds a Master of Arts degree from Columbia University, as well as a Master of Divinity degree from Gordon- Conwell Theological Seminary. She serves as director of Exchange Ministries and is the author of Sexual Wholeness in a Broken World. Her journey is found at http://pfox.org/Grove_City_College.pdf. Following are excerpts from her story which prove beyond any doubt that the Supreme Court in *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015) was outright lying when it found that parody marriages are a matter of civil rights:

While my sister was attending [college], I was going to a small liberal arts college in Indiana. My freshman year I had high hopes to have fun at school, make lots of friends find my "calling" in life, and then get married. Instead, I found something unexpected and frightening happening: I was falling in love with my freshman roommate. The feelings I felt for her were the feelings I had hoped to have felt for the guys I had dated in high school. I was overwhelmed and confused and had nowhere to go. . . . My roommate and I lived together all throughout college and one year after college, but we never talked about our feelings for one another or engaged in any

physical sexual relationship. Regardless, we were a couple. We were emotionally dependent upon each other (we viewed other people as a threat to our relationship, preferred to spend time alone and were frustrated when this didn't happen, became angry or depressed when the other withdrew slightly, lost interest in other friendships, and experienced romantic and sexual feelings for the other) . . . . After college, I entered the Peace Corps, which required me to leave my roommate. This was not easy for either of us. However, on my flight to Albania, I prayed that God would bring a man into my life. Thus began my search for love and the hopes to marry again. I was 23 years old. In Albania, I found myself having sexual feelings for both men and a particular woman as I served as a volunteer. I lost my virginity and became more promiscuous with men.

It was not soon after this that I fell into a sexual relationship with a woman who was openly gay, and who pursued me. In my loneliness and neediness for intimacy, I gave in to her and found being with her to meet a deep emotional need inside of me. This relationship continued until I moved to a different state for work. When I heard that she would be coming to live with me, I was euphoric and ready to come "out" of the closet, so to speak. I began telling friends, and I even attended a gay-friendly church, but it all seemed so foreign and unsatisfying . [Ultimately,] God taught me that sexual sin was my attempt to meet legitimate emotional needs in sexually illegitimate ways. He showed me that there were some emotional needs that had not been met in my family relationships growing up, there were some wounds, and so I was attempting to meet these needs and cover these wounds in sexual relationships as an adult. He taught me that there were also things I was born with: a sin nature, a particular temperament, various weaknesses, and a negative body image and negative view of my femininity. He taught me that even though I did not choose all my circumstances and struggles, I could choose to overcome them. I could choose to let God change my life.People ask me, "Do you still struggle with same-sex attraction?" My answer is no, I don't, but I still struggle with worry and doubt and lots of other things . . . . [25]

The inescapable take-away from Mrs. Tremba's testimony is that the United States Supreme

Court in *Obergefell* was lying when it pretended that sexual orientation is a matter that has

anything to do with the Fourteenth Amendment. Instead, the evidence clearly shows that the First

Amendment Establishment Clause has exclusive jurisdiction over marriage matters and that the

Establishment Clause completely prevents all 50 states from legally recognizing any form of

parody marriage or pro-gay policy as a matter of Constitutional preemption and mandate. Three

branches of government must now turn back, admit that the Supreme Court in *Obergefell* and

*Windsor* were straight up lying, and in a single instance, do away with (1) gay marriage policy,

---

[25](http://pfox.org/Grove_City_College.pdf.)

(2) conversion therapy bans, (3) sexual orientation discrimination statutes like CADA that Jack

Phillips and WW Bridal have been persecuted under, (3) government paid for sex-change

operations, (4) Drag Queen Story Hours at elementary schools and public libraries, (5)

transgender bathroom policies, (6) government mandated pronoun adjustments, and (7) allowing

citizens to change their gender on birth certificates based on feelings and not observable facts.

The three branches of government must pass and uphold the Marriage And Constitution

Restoration Act, get out of the parody marriage business, and completely disentangle itself from

the LGBTQ church.

## IV. The ex-gay community is subject to more animus, intolerance, and discrimination than any other minority group

The dramatic ascendency of LGBTQ political power and legal victories in recent years

have been tragically accompanied by the diminution of rights of conscience and religious

freedom.[26] This is because these victories amount to establishing Secular Humanism as the

national religion. Indeed, the rising tide of "sexual-liberty" has not lifted all boats. No other

minority group has endured the brunt of growing intolerance, moral-cultural approbation, and

derision more during this time of cultural upheaval than have former homosexuals who have

been radically transformed after pursuing the personalized truth of Christianity. The testimony

of ex-gays makes them a direct threat to members of the LGBTQ church who are hell bent on

using government to ratify their private moral beliefs at all costs.

---

[26] Religious individuals and groups whose sacred texts define sexual relationships and marriage
traditionally have been the target of increasing animosity, intolerance, and judicial and social
defamation. They have been unfairly branded with terms such as "bigot," "homophobe," and as
exhibiting hatred or "animus."

Sadly and ironically, the primary instigators of ex-gay animus have been the very same gay rights groups and individuals who were themselves recently demanding social "tolerance" and "respect" for same-sex lifestyles and marriage. This intolerance demonstrates that the endorsment and enforcement of pro-gay policies amounts to the greatest non-secular sham in the history of American jurisprudence. As the U.S. Court of Appeals for the Sixth Circuit observed, "[t]olerance," like respect and dignity, is best traveled on a "two-way street." *DeBoer*, 772 F.3d 388 at 410 (6th Cir. 2014), quoting *Ward v. Polite*, 667 F.3d 727, 735 (6th Cir. 2012). Yet, because ex-gays are a living rebuke of the inconvenient truth that that same-sex attraction is not immutable for Equal Protection purposes, former homosexuals have increasingly been subjected to very "unfriendly fire" and even violent oppression from many self-identified homosexuals, who have sought to delegitimize ex-gays out of existence. Self-identified homosexuals pride themselves on not believing in absolute truth, so there is nothing to stop them from feeling justified in undertaking any means to oppress anyone who impeaches the plausibility of their emotionally based religious worldview.

The *Windsor* majority stated that in "determining whether a law is motivated by an improper animus or purpose, 'discriminations of an unusual character' require careful consideration." *U.S. v. Windsor,* 133 S. Ct. 2675, 2692 (2013) (quoting *Romer v. Evans*, 517 U.S. 620, 633 (1996)). But unlike *Romer*, the state laws marriage to one man and one woman were neither unusual nor do they fail to be rationally related to States' legitimate public interest in regulating male-female relationships and their unique procreative possibilities and their propensities to uphold community standards of decency. In *Romer,* however, because the State had no valid reason for exempting only gays from anti-discrimination protections, the Secular

Humanists on the bench in that case pretended that the law was found to be "born of animosity toward" gays and suggested a design to make gays "unequal to everyone else." *Romer*, 517 U.S. at 634–35. And unlike *Windsor*, here in this unresolved controversy, there is no federal deprivation of a marriage status granted through a State's authority over domestic relations, and thus, there is no basis for the government to inferring that the purpose of the state law is to "impose a disadvantage"/"a separate status"/"a stigma" on gay couples. *Windsor* 133 S. Ct. at 2692- 95.[27]

*Amicus* believes based on having been heavily involved with the LGBTQ church that sexual orientation policies are a religious sham that are inseparably linked to the religion of Secular Humanism. The government's arbitrary endorsement of sodomic marriage is a religious and political power play that serves to undermine the Supremacy of the United States Constitution itself. It is a political power play undertaken by Democrats to exploit feelings of shame and guilt for the sake of their own selfish interests.

The Center for Garden State Families brings to this govermental body's attention the fact that ex-gays have themselves suffered significant discriminatory "animus" and endured "disadvantage," "separate status," and "stigma," at the hands of self-identified gays whose focus is "domination," not tolerance and unity. This is because the testimony of ex-gays is fatal to the fiction that sexual orientation is a matter of immutability and civil rights and that it is not a matter of religion. Hundreds of ex-gays live in a persistent state of worry and danger by highly radicalized Secular Humanists, who openly pride themselves on not believing in morality to

---

[27] The reasoning in cases like *Windsor, Romer,* and *Obergefell* is so intellectually dishonest that the decisions themselves are conclusive proof that legally recognized gay marriage is a non-secular sham that violates prong one of lemon.

begin with and who will do anything to keep the charade going - this includes engaging in laudry list of criminal offenses.  Although there is extensive evidence confirming sexual orientation's fluid and transient nature, the widely embraced theory by Secular Humanist that same-sex attraction must be a fixed and "immutable" "accident of birth," contributes greatly to animus against ex-gays and other non-observers to the religion of Secular Humanism to include mainly Christians who vote republican. This is because the very existence of former homosexuals undermines this popular yet false, out of date, and shallow cultural narrative regarding the purportedly fixed origins of same-sex attraction. *Amicus* posits that the gay "immutability" myth was developed and fostered as a bold but clumsy attempt to analogize the LGBTQ movement with the African American struggle for civil rights and equal protection in order to appropriate its cultural moral authority.  It is a complete and total act of bigotry. Those who support the government's entanglement with LGBTQ orthodoxy are either racists or they are individuals who are refusing to think logically. Either way, the government must obey the Establishment Clause and disentangle itself from the LGBTQ church completely.  The Democratic party is - once again - exploiting blacks to gain political power with a voting block with complete indifference to the fact that their misappropriation of the race-based civil rights movement threatens the integrity of it. This is why so many people of color are walking away. The Democrats have never been the cheerleaders of the protecting against racial discrimination, even President Johnson called the civil rights act "that nigger bill."[28]  It was because of the efforts of evangelicals that civil rights act passed.

---

[28]It was because of evangelical Christians that the civil rights movement came to be. It was because of the efforts of Christians that President Johnson stated "I'm going to have to bring up the nigger bill again."  The Democrats have always been enemies of truth and the Constitution.

Former homosexuals are perhaps the last invisible minority group in America today.[29] Ex-gays are reviled, ridiculed, and marginalized simply because they do exist and do pose a threat to the LGBTQ's efforts to misuse the government by enshrining their cult-like worldview that defies common sense and decency.[30] Consequently, many ex-gays and their supporters are forced to remain closeted, on the fringes of American culture, because of fear of societal disapproval, stigma, and violent oppression. See ANTIFA. It is true that individuals have experienced homosexuality differently and theories of the "causes" of same-sex attraction vary greatly. If one's sense of personal well-being is dependent on all other people who have experienced same-sex attractions having had an identical "gay experience," then that person is in a precarious position, because actual experiences vary significantly. The fact of the matter is that the Establishment Clause prohibits the government from endorsing or promoting LGBTQ ideology, no matter how sincere self-identified homosexuals are in their belief that they were "born that way." It is a long standing jurisprudence that neither emotional appeals or sincerely of belief will allow the government to usurp the Establishment Clause. *Holloman v. Harland*, 370 F.3 1252, 1286 (11th Cir. 2004).

Although pro-gay organizations advocate for the "sexual liberty" rights of self-identified homosexuals, lesbians, bisexuals, transgenders, transsexuals, and the intersexed, they do not add 'ex-gay' to their list of the aggrieved and nearly uniformly oppose ex-gay rights because ex-gays exposed the pro-gay movement as a non-secular sham that is fixated on Secular Humanism

---

[29](http://www.nytimes.com/2011/06/19/magazine/my-ex-gay-friend.html?pagewanted=all&_r=0
)
[30](http://www.christianpost.com/news/former-gay-activist-marries-woman-addresses-critics-who
-condemn-his-new-heterosexual-lifestyle-110736)

domination as a matter of self-entitled egomania.[31] Yet the inclusion of ex-gays ensures tolerance for all segments of our society. Acknowledging the ex-gay community exists and is worthy of respect and dignity does not mean that individuals have the right under the Free Exercise Clause to self-identify as homosexual. They absolutely do have that right, but government cannot respect the identity narrative itself or treat it as if it was real. The government certainly cannot force the taxpayers to respect homosexual identity narratives as if they were moral, decent, and plausible, when the evidence shows that they are none of those things.

Due to its political powerlessness and a near singular focus on LGBT rights, the ex-gay community finds that Americans are not generally unaware of the widespread intolerance practiced against those who leave homosexuality. Here are some poignant examples: (1) Transgender individuals are affirmed for changing their gender by mutilating their genitals, but ex-gays are ridiculed for changing their invisible sexual orientation. (2) African American ex-gay Grammy winner Donnie McClurkin was removed from singing at a Martin Luther King memorial concert following complaints by truth allergic gay leaders.[32] Self-identified Gay leaders also criticized then-presidential candidate Barack Obama for allowing Donnie McClurkin to sing at a fundraiser and insisted that he drop the singer from the program.[33] (3) The World Bank removed the National Center For Law and Policy, a non- profit corporation, from its charitable fundraising program after receiving complaints from the Human Rights Campaign, a

---

[31] Amicus is not aware of a single gay rights organization in the United States which supports the equal rights of the ex-gay community. Like all peoples, former homosexuals want to be open and safe at work, in their community, and in the public square.
[32] (http://www.christianpost.com/news/ex-gay-community-baptist-leadership-say-dc-officials-are-infringing-on-pastors-civil-rights-102212).
[33] (http://www.youtube.com/watch?v=A3jkeTdgLrg).

pro-gay activist organization.[34] (4) In response to complaints from gay organizations, Washington D.C. Mayor Adrian Fenty apologized for issuing a certificate of appreciation to an ex-gay organization. Yet in signing gay marriage legislation for the nation's capital, the mayor had promised equality for all D.C. residents.[35] (5) Ex-gays and their supporters are routinely denied inclusion in all realms of society and access to public venues. Following complaints from local LGBT groups, an ex-gay billboard endorsing change and tolerance for all was taken down after three days in Tucson; the Montgomery County Maryland public school system amended its community flyer distribution program to prevent an ex-gay organization from participating; ex-gay conferences and events are frequently picketed; and a metropolitan transit authority cancelled its free public service advertising to prevent ex-gay organizations from participating. (6) Gay rights groups are now wielding their considerable political power to aggressively oppose and outlaw much needed counseling and therapy for men, women, and youth who struggle with unwanted same-sex attraction because the gay rights groups refuse to come to terms with the fact that they are part of a religious cult, and not part of an actual civil rights movement. These activities are carried on by organizations like The National Center for Lesbian Rights,[36] Southern Poverty Law Center,[37] and Human Rights Campaign.[38]

These intolerant and discriminatory actions by LGBTQ activists "impose[s] a disadvantage, a separate status, as so a stigma" on gays who want to overcome unwanted same-sex attractions and former homosexuals who have successfully done so, "demean[ing]" and

---

[34] (http://www.hrc.org/press-releases/entry/hrc-to-world-bank-remove-pfox-from-your-community-connections-campaign).

[35] (http://voices.washingtonpost.com/dc/2010/04/fenty_apologizes_for_honoring.html).

[36] (http://www.nclrights.org/explore-the-issues/bornperfect/)

[37] (http://www.splcenter.org/conversion-therapy)

[38] (http://pfox-exgays.blogspot.com/2012/05/wacky-wayne-besen.html).

"humiliate[ing]" ex-gays. *Windsor*, 133 S. Ct. at 2693-94. Every day brings new hostile acts against former homosexuals, a politically unpopular group. The *Obergefell v .Hodges, 135 S.Ct. 2584 (2015)* putsch has made things far worse - it is why Justice Kennedy stepped down in the wake of the 7 to 2 decision *Masterpiece Cakeshop v. the Colorado Civil Rights Commission*, 584 U. S. ____ (2018) . This irrational prejudice against those who have overcome unwanted same-sex attractions perpetuates misunderstanding and harm against the ex-gay community. It also demonstrates a disregard for diversity and a refusal to respect basic human rights of dignity and self-determination. Unfortunately, recent judicial victories in same-sex "marriage" cases have empowered and emboldened words and acts of animus by loosely equating the legalization of same- sex marriage with proof of gay "immutability," providing further justification for the unfounded viewpoint that ex-gays "do not exist" and, therefore, should be ignored or banished from society and not allowed to participate in the marketplace of ideas and commerce.[39] The negative stereotyping by gay activists of ex- gays is a sad end to the long struggle for tolerance by the gay community; the oppressed have become the oppressors. But that was always foreseeable. The fact that ex-gays and their supporters are now the targets of the same people who, until recently, were allegedly victimized themselves, demonstrates the tremendous political power and social acceptance of gays and lesbians. Yet, in spite of the significant and real animus ex-gays suffer, *Amicus* does not concur that unfounded claims of hatred or animus should be used as an excuse to redefine the important institution of marriage. Indeed, the Sixth Circuit, exhibiting appropriate judicial humility and restraint, recognized its inability to attribute animus to millions of voters: "If assessing the motives of multimember legislatures is difficult, assessing

---

[39] (http://www.huffingtonpost.com/alec- fischer/this-is-what-happened- whe_1_b_6068712.html)

the motives of all voters in a statewide initiative strains judicial competence." *DeBoer*, 772 F.3d at 409. Thus, all three branches of government must not be quick to disparage, demean, and disrespect, with that monstrous moniker "animus," the good citizens of states whom have determined, for any number of legitimate reasons by participating in the democratic process, that marriage should remain defined as it always has been because marriage policies between one man and one woman are secular and actually accomplish the purpose for which they were made. Pro-LGBTQ policies are non-secular shams because they accomplish the very opposite of their intended purpose to generate tolerance, equality, and unity. Pro-gay policies are based on fake civil rights, but the policies erode civil rights that are real. To assume that prejudice or hatred is the primary driving force in maintaining marriages' traditional form, defames millions of taxpayers in the United States who have the humility and common sense to believe in absolute truth and who do not want their tax dollars going towards the destructive entangling the their government with the asinine religion of Secular Humanism because those policies (1) establish Secular Humanism as the national religion, (2) erode community standards of decency, (3) undermine the integrity of the race-based civil rights movement lead by Pastor Martin Luther King Jr, (4) and proliferate the normalization of false permission giving beliefs about sex that leads to the sexual exploitation of children. It is totally outrageous.

## CONCLUSION

All prior cases that pretend that sexual orientation is a matter of civil rights and not of religious mythology must be overruled by in light of the overwhelming evidence that all self-asserted sex-based identity narratives that are questionably real, questionably moral, and questionably legal are implicitly religious, predicated on a series of unproven faith based

assumptions, and inseparably linked to the religion of Secular Humanism. Just about every

legislative body in the country is preparing to introduce resolutions that resolve what the United

States Supreme Court and nearly every Court of appeals has found - that Secular Humanism is a

religion. The testimony of ex-gays - alone - causes the legal justifications supporting the fake gay

civil rights movement to implode.  The government's dishonest and unconstitutional

endorsement of the LGBTQ church has not only failed to accomplish its intended purpose, it has

lead to the overt persecution and oppression of ex-gays and Christians. Homosexual sexual

orientation is not pre-determined and fixed by "the accident of birth," but is in fact subject to

alteration and change.  All three branches of government must uphold the Marriage And

Constitution Restoration Act in accordance with their duty to uphold the Constitution under

Article VI and to obey the Establishment Clause. This means (1) no more legally recognized gay

marriage, (2) no more sexual orientation discrimination statutes, (3) no more conversion therapy

bans, (4) no more threats towards ex-gays,  (5) no more Christian persecution, (6) no more

transgender bathroom nonsense, (7) no more changing pronouns, no more changing birth

certificates, (8) no more LGBTQ indoctrination in schools, and (9) no more government

entanglement with LGBTQ ethos whatsoever. The government's entanglement with the LGBTQ

community has been a total and complete disaster. By disentangling itself with the LGBTQ

church, ex-gays will no longer have to live in fear of persecution by ANTIFA-type-thugs and

other Secular Humanist groups, who have become emboldened and plunged into a deeper state

of intellectual darkness by the government's reckless and dishonest endorsement. The bottomline

is that the government should have never opened the door to entangling itsel fwith the LGBTQ

church in the first place. We all make mistakes.  But we can change. Our nation has the ability to

turn back and get it right. Self-identified homosexuals can leave that worldview behind if they want to, choosing a different path and the amicus has. One reason why the *Amicus* is filing this brief is for the same reason why the government must get out of the parody marriage business. The *Amicus* wants young people who have been manipulated or seduced into opening the door to the LGBTQ church's spiritual take on reality that they too can change and leave it behind - finding their identity elsewhere in a manner that will allow them to experience maximized human flourishing. Hope remains. The heart, mind, and spirit can be radically transformed, and the past left behind. For the government to tell its citizens that if they opened the door to buying into the LGBTQ orthodoxy, they cannot leave it behind, is a position that amounts to government sanctioned sexual exploitation and abuse. Self-identified gay people can leave behind the LGBTQ worldview, just as the *Amicus* has - stepping into a transcending freedom through the pursuit of the central figure of the New Testament gospel narrative.


Respectfully Submitted,

/s/Nile Copeland/
COPELAND LAW GROUP,
PLLC 5100 Westheimer Road, Suite 200
Houston, Texas 77056
713-382-7980 Office
nile@e-justice.com


## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document and attached exhibits were mailed with adequate postage to the Defendants in this actions on October 22, 2018 to Mayor Sylvester Turner City of Houston P.O. Box 1562 Houston, TX 77251;; Defendant Lawson, 500 McKinney Street Houston, Texas 77002 (832) 393-1313:::

/s/Nile Copeland/



## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **AARON GUIDRY, member of Warriors For Christ and Special Forces Of Liberty, LT MARK CHRISTOPHER SEVIER, De Facto Attorney Generals and Special Forces Of Liberty, SGM JOHN GUNTER JR, Special Forces Of Liberty, WHITNEY KOHL, Special Forces Of Liberty, JOAN GRACE HARLEY, Special Forces Of Liberty, PASTOR RICH PENKOSKI, Warriors For Christ and Special Forces Of Liberty**<br><br>**V.**<br><br>**TERESA ELBERSON, director of the Lafayette Public Library, JOHN BEL EDWARDS, in his official capacity as Governor of Louisiana, JEFFREY MARTIN LANDRY, in his official capacity as Attorney General of Louisiana, Hon. STUART R. SHAW, in his official capacity as the Red River Parish Clerk, JOEL ROBIDEAUX, in his official capacity as Mayor of Lafayette** *Defendants* | **Case No: 6:18-cv-01232-RRS-PJH**<br>**The Honorable**<br>**Judge Robert R Summerhays**<br>**The Honorable Magistrate Judge Patrick J. Hanna** |

## MEMORANDUM IN SUPPORT OF THE MOTION FOR A PRELIMINARY AND PERMANENT INJUNCTION BY PLAINTIFF GUNTER AGAINST THE PUBLIC LIBRARY AND MAYOR OF LAFAYETTE PARISH JOINED BY PLAINTIFF SEVIER

https://www.facebook.com/warriorschurch/videos/319962062069993/

## TABLE OF CONTENTS

I. JUST LIKE WITH THE MARRIAGE AND CONSTITUTION RESTORATION ACT THE PLAINTIFFS SEEK TO BALANCE THE FREE EXERCISE CLAUSE WITH THE ESTABLISHMENT CLAUSE
...............................................................................................2
II. FACTUAL STATEMENT
...............................................................................................6
III. STANDING

......8

IV. PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION
......13

A. Applicable Legal Standard
......13

B. Applicable Legal Standard Applied to the Case At Bar
......15

1. There is Substantial Likelihood That The Plaintiffs Will Prevail On The Merits
......15

2. Plaintiffs Will Suffer Irreparable Harm If the Injunction Is Not Granted
......21

3. The Threatened Harm to Plaintiff Will Outweigh the Threatened Harm to Defendant If the Injunction is Not Granted
......23

4. Granting the Injunction Will Not Disserve the Public Interest
......24

IV. CONCLUSION
......25

Table Of Cases

*Agostini v. Felton*,
521 U.S. 203 (1997)
......2, 7

*Armbruster v. Cavanaugh*,
140 Fed. Appx. 564 (3rd Cir. 2011)
......3

*Baker v. Carr*,
369 U.S. 186, 204 (1962)
......9

*Blue Bell Bio Medical v. Cz.n-Bad, Inc.*,
864 F.2d 1253 (5th Cir. 1989)
......13

*Bookcase, Inc. v. Broderick*,
18 N.Y.2d 71, 271 N.Y.S.2d 947, 218 N.E.2d 668 (1966)
......6

*Bord of Educ, of Kiryas Joel Vill. Sch. Dist.v. Grumet*,
512 U.S. 687, 696 (1994)
......7

*Bowen v. Kendrick*,
487 U.S. 589 (1988)
......8, 10

*Bowers v. Hardwick*,
478 U.S. 186 (1986)

..................................................................17

*Canal Authority of State of Florida v. Callaw,*
499 F.2d 567 (5tb Cir. 1974)
..................................................................15

*Cantwell v. Connecticut,*
310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)
..................................................................15

*Chapin v. Town of Southampton,*
457 F. Supp. 1170 (E.D.N.Y. 1978)
..................................................................6

*Church of the Holy Trinity v. United States,*
 143 U.S. 457 (1892)
..................................................................2

*City of Los Angeles v. Alameda Books,* Inc.
535 U.S. 425, 122 S. Ct. 1728, 152 L. Ed. 2d 670 (2002)
..................................................................8

*City of Portland v. Jacobsky,*
496 A.2d 646 (Me. 1985)
..................................................................6

*Comm. for Public Ed. & Religious Liberty v. Nyquist,*
413 U.S. 756 (1973)
..................................................................10

*Court v. State,*
51 Wis. 2d 683, 188 N.W.2d 475 (1971) 413 U.S. 911, 93 S. Ct. 3032, 37 L. Ed. 2d 1023 (1973)
..................................................................5

*County of Allegheny v. ACLU,* 492 U.S. 573, 589-94, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)
..................................................................6

*Deerfielded Med Ctr. v, City of Deerfield Beach,*
661 F.2d 328, 338 (5th Cir. 1981)
..................................................................22

*DSC Communications Corp., v, DGl Technologies, Inc.,*
81 F.2d 597, 600 (1996)
..................................................................15

*Ebert v. Maryland State Bd. of Censors,*
19 Md. App. 300, 313 A.2d 536 (1973)
..................................................................5

*Edwards v. Aguillard,*
482 U.S. 578 (1987)
..................................................................1, 2, 14

*Elrod v. Burns,*
427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)
..................................................................22

*Entm 't Software Ass 'n v. Foll,*
451 F. Supp. 2d 823 (M-D. La, 2006)

...........................................................................................24

*Entertainment Software Ass ,n. v, Foll,*
451 F.Supp. 823 (M.D.La. 2006)
...........................................................................................21

*Everson v. Bd of Edu*c.,
330 U.S. 1, 67 S.Ct. 504, 91 L.Ed 711 (1947)
...........................................................................................15

*Flast v. Cohen,*
392 U.S. 83 (1968)
...........................................................................................8

*Friends of the Earth, Inc, v. Laidlaw Envtl, Serv.,*
528 U.S. 167 (2000)
...........................................................................................10, 12

*Forum for Academic & lust, Rights v. Rumsfeld,*
390 F.3d 219 (3rd Cir. 2004)
...........................................................................................22, 24

*Ginsberg v. New York,*
390 U.S. 629, 88 S. Ct. 1274, 20 L. Ed. 2d 195 (1968)
...........................................................................................6

*G&V Lounge, Inc, v. Mich. Liquor Control Comm'n,*
23 F.3d 1071 (6th Cir. 1994)
...........................................................................................24

*Hibbs v. Winn,*
542 U.S. 88 (2004)
...........................................................................................10

*Hunt v. McNair,*
413 U.S. 734 (1973)
...........................................................................................10, 11

*Hein v. Freedom From Religion Foundatio*n,
551 U.S. 587 (2007)
...........................................................................................15

*Holloman v. Harland,*
370 F.3 1252 (11th Cir. 2004)
...........................................................................................18

*Berger v, Berger v. Rensselaer Cent. Sch Corp.,*
766 F.Supp. 696, 982 F.2d 1160 (7th Cir. 1993)
...........................................................................................12

*Jacobellis v. Ohio,*
378 U.S. 184 (1964)
...........................................................................................5

*Jagar v. Douglas County School,*
862 F.2d 824 (11th Cir.1989)
...........................................................................................19

*Janvey v. Alguire,*
647 F.3d 585 (5th Cir. 2011

..............................................................................11

*Johnson v, Radford,*
449 F.2d 115 (5th Cir. 1971)

..............................................................................12

*Killebrew v. City of Greenwood,*
988 F. Supp. 1014 (N.D. Miss. 1997)

..............................................................................22

*Lawrence v. Texas,*
539 U.S. 558 (2003)

..............................................................................17

*Lee v. Weissman,*
505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)

.......................................................................6, 14, 23

*Lemon v. Kurtzman,*
403 U.S. 602 (1971)

.......................................................................2, 20

*Levitt v. Comm. for Pub. Educ. & Religious Liberty,*
413 U.S. 472 (1973)

..............................................................................7

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992)

..............................................................................9

*McCreary County v. ACLU of Kentucky,*
545 U.S. 844, 860 (2005)

.................................................................15, 19, 20, 21

*Morgan v. Fletcher,*
518 F.2d 236 (5th Cir. 1975)

..............................................................................13

*Massachusetts v. EP.A,,*
127 S.Ct. 1438 (2007)

..............................................................................12

*Meis v. Sanitas Serv. Corp.,*
511 F.2d 655 (5th Cir. 1975)

.......................................................................10, 11

*Miller v. California,*
413 U.S. 15 (1973)

..............................................................................5

*Mishkin v. State of New York,*
383 U.S. 502, 86 S. Ct. 958, 16 L. Ed. 2d 56 (1966)

..............................................................................6

*Mueller v. Allen,*
463 U.S. 388 (1983)

..............................................................................10

*Murillo v. Musegades,*
809 F. Supp. 487 (W.D. Tex. 1992)

..............................................................................22

*Murray v. City of Austin,*
947 F.2d 147 (5th Cir. 1999)
..........................................................................................9

*New Orleans Secular Humanist Ass Inc, v. Bridges,*
2006 WL 1005008 (E.D. La. Apr. 17, 2006)
..........................................................................................24

*North Carolina Civil Liberties v. Constangy,*
751 F,Supp. 552, 947 F.2d 1145, 505 U.S. 1219, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992)
.....................................................................................11, 12

*Obergefell v. Hodges,*
135 S.Ct. 2584 (2015)
.....................................................................................14, 17

*Ortega v. Recreation & Parks Comm'n for Par. of E. Baton Rouge,*
2018 WL 3471890 (La. App. 1 Cir. 7/18/18)
..........................................................................................11

*Paris Adult Theatre I v. Slaton,*
413 US 49 (1973)
..........................................................................................5

*Planned Parenthood of Southeastern Pa. v. Casey,*
505 U.S. 833 (1992)
..........................................................................................2

*Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.,* 150 F. Supp. 3d 419,, 2017
WL3324690 (3d Cir. Aug. 4, 2017)
..........................................................................................2

*Saladin v, City of Milledgeville,*
812 F.2d 687 (11th Cir. 1987)
..........................................................................................9

*Shapiro v. Thompson,*
394 U.S. 618 (1969)
..........................................................................................10

*Schlegel v. United States,*
416 F.2d 1372, 1378 (Ct. Cl.1969)
..........................................................................................6

*Schenck v. United States,*
249 U.S. 47 (1919)
..........................................................................................5

*Sierra Club v, Morton,*
404 U.S. 727 (1972)
..........................................................................................11

*Springtree Apartments, ALPIC v. Livingston Parish Council,*
207 F, Supp. 2d 507 (M.D. La. 2001)
..........................................................................................22

*Sovereign News Co. v. Falke,*
448 F. Supp. 306 (N.D. Ohio 1977)
..........................................................................................6

*Staley v. Harris Cty,*
332 F. Supp. 2d 1030, 485 F.3d 305 (5th Cir. 2007)
..............................................................................10, 17

*State v. Petrone,*
161 Wis. 2d 530, 468 N.W.2d 676 (1991)
.................................................................................5

*Suhre v. Hood Cty.,*
131 F.3d 1083 (4tb Cir. 1977)
.................................................................................9

*Texas Monthly, Inc. v. Bullock,*
489 U.S. 1 (1989)
..............................................................................10, 11

*Torcaso v. Watkins,*
367 U.S. 488 (1961)
.................................................................................1

*United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg 7 Transit Auth,,*
163 F.3d 341 (6th Cir. 1988)
................................................................................22

*United States v. American Library Assn., Inc,*
539 U. S 194 (2003)
.................................................................................8

*United States v. Gendron,*
2009 WL 5909127 (E.D. Mo. Sept. 16, 2009)
.................................................................................6

*Valley v. Rapides Parish School Board,*
118 F.3d 1047 (5th Cir. 1997)
................................................................................24

*Van Orden v, Perry,*
545 U.S. 677 (2005)
.........................................................................15, 18, 21

*Walz v. Tax Comm. of the City of New York,*
397 U.S. 664 (1970)
................................................................................10

*Washington Ethical Society v. District of Columbia,*
101 U.S. App. D.C. 371, 249 F.2d 127 (1957)
.................................................................................1

*Wiggins v, Stone,*
570 F. Supp. 1451, 1453 (M.D. La. 1983)
................................................................................22

*Welsh v. U.S,*
1970398 U.S. 333 (U.S. Cal. June 15)
.................................................................................1

*Weaver v, City of New Orleans,*
267 F. Supp. 2d 559 (E.D. La., 2003)
................................................................................24

*Wexler v, City of New Orleans,*
267 F. 2d 559 (E.D. La. 2003)
..........................................................................................................22, 24

**Other Authority**
2 Encyclopaedia of the Social Sciences, 293
...................................................................................................................1

J. Archer, Faiths Men Live By 120—138, 254—313 (2d ed. revised by Purinton 1958)
...................................................................................................................1

Stokes & Pfeffer, supra, n. 3, at 560.
...................................................................................................................1

(UCMJ) 809. ART. 90 (20)
...................................................................................................................3

La. Stat. Ann § 14:91.11
............................................................................................................6, 8, 21

Rule 65, Fed. R. Civ. P
..................................................................................................................13

MAY IT PLEASE THE COURT: Plaintiff SGM Gunter moves for a preliminary or permanent injunction, restraining, enjoining and/or prohibiting Mayor and the Public Library from hosting the Drag Queen Story Hour for Children at the Public Library or from partnering with the any non-secular organization, such as Delta Lambda Phi, to put on the Drag Queen Story Hour in a public government building.  Plaintiff Sevier, a former prosecutor for DOJ and DOD, Judge Advocate General, 27A, ROL joins both Plaintiff Gunter and Plaintiff Guidry in their motions for preliminary and permanent injunctive relief.  The United States Supreme Court has recognized that Secular Humanism is a religion.[1]  Secular Humanism is also commonly referred to postmodern western individualistic moral relativism and expressive individualism by experts. The evidence presented in this case through the sworn statements of ex-gays, medical professionals, licensed ministers, and persecuted Christians shows that sexual orientation and homosexual orthodoxy that will be preached at the Drag Queen Story Hour to 3 to 6 year olds that the Public Library has endorsed is inseparably linked to the religion of Secular Humanism.[2] In view of *Real Alternatives, In c. v. Burwell,* Delta Lambda Phi is a non-secular organization because it is (1) full, (2) organized, and (3) has a daily code by which members may guide their

---

[1]    See *Torcaso v. Watkins,* 367 U.S. 488, n. 11 (1961) and re-acknowledged in *Edwards v. Aguillard,* 482 U.S. 578 (1987).  See also *Washington Ethical Society v. District of Columbia,* 101 U.S. App. D.C. 371, 249 F.2d 127 (1957); 2 Encyclopaedia of the Social Sciences, 293; J. Archer, Faiths Men Live By 120—138, 254—313 (2d ed. revised by Purinton 1958); Stokes & Pfeffer, supra, n. 3, at 560. *Welsh v. U.S,* 1970398 U.S. 333 (U.S. Cal. June 15).The Louisiana State legislature and a majority of states will be introducing a resolution that resolves the Secular Humanism is a religion for the purposes of the Establishment Clause at the 2019 legislative session.
[2] (DE 7 Lisa Boucher ¶¶ 1-10; DE 17 Quinlan ¶¶ 1-37; DE 14 Pastor Cothran ¶¶ 1-50; DE 16 Dr. King ¶¶ 1-20; DE 15 Dr. Cretella ¶¶ 1-20; DE 10 Goodspeed ¶¶ 1-20; DE 9 Grace Harley ¶¶ 1-25; DE _Kohl ¶¶ 1-12; DE 12 Pastor Cuozzo;  ¶¶ 1-21; DE 13 Pastor Farr ¶¶ 1-33; DE 18 Pastor Penkoski ¶¶ 1-34; DE 11 Pastor Cairns ¶¶ 1-30;; DE 8 Christian Resistance ¶¶ 1-21; DE _ Special Forces Of Liberty ¶¶ 1-34)

lives.[3] Through their partnership with Delta Lambda Phi, the Library has failed the *Lemon* Test

and, therefore, violated the Constitution. See *Lemon v. Kurtzman*, 403 U.S. 602 (1971).[4]

## I. JUST LIKE WITH THE MARRIAGE AND CONSTITUTION RESTORATION ACT THE PLAINTIFFS SEEK TO BALANCE THE FREE EXERCISE CLAUSE WITH THE ESTABLISHMENT CLAUSE

This lawsuit does not pit Christianity against Secular Humanism. The United States

Supreme Court found that "America is a Christian Nation" in *Church of the Holy Trinity v.*

*United States*, 143 U.S. 457 (1892). However, the Supreme Court in found that "America is a

[Secular Humanist] nation" in *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833,

847 (1992), when Justice Kennedy stated "at the heart of liberty "at the heart of liberty is the

right to define one's own concept of existence, of meaning, of the universe." Justice Kennedy's

proverb means "Jedem das Seine," which is German for "to each his own" which is exactly what

---

[3] *Real Alternatives, In c. v. Burwell*, 150 F. Supp. 3d 419, 440–41 (M.D. Pa. 2015), aff'd sub nom. *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, No.16-1275, 2017 WL3324690 (3d Cir. Aug. 4, 2017). In *Real Alternatives*, the court stated: "We detect a difference in the "philosophical views" espoused by [the plaintiffs], and the "secular moral system[s]...equivalent to religion except for non-belief in God" that Judge Easterbrook describes in *Center for Inquiry*, 758 F.3d at 873. There, the Seventh Circuit references organized groups of people who subscribe to belief systems such as Atheism, Shintoism, Janism, Buddhism, and secular humanism, all of which "are situated similarly to religions in everything except belief in a deity." *Id.* at 872. These systems are organized, full, and provide a comprehensive code by which individuals may guide their daily activities. Delta Lambda Phi is "organized, full, and provide[s] a comprehensive code by which [its members can guide their daily lives.] Instead of having a cross or the ten commandments, the LGBTQ church has the gay pride flag and their own commandments, such as if you disagree with LGBTQ ideology you are a bigot worth marginalizing. The unproven naked truth claims evangelized by the LGBTQ church such as (1) there is a gay gene, that (2) people can be born in the wrong body, that (3) same-sex sexual activity checks out with the human design, that (4) same-sex buggery is not immoral, and that (5) people come out of the closest baptized gay consists of a series of unproven faith based assumptions that are hyper religious and take a huge amount of faith to believe are even real, since these truth claims buck common sense and are more likely than not shallow qualifiers hoping to justify immoral sexual conduct that is indecent, immoral, and questionably legal.

[4] "To pass muster under the Establishment Clause, a practice must satisfy the *Lemon* test, pursuant to which it must: (1) have a valid secular purpose; (2) not have the effect of advancing, endorsing, or inhibiting religion;13 and (3) not foster excessive entanglement with religion." See *Lemon v. Kurtzman*, 403 U.S. 602 (1971). Government action "violates the Establishment Clause if it fails to satisfy any of these prongs." *Edwards*, 482 U.S. at 583; *Agostini v. Felton*, 521 U.S. 203, 218 (1997). The Library's actions taken in its partnership with Lambda Delta Phi has caused it to violate all three prongs of *Lemon*. The Library's decision to host and endorse Drag Queen Story Hour for 3 to 6 years olds in a manner that violates its own policies makes the event (1) a non-secular sham that (2) has the effect of cultivating indefensible legal weapons against non-observers of the religion of Secular Humanism and that (3) has the effect of excessively entangling the government with the religion of Secular Humanism.

the sign over Buchenwald concentration camp read. So, "America is [not] a Christian Nation and "America is certainly not a [Secular Humanist] Nation." At best, it could be declared that "America is [unofficially] a Christian Nation" insofar as the laws of the United States are required to be predicated off of self-evident morality, which is natural, neutral, and non-controversial. The laws of the United States often parallel Christianity by coincidence, since Christianity is also based on a radically transformative self-evident truth and perhaps the master narrative of it.[5] America will never mandate Christianity because it would create the very legalism that Christ himself was so adamantly opposed to. Religions must stand on their own merit without the government's stamp of approval if the United States is to remain a Constitutional Republic. The evidence shows that the reason why the LGBTQ church and Democrats continually push to have the government endorse their ideology is because it is so implausible and subversive to human flourishing that without the government's affirmation the worldview collapses in on itself under the weight of its own absurdity. The same cannot be said of Christianity, which continues to grow and expand, cutting through time and space in a manner that is transcultural. Yet, this lawsuit is not about asking government to impose Christianity on anyone. This is not a lawsuit where the Plaintiffs are suggesting that they are "morally superior" because they have decided to become Christ Followers as the result of robust thought.

---

[5] Without faith," there is "no basis for morality," and "without morality," there is "no basis for law." There is no way around that axiom. For anyone to say that "no one doctrine on morality is superior" is a "doctrine on morality" that asserts itself as "superior." In his letters from a Birmingham jail, Dr. King wrote that the reason he knew that a law was unjust was because it violated a "higher law" or a "divine law." He was right. If Military Officers, like Plaintiff Sevier can disobey an unlawful order from all the way up to the President, then it is a waste of time for any government body to pretend that moral judgments do not count. They do. (UCMJ) 809. ART. 90 (20); *Armbruster v. Cavanaugh*, 140 Fed. Appx. 564 (3rd Cir. 2011). So the question is which set of moral doctrine can the government used to create policy so that it does not erode freedom and offend the Constitution? The answer is self-evident morality that does not buck common sense, is non-controversial, and that is transcultural. If self-evident morality as a basis for law happens to parallels institutionalize religions, like Christianity, that does not make policies that are built upon it unconstitutional.

This portion of the lawsuit is simply about what actions the United States Constitution will allow the Mayor and the Public Library to undertake without trampling the Constitutional rights of its the Plaintiffs and others who are non-observers of the religion of Secular Humanism. This case is certainly not an opportunity for members of the judiciary to threaten sanctions as a per se act of judicial activism and intimidation. This cause of action is not a case for members of the local bar who label themselves as "Christian lawyers" to cower in the shadows in a perpetual state of ineptness because they are afraid of putting into practice what they claim to believe, when it comes to protecting children and honoring their duty under Article VI, as judicial officers, to uphold the Establishment Clause.[6]

This is a simple case based on the First Amendment. Whether any Christian conservative Republican likes it or not, the Free Exercise Clause of the First Amendment of the United States allows anyone in the State of Louisiana to self-identify as anything they would like - to include homosexual, zoophile, wizard, polygamists, transgender, an objectophile etc. Furthermore, the Free Exercise Clause allows for anyone to participate in a parody wedding ceremony and to live as married people do for better or worse.[7] Any parent could teach their children about the merits of Secular Humanism ideology and the LGBTQ orthodoxy in the privacy of their homes.[8]

---

[6] Several different so-called Christian Attorneys in Lafayette refuse to even help outside counsel appear Pro Hac Vice or to file amicus briefs from interested third parties because they are too afraid of the Court and too afraid of the LGBTQ community. It really is an indictment on the character fitness of the members of the Lafayette bar. Here are just a few of the lawyers who flaked - Murphy Foster, Doug Palumbo, Brett Grayson, Ken Jones.

[7] For example, a man can have a wedding ceremony with a a man and believe that the man is his wife until blue in the face with absolute impunity. Any parent could teach their children about the merits of Secular Humanism ideology and the LGBTQ orthodoxy.

[8] The Free Exercise Clause likely permits self-identified homosexuals and transgender to have a public meeting in a designated public forum within the Library to discuss the plausibility of homosexual lifestyle and ideology with other adults. The Free Exercise Clause permits the Library to partner with secular organizations that have a primary secular purpose that is neutral, natural, and non-controversial.

In terms of an Establishment Clause analysis in this case, Delta Lambda Phi is a non-secular organization and so are the other organizations that are seeking to unleash the Drag Queen Story Hour display exhibition in partnership the Public Library. The target audience of the exhibition involves children and the goal is indoctrination. The objective of the Drag Queen Story Hour is to unequivocally to promote a faith-based worldview of sex, faith, morality, marriage, and gender with the government's stamp of approval that is predicated on a series of unproven faith-based assumptions and naked assertions that are implicitly religious and inseparably linked to the religion of Secular Humanism. The organizations that seek to display Drag Queen Story Hour are as sincere in their beliefs that the exhibition is moral just as many jihadist suicide bombers are about their beliefs that Drag Queen Story Hour is an abomination, as set forth in to Quran. In view of the fact that the Library was served with 1,700 letters, a petition with 17,000 signatures, and demands from 51 pastors is direct evidence that the event violates community standards of decency from an objective view point.[9]  The State has a compelling interest to uphold community standards of decency, and it is upon that legal basis that the Mayor - himself - could have permanently shut down the event with impunity. *Paris Adult Theatre I v. Slaton*, 413 US 49 (1973). In view of the totality of the circumstances, the speech that is expected to be preached at the Drag Queen Story Hour is not only "religious speech," it qualifies as unprotected obscene speech that is harmful to minors.[10] The entire exhibition amounts to

---

[9] *Miller v. California*, 413 U.S. 15 (1973);; *Jacobellis v. Ohio*, 378 U.S. 184 (1964), the Court stated, "I shall not today attempt further to define the kinds of material I understand to be embraced within that shorthand description [sexual immorality], and perhaps I could never succeed in intelligibly doing so. But I know it when I see it."

[10]  Just as a call by an Islamic Iman for immediate acts of violence through jihad is "religious speech," it also constitutes dangerous unprotected harmful speech. See *Schenck v. United States*, 249 U.S. 47 (1919) (shouting "fire" in a movie theater is not protected speech for purposes of the First Amendment). "Obscenity is not within the area of protected speech or press." *Court v. State*, 51 Wis. 2d 683, 188 N.W.2d 475 (1971) vacated, 413 U.S. 911, 93 S. Ct. 3032, 37 L. Ed. 2d 1023 (1973) and abrogated by *State v. Petrone*, 161 Wis. 2d 530, 468 N.W.2d 676 (1991);; *Ebert v. Maryland State Bd. of Censors*, 19 Md. App. 300, 313 A.2d 536 (1973). Obscenity is not protected expression and may be suppressed without a showing of the circumstances which lie behind the phrase "clear and present danger" in

exposing children to "sexual immorality" and is unlawful under La. Stat. Ann § 14:91.11.[11] The

consistent theme of the Plaintiffs' litigation is that the government must get out of the parody

marriage business and must disentangle itself with the LGBTQ church completely because that is

what the Establishment Clause requires; however, the Free Exercise Clause allows adults to buy

into Secular Humanism without the government's interference or stamp of approval. As Prime

Minister Churchill stated, "Where there is a lot of free speech, there is a lot of stupid speech."

The Plaintiffs advocate for the Nation being place where stupid speech is permitted. See Bernie

Sanders' economic ideas.

## II. FACTUAL STATEMENT

A separate statement of facts was filed in Plaintiff Guidry's memorandum for an injunction and

is incorporated here. Delta Lambda Phi is a non-secular organization that the Library has

partnered with to put on a sectarian exhibition at the Public Library for children in a

non-designated public forum in violation of its own policies to convey that the Library favors the

religion of Secular Humanism over non-religion and other religions.[12] Because the Plaintiffs

---

its application to protected speech. *Roth v. United States*, 354 U.S. 476, 485, 77 S.Ct. 1304, 1309, L.Ed.2d 1498. *United States v. Gendron*, 2009 WL 5909127 (E.D. Mo. Sept. 16, 2009) report and recommendation adopted, S2 4:08CR 244 RWS, 2010 WL 682315 (E.D. Mo. Feb. 23, 2010);; *Chapin v. Town of Southampton*, 457 F. Supp. 1170 (E.D.N.Y. 1978);; *Sovereign News Co. v. Falke*, 448 F. Supp. 306 (N.D. Ohio 1977);; *City of Portland v. Jacobsky*, 496 A.2d 646 (Me. 1985).

[11] Courts have found that "any school boy knows that a homosexual act is immoral, indecent, lewd, and obscene. Adult persons are even more conscious that this is true." *Schlegel v. United States*, 416 F.2d 1372, 1378 (Ct. Cl.1969). Accordingly, the Library knows that through their partnership with Delta Lambda Phi that the goal is to indoctrinate minors to non-secular ideology that is "immoral, indecent, lewd, and obscene." For centuries homosexual orthodoxy has been classified as obscene and the fact remains that "to simply adjust the definition of obscenity to social realities has always failed to be persuasive before the Courts of the United States." *Ginsberg v. New York*, 390 U.S. 629, 639–40, 88 S. Ct. 1274, 20 L. Ed. 2d 195 (1968); *Mishkin v. State of New York*, 383 U.S. 502, 509, 86 S. Ct. 958, 16 L. Ed. 2d 56 (1966); and *Bookcase, Inc. v. Broderick*, 18 N.Y.2d 71, 271 N.Y.S.2d 947, 951, 218 N.E.2d 668, 671 (1966).

[12] Just as government officials may not favor or endorse one religion over others, so too officials "may not favor or endorse religion generally over non-religion." *Lee v. Weissman*, 505 U.S. 577, 627, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992)(Souter, Justice, concurring)(citing *County of Allegheny v. ACLU*, 492 U.S. 573, 589-94, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). "A proper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of "neutrality" toward religion,' favoring neither one religion over others nor religious adherents

have objected to the Library's endorsement of the Drag Queen Story Hour for Constitutional

reasons, the Plaintiffs and their family members have been libeled, stalked, threatened, and

harassed.[13] (DE 45 Penkoski and Sevier ¶¶ 1-21). To avoid litigation, the Plaintiffs filed

complaints with the Library in step with the Library's guidelines, using the Library's complaint

forms. The Library maintains its partnership with Delta Lambda Phi and plans to host the Drag

Queen Story hour at the Library on a continuing basis.

It is Plaintiffs' contention that Defendants decision to (1) publicly partner with Delta

Lambda Phi, to (2) promote Drag Queen Story Hour on its flyers, to (3) showcase the event on

its website, to (4) select the books, to (5) special order books for the event with tax dollars,[14] to

(6) violate its own guidelines, to (7) give less favorable treatment to Christian organizations,[15] to

---

collectively over nonadherents." *Bord of Educ, of Kiryas Joel Vill. Sch. Dist.v. Grumet*, 512 U.S. 687, 696 (1994) (quoting *Nyquist*, 413 U.S. at 792-93). The U.S. Constitution, while permitting legislators to act on preferences in policy and politics, plainly prohibits state actors to imbue official favored status on particular religious communities. See, e.g., id. at 703 (stating that the "fundamental source of constitutional concern" in that case was that the government "itself may fail to exercise governmental authority in a religiously neutral way" and lauding that "principle at the heart of the Establishment Clause, that government should not prefer one religion to another, or religion to irreligion"). "Whatever else the Establishment Clause may mean . . ., it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity [and Secular Humanism] over other religions). The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *County of Allegheny*, 492 U.S. at 605 (citations and internal quotation marks omitted). This includes a prohibition of government actors putting non-institutionalized religions, like the religion of Secular Humanism, over non-religion.

[13] Pastor Penkosky wrote "1. Sean Nicholson posted on my facebook page 'Warriors For Christ I'll sodomize you hateful pricks.' 2. Ashley Lanclos posted on my facebook page 'warriors for Christ rapes children' 3. Emma Latta posted on my facebook page 'you are a mother fuckign bigot,' and "sue me [sic] I'll find every anti gay tape there is of you and play it in court. Hint up front you will not win. I'll also claim a first amendment defense.' 4. Stephen Barnhart posted on my facebook page: 'do the world a favor [sic] kill yourself and family the word could use less

[14] See *Levitt v. Comm. for Pub. Educ. & Religious Liberty*, 413 U.S. 472, 480 (1973) ("[T]he State is constitutionally compelled to assure that the state-supported activity is not being used for religious indoctrination."); Furthermore, the Library is guilty of treating Secular Humanist better than the Plaintiffs and other non-observers of the religion of Secular Humanism living in Lafayette. The Library's actions demonstrate that "Aid to religious organizations, if provided at all, must be "allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and [must be] made available to both religious and secular beneficiaries on a nondiscriminatory basis." *Agostini*, 521 U.S at 231.

[15] Here is a video of the Public Library informing that Christians cannot quote scripture to each other in the Public Library, while an LGBTQ sympathizer is reading books to children to the purpose of indoctrinating them to Secular Humanism. https://www.facebook.com/warriorschurch/videos/319962062069993/

(8) allow self-identified by transvestites to prosethetize to children that the Library advances, promotes and endorses the religion of Secular Humanism in violation of the Establishment Clause of the First Amendment to the United States Constitution. The Plaintiffs ask the Court to reasonably presume that such government aid will, "knowingly or unknowingly, result in religious indoctrination." *Bowen v. Kendrick*, 487 U.S. 589, 612 (1988). Defendants' actions are devoid of any secular purpose. The Defendants seek to normalize false permission giving beliefs about sex and to groom children for a higher likelihood that they someday are molested or that they someday molest members of the same-sex. The ideology that the Defendants seek to impose on children manages to be racially, intellectually, emotionally, sexually, and spiritually exploitative. It is per se sexual immorality and inappropriate for minors under La. Stat. Ann § 14:91.11. Plaintiffs seek a preliminary injunction order from this Court restraining, enjoining and prohibiting Defendants from partnering with non-secular organizations like Delta Lambda Phi that seek to unleash the Drag Queen Story Hour in a public place for 3 to 6 year olds.[16]

### III. STANDING

The concept of standing is one aspect of justiciability. See *Flast v. Cohen*, 392 U.S. 83, 98 (1968). To establish standing under Article III of the United States Constitution a plaintiff must have suffered an injury in fact; he must have sustained an actual injury which is concrete and particularized. There must be a causal connection between the injury and the conduct

---

[16] The Library could potentially permit non-secular organizations like Delta Lambda Phi to host the Drag Queen Story Hour for adults in a designated public forum in the Library. Yet, if the Library did that it would have to hold strip club story hour for adults as well upon request. Strip clubs and homosexuality are along the same seamless spectrum of sex-based sexual immorality that violates the givenness of our nature and the truth about the way things are from the reasonable observer standpoint. The courts and the legislatures have given libraries strong incentives to uphold community standards of decency and to not expose minors to sexually immorality. See *United States v. American Library Assn., Inc*, 539 U. S 194 (2003). Just as adult book stores can be zoned to hard to reach parts of towns away from children, the Court can zone the Drag Queen Story Hour for children out of the public library. *City of Los Angeles v. Alameda Books*, Inc. 535 U.S. 425, 122 S. Ct. 1728, 152 L. Ed. 2d 670 (2002).

complained of, meaning that the injury has to be fairly traceable to the challenged action of the

defendant. Finally, it must be likely, and not merely speculative, that the injury will be redressed

by a favorable decision. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992);

*Murray v. City of Austin,* 947 F.2d 147 (5th Cir. 1999). The essential question for standing is

whether a plaintiff has alleged "a personal stake" in a controversy, such that courts can be

assured of a "concrete adverseness which sharpens the presentation of issues necessary for the

illumination of difficult constitutional questions." *Baker v. Carr*, 369 U.S. 186, 204 (1962);

*Saladin v, City of Milledgeville*, 812 F.2d 687, 690 (Ilth Cir. 1987).

"[T]he standing inquiry in Establishment Clause cases has been tailored to reflect the

kind of injuries Establishment Clause plaintiffs are likely to suffer. * * *. [T]he

Establishment Clause plaintiff is not likely to suffer physical injury or pecuniary loss directly

affected by an alleged establishment of religion." Rather, "the spiritual, value-laden beliefs of

the plaintiffs' are most often directly affected by an alleged establishment of religion.

Accordingly, rules of standing recognize that noneconomic or intangible injury may suffice to

make an Establishment Clause claim justiciable." *Suhre v. Hood Cty.*, 131 F.3d 1083, 1086

(4tb Cir. 1977).  This case involves such an intangible injury in fact.

The Plaintiffs or their agents are card carrying members of the Lafayette Public Library.

They and their organization members use the Library for secular purposes to assist them with

their work with the Louisiana State legislature. This includes the Plaintiffs efforts to pass the (1)

Human Trafficking And Child Exploitation Prevention Act; the (2) Stop Social Media

Censorship Act; the (3) Admission Act;  the (4) Marriage And Constitution Restoration Act; the

(5) Secular Humanism Resolution; the (6) the Life Appropriation Act; the (7) Elevated Marriage

Act; and the porography health crisis resolution. The Plaintiffs print materials at the Library.

They pay sales tax through their use of the Library.[17]

As taxpayers, when the Plaintiffs go to the Library for meetings, printing, and other

purposes, they do not want to be exposed to the exhibition. The Plaintiffs do not want their

children or other children exposed to a religious obscene display endorsed by the Library. As

taxpayers, they do not want their children exposed to the offensive exhibition.[18] As made clear

in *Staley v. Harris Cty*, 332 F. Supp. 2d 1030 (S.D.Tex. 2004), dismissed and remanded, 485

F.3d 305 (5th Cir. 2007), the threat of unwelcomed and continued contact is sufficient to meet

the "injury in fact" requirement.[19] Thus, similar to the plaintiff in Staley, Plaintiffs here do not

want to come into unwelcomed contact.[20] The Plaintiffs do not want to come in contact with the

---

[17] Because [the Plaintiffs] pay sales tax on an ongoing basis, [they are] continually forced to be an involuntary donor and give unwilling support [to the Library's efforts to entangle the government with the Religion of Secular Humanism]." See *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 14 (1989). *Meis v. Sanitas Serv. Corp.*, 511 F.2d 655, 656 (5th Cir. 1975). Also, it is true that the Fourteenth Amendment protects the liberty of individuals to travel throughout the nation, uninhibited by statutes, rules, or regulations that unreasonably burden or restrict their movement. This right guards against interference with citizens' rights "to migrate, resettle, find a new job, and start a new life." *Shapiro v. Thompson*, 394 U.S. 618, 629 (1969).

[18] Here are cases that proceeded to judgment on the merits without mention of taxpayer standing doctrine. See *Hibbs v. Winn*, 542 U.S. 88 (2004) (holding that Tax Anti-Injunction Act did not bar taxpayer suit, without mentioning taxpayer standing issue);; *Mueller v. Allen*, 463 U.S. 388 (1983) (permitting taxpayers to challenge constitutionality of a tax deduction without mentioning standing issue);; *Comm. for Public Ed. & Religious Liberty v. Nyquist*, 413 U.S. 756 (1973) (permitting taxpayer challenge to school aid statute without mentioning standing issue);; *Hunt v. McNair*, 413 U.S. 734 (1973) (permitting taxpayer challenge to South Carolina statutory scheme of aid to colleges without mentioning standing);; *Walz v. Tax Comm. of the City of New York*, 397 U.S. 664 (1970) (permitting realty owner to challenge, on a taxpayer theory, tax exemptions for religious organizations without mentioning standing). Here is the common denominator in all of those cases: (1) government actors, whose salaries come from the taxpayers, (2) allegedly engaged in a course of action that could reasonably be considered to have a primary religious purpose over a secondary secular purpose, which (3) had some form of secondary adverse impact on the plaintiff(s). Courts should not exalt form over substance, especially when it may allow an end-run around the Establishment Clause and harms children.

[19] In *Staley*, the requirement was met by a plaintiff who is a resident and taxpayer of Harris County. She is also an attorney who passes by the monument going to and from the Courthouse in the course of her profession She testified that she is offended by the Bible display in the Mosher memorial because it advances Christianity and it sends a message to her and to non" Christians that they are not full members of the Houston political community. 332 F.Supp.2d at 1034.

[20] The Plaintiffs object to the unconstitutional use of their tax dollars to support religious purposes, activities, and facilities; and that the organization's purpose is to protect constitutional rights); see a/so, e, g , *Bowen v. Kendrick*, 487 U.S. 618-20 (recognizing the longstanding rule that taxpayer standing is sufficient for Establishment Clause claims); *Friends of the Earth, Inc, v. Laidlaw Envtl, Serv.*, 528 U.S. 167, 181 (2000) (holding that an organization

exhibition at any time because they have been victimized by devout Secular Humanists. In

*North Carolina Civil Liberties v. Constangy,* 751 F.Supp. 552, 553 (W.D.N.C. 1990), aff f. 947

F.2d 1145 (40 Cir. 1991), cert. den'd. 505 U.S. 1219, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992),

the court commenced each session with a prayer. The practice was challenged by individual

attorneys and the North Carolina Civil Liberties Union on behalf of its members. Standing was

granted to attorneys who had "been present for at least one recitation of Judge Constagny's court

opening prayer." 751 F.Supp. at 553. The "injury in fact" requirement was met by the some of

the individual plaintiffs even though they had appeared before Judge Constangy only once, and

there was no allegation that they would be required to appear before him again in the future.

Plaintiffs' "injury in fact" is even stronger, for they intend to continue to use the Lafayette public

library and the Library intends to regularly sponsor the event.[21]

The Plaintiffs already came in contact with a watered down version of the Drag Queen

Story Hour in a non-designated public[22] forum on October 6, 2018 and found it to be

---

has standing to sue on behalf of its members when members would have standing to sue in their own right, where the interests at stake are germane to purpose of organization, and where the participation of individual members is not required. (citing *Hunt v. Washington State Apple Advertising Comm 'n,* 432 U.S. 333, 343 (1977)); *Sierra Club v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 555 (5th Cir. 1996) (same). Because the Court refuses to grant the Plaintiffs ECF access, the Court knows that the Plaintiffs are spending a lot of sale taxes in state. Because [the Plaintiffs] pay sales tax on an ongoing basis, [they are] continually forced to be an involuntary donor and give unwilling support [to the Library's efforts to entangle the government with the Religion of Secular Humanism]." See *Texas Monthly, Inc. v. Bullock,* 489 U.S. 1, 14 (1989). The printing alone for the filings submitted to this Court is proof of that. *Meis,* 511 F.2d at 656. A *prima facie* case does not mean that the plaintiff is entitled to summary judgment. *Janvey v. Alguire,* 647 F.3d 585, 595–96 (5th Cir. 2011). Rather, the plaintiff needs only to present evidence of its substantial likelihood to succeed on the merits. *Id.*

[21] Plaintiff Sevier should be allowed to proceed on behalf of all of Special Forces Of Liberty because "the association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Sierra Club v, Morton,* 404 U.S. 727, 734-741 (1972). Plaintiff has made such an allegation. However, because Plaintiff Sevier is the subject of a dishonest Judicial coup d'etat ran by Krisann Hodges and the members of the Tennessee Supreme Court because he is a whistleblower, the Plaintiffs are currently proceeding in a manner that is prejudicial to the career advancement of the Judges assigned to the case, not to themselves.

[22] "In limited public and nonpublic forums, a government entity may impose restrictions on speech that are reasonable and viewpoint neutral." *Ortega v. Recreation & Parks Comm'n for Par. of E. Baton Rouge,* 2018 WL 3471890, at *3 (La. App. 1 Cir. 7/18/18). If the "government has intentionally designated a place or means of communication as a public forum, speakers cannot be excluded without a compelling governmental interest. Access

unwelcomed and offensive. Its mere presence gives impression that the City favors religion, at least one particular religion - Secular Humanism. The facts of this case are more compelling than those present in Costangy wherein standing was conferred upon the North Carolina Civil Liberties Union. In that case, the association was allowed to file suit on behalf of "[a] number of its members [who] live in Charlotte and may be subject to being ordered to attend Judge Constangy's courtroom as witnesses or defendants in the same manner as any other citizens or group of citizens." Standing was granted even though these plaintiffs had not yet been exposed to Judge Constangy's Establishment Clause violations. 751 F.Supp. at 553.

Having established that Plaintiffs have sustained an injury, the next inquiry is whether the injury is fairly traceable to the defendant." *Massachusetts v. EP.A,,* 127 S.Ct. 1438, 1453 (2007). It is without dispute that this second requirement has been satisfied. The injury sustained by Plaintiffs is a direct "but for" result of the Defendants' policy and/or practice of (1) partnering with non-secular organizations like Delta Lambda Phi, (2) picking out the books, (3) special ordering them, (4) promoting the event on flyers, (5) promoting the event on the website, (6) giving special treatment to the LGBTQ groups in violation of the Library's own policies.

"Were it not for the [Defendants,] [policy violations and/or practice], there would be no constitutional injury." *Berger v, Berger v. Rensselaer Cent. Sch Corp.*, 766 F.Supp. 696, 702 (N.D. Ind. 1991), rev'd on other grounds, 982 F.2d 1160 (7th Cir. 1993), cert denied 508 U.S. 711, 113 S.Ct. 2344, 124 L.Ed.2d 254. The final inquiry asks whether a favorable judicial decision is likely to redress Plaintiffs' injury. See, e.g., *Massachusetts v. EPA,,* 127 S.Ct. at

---

to a nonpublic forum, however, can be restricted as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.' Id., at 46, 103 S.Ct., at 955." See *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800, 105 S. Ct. 3439, 3448, 87 L. Ed. 2d 567, 53 USLW 5116 (1985).

1453. To establish redressability, [Plaintiffs] must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc,* 528 U.S. at 181. Plaintiff clearly meets this test, for the issuance of a decision on the merits in favor of Plaintiffs can, and in this case will, prevent Defendants from continuing its partnership with non-secular organizations that seeks to use government assets to put on an obscene non-secular exhibition crafted to indoctrinate children and to communicate that Secular Humanism is the favored religion of the Library. An injunction against future displays of the Drag Queen Story Hour exhibition in the Public Library with the Public Library's endorsement will prevent the Plaintiffs from being subjected to future Establishment Clause violations, while having the added benefit of safeguarding children from government sponsored sexual immorality and indoctrination. Plaintiffs have established standing, for (1) there is an ongoing injury because the Library's partnership continues with the Delta Lambda Phi and because the Library intends to continue the partnership indefinitely, (2) which is resulting from the Library's' unconstitutional policy violations and/or practice, and (3) which will be redressed by court injunction. The Library has spent tax dollars on this event at the objection of non-observers of the religion of Secular Humanism, and the Library will continue to do so unless the Court enjoins it.

## IV. PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION
### A. Applicable Legal Standard

This motion is filed pursuant to Rule 65, Fed. R. Civ. P. The granting or denial of a preliminary injunction rests in the discretion of the district court." *Johnson v, Radford*, 449 F.2d 115, 117 (5th Cir. 1971); *Morgan v. Fletcher,* 518 F.2d 236, 239 (5th Cir. 1975); *Blue Bell Bio Medical v. Cz.n-Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989). The United States Supreme

Court has emphasized that there are "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools," *Lee*, 505 U.S. at 592, and the federal courts have thus "been particularly vigilant in monitoring compliance with the Establishment Clause" in the public-school context, see *Edwards*, 482 U.S. at 578-583.[23] It follows that "heightened concerns" apply here to the Lafayette children's library, which is a public taxpayer funded building, just like elementary schools are, with librarians whose salaries are paid for by the taxpayers, just like public elementary teachers are. The real reason why the Secular Humanists employees at the Library want to have the Library attached to Drag Queen Story Hour instead of having self-identified transvestites plan the Drag Queen Story by themselves at a private location with materials that they paid for and selected is because the whole point of the partnership is to communicate to impressionable minors, to the Plaintiffs, and to all Christians in Louisiana that Secular Humanism as advocated by the LGBTQ denomination is the favored religion of the Library, Louisiana, and the United States. It is an imperialistic political and religious power play that constitutes an evil that the United States Constitution prohibits.

There are four prerequisites governing the issuance of a preliminary injunction by the district court: (1) substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant,

---

[23] Two years after *Obergefell v. Hodges,* 1 35 S.Ct. 2584 (2015) and there has not been the "land rush" in gay marriage that was promised. There has been a land rush to persecute Christians with government assets and to use government assets to indoctrinate children to Secular Humanism ideology. The raw numbers tell the tale. Prior to the *Obergefell* decision two years ago, the 7.9 percent of gays who were married would have amounted to 154,000 married gay couples. Two years later, this had grown to 10.2 percent or 198,000 married couples. Gay marriage is a sham policy is a sham. Gay marriage is fake marriage, but the Persecution of Christians in the wake of the *Obergefell* putsch is real.

and (4) that granting the preliminary injunction will not disserve the public interest. *Canal*

*Authority of State of Florida v. Callaw,* 499 F.2d 567, 572 (5tb Cir. 1974); *DSC*

*Communications Corp,, v, DGI Technologies, Inc.*, 81 F.2d 597, 600 (1996) (citations omitted).

## B. Applicable Legal Standard Applied to the Case At Bar
### 1. There is Substantial Likelihood That The Plaintiffs Will Prevail On The Merits

The First Amendment to the United States Constitution states that "Congress shall make

no law respecting an establishment of religion, or prohibiting the free exercise thereof." The

religion clauses of the First Amendment are made applicable to the States by the Fourteenth

Amendment. See *Everson v. Bd of Educ.*, 330 U.S. 1, 8, 67 S.Ct. 504, 508, 91 L.Ed 711 (1947)

(applying the Establishment Clause to the states); *Cantwell v. Connecticut,* 310 U.S. 296, 303,

60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940) (applying the Free Exercise Clause to the states). The

Establishment Clause applies just as equally to Executive Branch expenditures as it does to

legislative exercises of the Taxing and Spending Power, to permit Executive Branch use of

appropriated funds to accomplish an unconstitutional end would mean that "Establishment

Clause protection would melt away." (Souter, J., dissenting). *Hein v. Freedom From Religion*

*Foundation*, 551 U.S. 587, 640 (2007) (Souter, J., dissenting)

The constitutionality of the exhibition can be analyzed in light of the two recent Supreme

Court Establishment Clause decisions: *Van Orden v, Perry*, 545 U.S. 677 (2005), (Rehnquist,

plurality), and *McCreary County v. ACLU of Kentucky*, 545 U.S. 844, 860 (2005). In *Van Orden,*

the Court phrased the issue as to "whether the Establishment Clause of the First Amendment

allows the display of a monument with the Ten Commandments on the Texas State Capitol

grounds." 545 US 681. In concluding that it does, the Court stressed the following factors:

1. The monolith was not a stand alone monument. Focusing on the 22 acres surrounding the
Texas State Capitol, the Court identified "17 monuments and 21 historical markers

commemorating the people, ideals, and events that compose Texas identity."
"The bottom of the monument bears the inscription PRESENTED TO THE PEOPLE AND
YOUTH OF TEXAS BY THE FRATERNAL ORDER OF EAGLES OF TEXAS 1961.'"
3. The cost of erecting the monument was home by the Eagles. 4. The monument had existed in
its present location for 40 years prior to it being challenged on constitutional grounds.
5. Petitioner waited until six years after initially encountering the monument to file suit.
545 US 681 82.

In his concurring opinion Justice Breyer likewise concluded that the display did not

violate the Establishment Clause. *Id* at 705. He did not dispute the fact that the text of the Ten

Commandments carried a "religious message." However, he stated that "[in} certain contexts, a

display of the tablets of the Ten Commandments can convey not simply a religious message but

also a secular moral message (about proper standards of conduct) . . . [a]nd . . . . also . . . a

historical message (about a historic relation between those standards and law)." *Id* at 702.

Focusing on the issue at hand, Justice Breyer concluded that the tablets have been used as part of

a display that communicates a religious but a secular message as well." *Id*.  In reaching his

conclusion that there was not a violation of the Establishment Clause, Justice Brayer considered

numerous factors, chief among which were: 1. The circumstances surrounding the monument's

placement; 2. Who donated the monument; 3. The placement on state grounds; 4. The display's

physical setting; and 5. The amount of time the display stood unchallenged. *Id.* at 700-704.  First,

Justice Breyer found "[t]he physical setting of the monument . . suggests little or nothing of the

sacred. The monument sits in a large park containing 17 monuments and 21 historical markers,

all designed to illustrate the ideals' of those who settled in Texas and of those who have lived

there since that time." *Id.* Second, the monument was donated by the Fraternal Order of Eagles,

an organization which "sought to highlight the Commandments' role in shaping civic morality as

part of the organization's efforts to combat juvenile delinquency." Id, at 701. The fact that the

tablets on the monument acknowledged that the monument was donated by the Fraternal Order of Eagles "further distances the State itself from the religious aspect of the Commandment's message." Id. at 701-702. He placed significance on the fact that the monument was donated by an organization seeking to combat juvenile delinquency. Id. Third, the fact that the monument has existed and gone unchallenged for forty (40) years was seen as evidence by Justice Breyer that few individuals were likely to have understood the monument as "a government effort to favor . . religion [or] to compel' any religious practice.'" Id. at 702.

The factors employed by Justice Breyer are controlling in the immediate case. See *Staley*, 485 F.3d at 309 ("Justice Breyer's concurrence is the controlling opinion in *Van Orden*,") Applying those factors to the case at bar, it becomes obvious that the Drag Queen Story Hour violates the Establishment Clause:

1. The circumstances surrounding the partnership: Drag Queen Story Hour came after the flawed decision in *Obergefell v . Hodges*, 135 S.Ct. 2584 (2015) that was so dishonest that Justice Scalia called it an "egotistic...judicial putsch" that constitutes "a threat to American Democracy." The history of homosexuality is that is was basically illegal until the Supreme Court used *Lawrence v. Texas*, 539 U.S. 558 (2003) to overturn *Bowers v. Hardwick*, 478 U.S. 186 (1986) in error. Drag Queen Story Hour proves that gay marriage policy is sham.

2. Who organized Drag Queen Story Hour: Drag Queen Story Hour was not organized by a secular group seeking to impart secular knowledge, but by Library and Delta Lambda Phi with a non-secular message predicated on a series of unproven faith-based assumptions.

3. The placement on public property and the physical setting: the Drag Queen Story Hour is to take place in the children's Library, which is a non-designated public forum and was selected in violation of the Libraries own policies to maximize government sanctioned indoctrination of minors to the unproven truth claims that are part of the the religion of Secular Humanism.

4. The amount of time the display exhibition went unchallenged: The Plaintiffs, unlike the plaintiff in *Van orden*, who passed the display at least 6 times prior to challenging it, challenged it immediately upon hearing that the Library planned to sponsor and host the Drag Queen Story

Hour in partnership with a non-secular organization that consists of self-identified transvestites who seek to pander obscenity to minors.

The facts of this case "indicate a governmental effort substantially to promote religion, not simply an effort primarily to reflect historically the secular impact of the religious inspired [children's books]." *Van Ogden*, 545 US at 703. The books that were special ordered attempt to normalize and encourage children to buy into dangerous unproven truth claims such as:

(1) there are more than two genders, (2) gay people are a people group, (3) a gay genes exists, (4) homosexuality is based on immutability like race is, (5) parody marriages are actual marriages, (6) truth is relative, (7) what is right for me is right for me and what is right for you is right for you, (8) people who disagree with homosexual orthodoxy are bigots, (9) sexual immorality is based on how the culture defines it, (10) it is good act upon your emotions and impulses.

All of those unproven truth claims are outrageously implausible, and according to ex-gays, medical professionals, licensed ministers, and persecuted Christians all of those truth claims amount to dogma that is inseparably linked to the religion of Secular Humanism.[24] The Library cannot endorse those beliefs just because the decision makers at the Library happen to be zealous Secular Humanists who have emotional reasons for wanting to impose their spiritual take on reality onto minors in their government capacity. Courts have made it clear that emotional reasons - even really good ones - do not allow state actors to usurp the Establishment Clause. See *Holloman v. Harland,* 370 F.3 1252 (11th Cir. 2004).[25] All of gay dogma, just like pro-abortion

---

[24] (DE 7 Lisa Boucher ¶¶ 1-10; DE 17 Quinlan ¶¶ 1-37; DE 14 Pastor Cothran ¶¶ 1-50; DE 16 Dr. King ¶¶ 1-20; DE 15 Dr. Cretella ¶¶ 1-20; DE 10 Goodspeed ¶¶ 1-20; DE 9 Grace Harley ¶¶ 1-25; DE _Kohl ¶¶ 1-12; DE 12 Pastor Cuozzo; ¶¶ 1-21; DE 13 Pastor Farr ¶¶ 1-33; DE 18 Pastor Penkoski ¶¶ 1-34; DE 11 Pastor Cairns ¶¶ 1-30;; DE 8 Christian Resistance ¶¶ 1-21; DE _ Special Forces Of Liberty ¶¶ 1-34).

[25] In *Holloman,* a public school teacher defended a daily moment of silent prayer by arguing that she intended to teach students compassion, pursuant to a character education plan mandated by the State. Id. at 1285. The court concluded that this emotional explanation did not constitute a valid secular purpose because the teacher's most basic intent unquestionably was to offer her students an opportunity to pray. "While [the teacher] may also have had a higher-order ultimate goal of promoting compassion, we look not only to the ultimate goal or objective of the behavior, but also to the more immediate, tangible, or lower-order consequences a government actor intends to bring about." Id. The unmistakable message of the Supreme Court's teaching in *Holloman* is that the state cannot employ a religious means to serve an otherwise legitimate secular interests." Id. at 1286. The *Holloman* court further concluded that "a person attempting to further an ostensibly secular purpose through avowedly religious means is

ideology, is predicated exclusively on a series of unsubstantiated emotional appeals that the government cannot respect in view of the Establishment Clause.

The next test to apply is the one employed by the Court in *McCreary*. *McCreary* was also a display case. In that case, the American Civil Liberties Union filed suit to remove a display of the Ten Commandments featured prominently in a heavily trafficked area inside the courthouse. Realizing the fact that Ten Commandments, standing alone, posed a significant constitutional dilemma, the county decided to place other religious documents alongside it. This was to no avail, for the district court granted plaintiffs' request for an injunction, requiring the county to remove the display. In an effort to get around the ruling of the court, the county changed the display for a third time. The third display was entitled, "The Foundations of American Law and Government Display." It finally got around to including historical documents together with the Ten Commandments.

The Court, per Justice Souter, found an Establishment Clause violation present where the government acts with the "ostensible and predominant purpose of advancing religion" as judged from an objective observer's standpoint taking into consideration the text, legislative history, and "Implementation of the state action." *Id* at 8601. Addressing the three different displays, Justice Souter held that they violated the Establishment Clause. With regard to *McCreary* first Ten Commandments display, the Court held that, especially in light of the lack of any sign claiming a secular purpose, a "reasonable observer could only think that the Counties meant to emphasize and celebrate the Commandments' religious message." *Id.* at 868-869. As for the second display, the Court found that the other documents had a religious content nature and the

---

considered to have a Constitutionally impermissible purpose." Id., citing *Jagar v. Douglas County School*, 862 F.2d 824, 830 (11th Cir.1989)("An intrinsically religious practice cannot meet the secular purpose prong of the *Lemon* test.")

counties posted the Commandments precisely because of their sectarian content an

impermissible purpose. *Id.* at 70, Regarding the last display, the Court held that even though

the counties' actions do not "forever taint" all future displays of religious material, because

"reasonable observers have reasonable memories,"no reasonable person could conclude that the

counties had forgotten their original purpose." *Id.* at 866, 874. Based on those facts, the Court

concluded that the displays violated the Establishment Clause. *Id.* at 879-881.

Applying *McCreary* to the facts herein, it is patently obvious that the Library's

partnership with Delta Lambda Phi and Drag Queen Story Hour and the Library's decision to

display the exhibit at the public Library is calculated to indoctrinate minors to Secular

Humanism in violation of the Establishment Clause. The Library's display, endorsement, and

promotion of Drag Queen Story Hour violates the Establishment Clause by a landslide for failing

not one, but all three prongs of the *Lemon* test. (see Plaintiff Sevier's memorandum in support of

his motion for a Summary Judgment.) There can be no dispute respective to sectarian nature of

Drag Queen Story Hour that has been crafted to target impressionable children at the outrage of

the vast majority of the members in the community object to. The circus like element of the

Drag Queen Story Hour would clearly lead the reasonable observer to think that the Defendants

acted with the "ostensible and predominant purpose of advancing religion." The Drag Queen

Story Hour which involves men who self-identify as homosexual on a regular basis, pretending

to be females, is a critique on religion and the very absolute truth that the United States

Constitution and the Bill of Rights are based on. A critique on religion is always a new religion.

Additional, albeit not conclusive, evidence of the Defendants' desire to advance and foster

Secular Humanism is the fact that the Library has violated a host of its own policies in putting

forth an event in a non-designated public forum and violating its own policies and in violation of

La. Stat. Ann § 14:91.11.  According to the Library's guidelines, the Library is prohibited from

sponsoring and hosting religious events stating:

"space for religious proselytizing or religious announcements and personal notices or
communications will not be provided. The Library does not sponsor nor endorse the views of any
individual or group using the exhibit and display spaces."

The Library is in direct violation of this policy in hosting and endorsing the Drag Queen Story

Hour, providing a "space for religious proselytizing" the religion of Secular Humanism to 3 to 6

year olds.[26] The Library would not let a sunday school teacher host Christian sunday school in

the children's library, but the Library is permitting self-identified transvestites to host a Sunday

school for the church of Secular Humanism in the children's Library.  Consider the following:

(1) the selection of the books, (2) the target audience, (3) the location of the event all would lead

the reasonable observer to conclude that the United States, Louisiana, and the Library are under

the thumb of the religion of Secular Humanism. The Library's partnership with non-secular

organization and its participation in Drag Queen Story Hour is, therefore, unconstitutional. Since

the exhibition fails the test in both *Van Orden* and *McCreary* for being a non-secular religious

display, the Plaintiffs have a strong likelihood of prevailing on the merits of this litigation.  See

also the Plaintiffs Guidry's motion for an injunction filed on October, 7, 2018.

## 2. Plaintiffs Will Suffer Irreparable Harm If the Injunction Is Not Granted

In a recent decision, *Entertainment Software Ass ,n. v, Foll,* 451 F.Supp. 823, 835-836

(M.D.La. 2006), the court, addressing the issue of irreparable harm, stated:

---

[26] 1. http://lafayettepubliclibrary.org/wp-content/uploads/2010/01/Library-Meeting-Room-Guidelines-12-15-08.pdf.
2.http://lafayettepubliclibrary.org/wp-content/uploads/2009/12/BOOKTALK_sept_oct_2018_FINAL_w_Btw_Frien
ds.pdf. This video proves the double standard imposed by the Library in favor of Secular Humanism.
https://www.facebook.com/warriorschurch/videos/319962062069993/

The Supreme Court has made clear that the "loss of First Amendment freedoms, for even minimal period of time, unquestionably constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Deerfielded Med Ctr. v, City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). In the First Amendment context, irreparable injury "stems from the intangible nature of the benefits flowing from the exercise of those rights and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future." *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg 7 Transit Auth,*, 163 F.3d 341, 363 (6th Cir. 1988)(internal quotation marks omitted).

"It has been repeatedly recognized by the federal courts that violation of constitutional rights constitutes irreparable injury as a matter of law." *Springtree Apartments, ALPIC v Livingston Parish Council*, 207 F, Supp. 2d 507, 515 (M.D. La. 2001). See also, *Killebrew v. City of Greenwood*, 988 F. Supp. 1014, 1016 (N.D. Miss. 1997) ("Plaintiffs' claims are primarily based upon violation of their constitutional rights under the Equal Protection Clause of the Fourteenth Amendment, and thus, the threat of irreparable injury is present as a matter of law."); *Murillo v. Musegades*, 809 F. Supp. 487, 497 (W.D. Tex. 1992) ("Irreparable injury is established upon movants showing constitutionally protected rights have been violated."); *Wiggins v, Stone*, 570 F. Supp. 1451, 1453 (M.D. La. 1983) ("[I]t is well established that deprivation of a constitutionally protected right constitutes irreparable injury[.]"); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed.1995) ("When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). This reasoning essentially collapses the "likehhood of success on the merits" and "irreparable harm" prongs of the injunctive inquiry where constitutional rights are at stake. *Forum for Academic & lust, Rights v. Rumsfeld*, 390 F.3d 219, 246 (3rd Cir. 2004). The presumption of irreparable harm entitling a movant to injunctive relief arises in these

circumstances because where constitutional rights are at stake, monetary compensation is not an adequate remedy. Due to the fact that the Library's partnership with Delta Lambda Phi, and its decision to sponsor, endorse, favor, and promote the Drag Queen Story Hour in a non-designated public forum in an effort to prosthelytize Secular Humanism to minors in violation of the Library's guideless "unjustly infringes upon First Amendment freedoms, there is a substantial likelihood that irreparable harm will result if the [preliminary injunction} is not granted." *Wexler v, City of New Orleans,* 267 F. 2d 559, 568 (E,D.La. 2003). Indeed, if the preliminary injunction is not granted, Plaintiffs will be placed in an untenable position. They will have to choose between not going to the Public Library and not bringing their children or going and having themselves or their children exposed to an obscene religious exhibition that has the government's stamp of approval. It is well established that a person need not forego a venue which they otherwise have a right to be to avoid contact with an unconstitutional practice. This "compliance or forfeiture" requirement was expressly rejected in *Lee id.* at 596. The Public Library is a place where the Plaintiffs have a right to be.

### 3. The Threatened Harm to Plaintiff Will Outweigh the Threatened Harm to Defendant If the Injunction is Not Granted

The public has an interest in upholding community standards of decency from being eroded by individuals with an emotional problem absolute truth. If the Library is allowed to continue its public partnership with Delta Lambda Phi and the Drag Queen Story Hour, if the Library is permitted to violate its own policies in endorsing the Drag Queen Story Hour, and if the Library is allowed to display the Drag Queen Story Hour for children in a public building the "Plaintiffs will be denied First Amendment Freedoms . . whereas Defendant[s] do not appear to be at any

risk of suffering harm. Thus in balancing the equities, the scale tips in favor of the [P]laintiffs."

*Wexler, id,* at 568-569.

### 4. Granting the Injunction Will Not Disserve the Public Interest

The public does not have an interest in perpetuating a violation of the Establishment Clause.

Indeed, the public interest would be harmed if the Library were allowed to violate its own

policies put on the Drag Queen Story Hour display in partnership with non-secular organizations.

It is well-settled law that the public interest is always served by ensuring compliance with the

Constitution and civil rights law. See, e.g., *Valley v. Rapides Parish School Board,* 118 F.3d

1047, 1056 (5th Cir. 1997) (finding that public interest would be undermined if unconstitutional

actions of a school board were permitted to stand); *G&V Lounge, Inc, v. Mich. Liquor Control

Comm'n,* 23 F.3d 1071, 1079 (6th Cir. 1994) (holding that it is always in the public interest to

prevent violation of constitutional rights).[27] "The public interest is best served by enjoining a

statute that unconstitutionally impair First Amendment rights." *Forum for Acad & Inst, Rights,*

390 F.3d at 246.  Further, the public has a substantial interest in promoting the well-being of the

community and maintaining the 'historic constitutionally mandated neutrality of government

toward religion. An injunction would eliminate Library's unmistakable and destructive message

that Secular Humanism is the favored religion in the public Library, in Louisiana, and in the

United States.  The public interest is best served by enjoining the Library from displaying the

Drag Queen Story Hour  exhibition or from partnering with the non-secular organizations to

---

[27] "The public interest is best served by enjoining any [government action] which impermissibly favors a religious group in violation of the Establishment Clause of the First Amendment until it can be conclusively determined whether the [government action] withstands constitutional scrutiny."*New Orleans Secular Humanist Ass Inc, v. Bridges,* Civ, A. No. 04-3165, 2006 WL 1005008, at *6 (E.D. La. Apr. 17, 2006) see also, e.g, *Entm 't Software Ass 'n v. Foll,* 451 F. Supp. 2d 823, 837 (M-D. La, 2006); *Weaver v, City of New Orleans,* 267 F. Supp. 2d 559, 568-69 (E.D. La.), 2003); *Foster,* 2002 WL 1733651, at *2

display it elsewhere in an area accessible to the public "until it can be conclusively determined that the [exhibition] withstands constitutional scrutiny." *Wexler, id , Entertainment Software Ass'n, Id.* at 835-836.

## IV. CONCLUSION

There is a strong likelihood of success on the merits by Plaintiffs. Plaintiffs will sustain irreparable injury if a preliminary injunction is not issued; the balancing of the equities is in Plaintiffs, favor; and, no disservice to the public will result in the `granting of the preliminary Injunction. The Plaintiffs have repeatedly implored local counsel to get involved in their case or at least allow outside lawyers to appear Pro Hac Vice to no avail for reasons that based on pure cowardice. For evil to flourish, it only requires good men to do nothing. Nevertheless, "who is making the argument" is not as important as "what is being argued." The Plaintiffs are capable even if the posture is no preferred by the Court. The Plaintiffs ask Judge Summerhays to do exactly what he told Senator Whitehouse he would do when confronted with a case on this topic. The Court's "legal decision-making process should be governed by the facts and the law, not empathy or personal convictions."[28] The facts and law are in the Plaintiffs favor.

---

[28] Question: During Justice Sotomayor's confirmation proceedings, President Obama expressed his view that a judge benefits from having a sense of empathy, for instance "to recognize what it's like to be a young teenage mom, the empathy to understand what it's like to be poor or African-American or gay or disabled or old."a. What role, if any, should empathy play in a judge's decision-making process? Answer by Judge Summerhay: A judge's legal decision-making process should be governed by the facts and the law, not empathy or personal convictions....I also believe that empathy factors into to how judges treat the lawyers and parties that appear before them."

Respectfully submitted:

/s/John Gunter/
SPECIAL FORCES OF LIBERTY
techlawjohn123@gmail.com
1000 Renaud Dr Lot 163
Scott, LA 70583
(801)654 5973
Bravo Three Zero
marriagerestorationact.com

/s/Chris Sevier Esq./
DE FACTO ATTORNEY GENERALS
SPECIAL FORCES OF LIBERTY
ghostwarsmusic@gmail.com
BPR# 026577
1000 Renaud Dr Lot 163
Scott, LA 70583
(615) 500-4411
Bravo Three Zero

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document and attached exhibits were mailed with adequate postage to the Defendants in this actions on October 7, 2018 to Teresa Elberson, 301 West Congress Street Lafayette, LA 70501;; John Bel Edwards, 900 N 3rd St #4, Baton Rouge, LA 70802;; Jeffrey Martin Landry at 1885 North Third Street Baton Rouge, LA 70802;; Hon. Stuart R. Shaw 615 East Carroll Street, Coushatta, LA 71019, Joel Robideaux, P.O. Box 4017-C, Lafayette, LA 70502. To Joy Rabalais 200 W Congress St Ste 1000 Lafayette, LA 70501-6864 Lafayette Parish: rabalais@bornewilkes.com.

/s/Chris Sevier Esq./

**APPENDIX**

**Nomination of Robert R. Summerhays to the United States District Court
For the Western District of Louisiana Questions for the Record Submitted April 18, 2018
QUESTIONS FROM SENATOR WHITEHOUSE**

Question: During Justice Sotomayor's confirmation proceedings, President Obama expressed his view that a judge benefits from having a sense of empathy, for instance "to recognize what it's like to be a young teenage mom, the empathy to understand what it's like to be poor or African-American or gay or disabled or old."a. What role, if any, should empathy play in a judge's decision-making process?

Answer by Judge Summerhay:

A judge's legal decision-making process should be governed by the facts and the law, not empathy or personal convictions. However, the personal circumstances and history of a party may be relevant to a judge's decision where the law requires consideration of these factors. For example, the personal circumstances and history of a defendant are relevant to sentencing under 18 U.S.C. § 3553.

I also believe that empathy factors into to how judges treat the lawyers and parties that appear before them. As a bankruptcy judge, I have a docket of over 5,000 cases, more than 90% of which are individual consumer cases. On a typical hearing day for consumer cases, I may have as many as 100 people who come before me. Many of these consumer debtors are at the lowest points in their lives. I address each consumer debtor one by one and rule on their cases. I listen to their counsel's arguments and I am careful to give each debtor the opportunity to speak. Even though I am bound to rule according to the facts and the law, I treat them with compassion and respect when I address them and ultimately rule on their cases. I think that this compassion and respect is critical to maintaining faith in and respect for the judiciary.

b. What role, if any, should a judge's personal life experience play in his or her decision-making process?

As with empathy, a judge's legal decision-making process should be governed by the law and the factual record, not the judges' personal convictions or life experiences.

La. Stat. Ann § 14:91.11

A .(1) The unlawful sale, exhibition, rental, leasing, or distribution of material harmful to minors is the intentional sale, allocation, distribution, advertisement, dissemination, exhibition, or display of material harmful to minors, by a person who is not the spouse, parent, or legal guardian of the minor to any unmarried person under the age of eighteen years, or the possession of material harmful to minors with the intent to sell, allocate, advertise, disseminate, exhibit, or display such material to any unmarried person under the age of eighteen years, by a person who is not the spouse, parent, or legal guardian of the minor at a newsstand or any other commercial establishment which is open to persons under the age of eighteen years. (2) "Material harmful to minors" is defined as any paper, magazine, book, newspaper, periodical, pamphlet, composition, publication, photograph, drawing, picture, poster, motion picture film, video tape, video game, figure, phonograph record, album, cassette, compact disc, wire or tape recording, or other similar tangible work or thing which exploits, is devoted to or principally consists of, descriptions or depictions of illicit sex or sexual immorality for commercial gain, and when the trier of fact determines that each of the following applies: (a) The material incites or appeals to or is designed to incite or appeal to the prurient, shameful, or morbid interest of minors. (b) The material is offensive to the average adult applying contemporary community standards with respect to what is suitable for minors. (c) The material taken as a whole lacks serious literary, artistic, political, or scientific value for minors. (3) For the purpose of this section "descriptions or depictions of illicit sex or sexual immorality" includes the depiction, display, description, exhibition or representation of: (a) Ultimate sexual acts, normal or perverted, actual, simulated, or animated, whether between human beings, animals, or an animal and a human being; (b) Masturbation, excretory functions, or exhibition, actual, simulated, or animated, of the genitals, pubic hair, anus, vulva, or female breast nipples; (c) Sadomasochistic abuse, meaning actual, simulated, or animated, flagellation or torture by or upon a person who is nude or clad in undergarments or in a costume which reveals the pubic hair, anus, vulva, genitals or female breast nipples, or the condition of being fettered, bound, or otherwise physically restrained, on the part of one so clothed; (d) Actual, simulated, or animated, touching, caressing, or fondling of, or other similar physical contact with, a pubic area, anus, female breast nipple, covered or exposed, whether alone or between human*, animals or a human and an animal, of the same or opposite sex, in an act of apparent sexual stimulation or gratification; or (e) Actual, simulated, or animated, stimulation of the human genital organs by any device whether or not the device is designed, manufactured, and marketed for such purpose. (4) "Minor" means any person under the age of eighteen years. (5) "Video game" means an object or device that stores recorded data or instructions, receives data or instructions generated by a person who uses it, and, by processing the data or instructions, creates an interactive game capable of being played or viewed on or through a computer, gaming system, console, or other technology. B.(1) It shall be unlawful for a person who is not the spouse, parent, or legal guardian of the minor to invite or permit any unmarried person under the age of eighteen years of age to be in any commercial establishment that exhibits or displays any item, material, work or thing of any kind that is described in Subsection A of this Section. (2) Lack of knowledge of age shall not constitute a defense, unless the defendant shows that he had reasonable cause to believe that the minor involved was eighteen years of age or more and that the minor exhibited to the defendant a selective service card, driver's license, military identification card, birth certificate or other official or apparently

official document purporting to establish that such a minor was eighteen years of age or more. (3) For the purpose of Subsections A and B of this Section, "exhibition or display" means the exhibition or display of material harmful to minors as defined in Subsection A of this Section so that, as displayed, depictions and representations of illicit sex or sexual immorality are visible to minors. (4) A commercial establishment shall not be in violation of this Section if the commercial establishment provides for a separate area for the exhibition or display of material harmful to minors and designates said area "NOT FOR MINORS" or similar words and the commercial establishment prohibits persons under the age of eighteen years from seeing or examining the contents of material harmful to minors. C. This section does not preempt, nor shall anything in this section be construed to preempt, the regulation of obscenity by municipalities, parishes and consolidated city parish governments; however, in order to promote uniform obscenity legislation throughout the state, the regulation of obscenity by municipalities, parishes and consolidated city parish governments shall not exceed the scope of the regulatory prohibitions contained in the provisions of this section. D. Prior to selling material harmful to minors as provided for by this Section, a commercial establishment shall require the individual purchasing the material harmful to minors to provide a driver's license, selective service card, military identification card, birth certificate, or other official form of identification which on its face establishes the age of the person as eighteen years or older. E. Whoever is found guilty of violating the provisions of this Section shall be fined not less than one hundred dollars nor more than two thousand dollars or imprisoned for not more than one year, or both.  In view of La. Stat. Ann § 14:91.1, the transvestite Story Hour must be shut down because it is and unlawful exhibition that is injurious to the children of Lafayette. To begin with the self-identified transvestites and their supportive librarian counterparts are not the "spouse, parent, or legal guardian" of the children that they intend to seduce and target with their toxic obscene ideology that bucks common sense. The self-identified transvestites and their librarian counterparts are all over the "age of 18. " They jointly intend to exhibit and display a sexually charged sermon with stimuli that includes "tangible works" in a quasi-commercial taxpayer funded facility that has the effect to conveying that Secular Humanism is the official religion of the State. The entire exhibition is unequivocally calculated to "incite or appeal to the prurient, shameful, or morbid interest of minors." The disturbing part is that the librarians and self-identified transvestites are well aware of it. Based on the unbelievable amount of public outrage, there can be no dispute that the "the material is offensive to the average adult applying contemporary community standards with respect to what is suitable for minors."

**VERBATIM COPIES OF**

**Subject:** quick note:
**Date:** Sunday, July 1, 2018 at 5:43:42 PM Central Daylight Time
**From:** Meredith Crawford
**To:** Sarah Durr, Angela Criddle
Category: DQST:

a young man with the new LGBT fraternity on campus came to visit to do some community fun with us at the library. i suggested maybe once a semester and either a storytime (drag queen or something tamer) or something where they could mentor like a code club or something like that.

they were down, I have his email, but I thought that I would run that all by y'all first and see what you think. better ideas? I'm totally down for once a semester p.j. party with these frat boys. I don't see a tuesday talk coming down the pike, so here it is!

Meredith Crawford,
Children's Librarian,
337-261-5774
Lafayette Public Library
Lafayette, Louisiana

**Subject:** **RE:Pink is for Boys by Robb Pearlman**
**Date:** Thursday, July 19, 2018 at 10:18:05 AM Central Daylight Time RoseSt. Romain
**From:** Angela Criddle, Sarah Durr
**To:** Rebecca Libersat
Subject: DQSH
Criddle

I ordered all of your titles except Annie's Plaid Shirt; it wasn't in Baker & Taylor. I'll put holds on all the titles for you when they are ordered next week.

However, I DID order Prince & Knight by Daniel Haack and Stevie Lewis.
The same team have another book coming out in April 2019 called Maiden & Princessthat features a biological girl maiden who falls in love with a princess. I plan to order it.


Cheers,

ra

RoseAnne St. Romain
Collection Development Coordinator - Youth Services Lafayette Public Library
301 W. Congress
Lafayette, LA70501
Phone(337}261-5795

**From:** Angela Criddle
**Sent:** Tuesday,July 17, 2018 6:22 PM
**To:** RoseSt. Romain <rose.stromain@lafayettepubliclibrary.org>; <sarah.durr@lafayettepu bliclibra ry.org>
**Subject:** Re: Pink is for Boys by Robb Pearlman Sarah Durr

Pink Is For Boys is actually on my list! I made a list of books I thought were both subject appropriate (the fraternity asked for books where children explore gender fluidity) and good for reading aloud at storytime. Sarah, I knew I was forgetting to bring something up in our Tuesday Talk - this was it.

Books we already own {I either have these at my desk already or have them on hold):
Ballerina Nate
The Princess Knight
Pink Is For Boy
A Fire Engine For Ruthie

Books we don't own (yet!):
From the Stars In the Sky.to the Fish In the Sea
Julian Is A Mermaid
Jacob's New Dress
Annie's Plaid Shirt
Prince & Knight

If I had to say right now which three I'd read, I'd probably pick Prince & Knight, From the Stars in the Sky to the Fish in the Sea, and Jacob's New Dress.

Criddle
Children's Librarian - Main
Lafayette Public Library
337-706-8916

# Drag Queen Storytime at Lafayette Public Library, October 6

Lafayette Public Library (LPL) will host a Drag Queen Story Time in partnership with Delta Lambda Phi, a fraternal colony at the University of Louisiana at Lafayette. This special story time will feature drag performers from the social fraternity who will read stories and sing songs that foster creativity, imagination and fun while encouraging self-expression. The story time will end with a craft and dance. The event will take place on Saturday, October 6, 2018 from 2:00 pm to 3:00 pm at the Main Library (301 West Congress Street, Lafayette, LA 70501).

By offering Drag Queen Story Time, LPL is joining the likes of New York Public Library, Chicago Public Library, New Orleans Public Library and many more across the country in sharing stories of individuality, acceptance and understanding with children and their families . This event is just one of the many ways the library partners with local groups and organizations to offer a variety of unique and interesting programs that celebrate the diversity in our community .

This story time will feature books and activities appropriate for young audiences and families and is recommended for ages 3-6 . It is free to the public, and costumes are welcome.